**EXHIBIT "I"**

THE AFFIDAVIT OF DALTON WILSON TO WHICH WAS ATTACHED HIS PREVIOUS DECLARATION IN U.S. DISTRICT COURT IS FOUND IN EXHIBIT “A” TO THIS STATEMENT OF UNDISPUTED FACTS.















**EXHIBIT "J"**

THE AFFIDAVIT OF DALTON WILSON TO WHICH WAS ATTACHED HIS PREVIOUS DECLARATION IN U.S. DISTRICT COURT IS FOUND IN EXHIBIT "A" TO THIS STATEMENT OF UNDISPUTED FACTS.

# EXHIBIT "K"

United States Department of the Interior

OFFICE OF THE SOLICITOR
Suite 6201, Federal Building
125 South State Street
Salt Lake City, Utah 84138

RECEIVED
MAIL ROOM
1999 AUG 16 P 2:52
BUREAU OF LAND MANAGEMENT
BATTLE MOUNTAIN DISTRICT

U.S. Department of the Interior 150 1849-1999

PROTECTED FROM DISCLOSURE: ATTORNEY-CLIENT COMMUNICATION, ATTORNEY WORK PRODUCT

August 13, 1999

Memorandum

To: Gerald M. Smith, Field Manager,
Battle Mountain Field Office, Bureau of Land Management

From: John Steiger, Attorney-Advisor

Subject: Simpson Park WSA Incursion Issues

By memorandum dated April 23, 1999, you asked this office to address a number of questions arising from Mr. Dalton Wilson's construction of a water diversion structure on public lands in the Simpson Park Wilderness Study Area (WSA). This memorandum memorializes our recent teleconference call in which I provided you with our views. Below is a summary of our responses to the questions as presented in the April 23 memorandum.

1. "Is Application 4613 a valid existing right because it is recognized as a valid water right in good standing by the State Engineer?"

The document to which you refer, "Application 4613," is a State of Nevada water right certificate for a 1917 appropriation. The certificate number, as assigned by the Nevada State Engineer, is 1656. This certificate is at least prima facie evidence of a valid water right. See Town of Eureka v. State Engineer, 826 P.2d 948, 951 (Nev. 1992) (stating that a "vested water right" arises "through a state permit" and "'is regarded and protected as real property'" (citation omitted)). If the water right has not been used for five consecutive years, it may be challenged through a forfeiture action pursuant to section 534.090 of the Nevada Revised Statutes (see response to question No. 7 below). However, until the successful prosecution of such an action, the BLM should consider the water right valid.

2. "Are there any construction or re-construction authorizations associated with Application 4613?"

Generally, as a matter of state water law, a water right certificate does not authorize the construction or re-construction of any facilities. See 1 W. Hutchins, Water Rights Laws in the Nineteen Western States 444 (1971) ("The water right . . . is entirely distinct from the property right in the works . . . and each may exist without the other."); see also id. 599. If

the certificate holder wishes to change his point-of-diversion from that indicated on the certificate or to modify the diversion works to divert a greater quantity of water than indicated he must apply to the State Engineer before commencing construction. To the extent that construction can be deemed maintenance or improvement not affecting the point or quantity of diversion, the water right holder probably does not need the approval of the State Engineer.

We understand that Mr. Wilson is relying on water right certificate No. 1656 to support a claim to a right-of-way (ROW) under R.S. 2339, originally enacted as section 9 of the 1866 Mining Act (codified as amended at 43 U.S.C. § 661). As an initial matter, it is important to emphasize that the state water right itself does not authorize any type of construction or re-construction: if such an "authorization" exists, it would be pursuant to the alleged R.S. 2339 ROW.

Mr. Wilson may have a R.S. 2339 ROW, but it appears that he has not provided sufficient evidence for the BLM to conclude that such a right exists or to determine its scope. The Department's position, based on ample case law, is that a R.S. 2339 ROW may be recognized only if the claimant demonstrates that the means of conveyance had been constructed and was operational when R.S. 2339 was repealed by FLPMA in 1976 (or the subject lands were withdrawn, whichever occurred first). See, e.g., Bear Lake & River Water Works & Irrig. Co. v. Garland, 164 U.S. 1, 18-19 (1896); United States v. McIntire, 101 F.2d 650, 654 (9th Cir. 1939); United States v. Utah Light & Ry. Co., 242 F. 742, 744 (D. Utah 1914); Sydner v. Colorado Gold Dredging Co., 181 F. 62, 66 (8th Cir. 1910); United States v. Rickey Land & Cattle Co., 164 F. 496, 499-500 (C.C.N.D. Cal. 1908); Mannix v. Powell Co., 243 P. 568, 569 (Mont. 1926); Verde Water & Power Co. v. Salt River Valley Water Users Ass'n, 197 P. 227, 229 (Ariz. 1921); Crane Falls Power & Irr. Co. v. Snake River Irr. Co., 133 P. 655, 660-63 (Id. 1913).

Based on the information you provided to us, the only evidence of the purported right, besides the water right certificate, are scraps of old wood in the vicinity of the point of diversion that may be the remnants of a spring box. Apparently, there is no evidence of any ditches, canals, or other diversion/conveyance structures as of 1976. We believe that this is an insufficient basis on which to conclude that a R.S. 2339 right exists.

We note that, as a general matter, even if a R.S. 2339 right exists, it would be limited to the original alignment and scope as it existed in 1976 (or when the lands were withdrawn). See, e.g., Sydner, 181 F. at 70; Hage v. United States, 35 Fed. Cl. 147, 161 (1996), citing Union Mill & Mining Co. v. Dangberg, 81 F. 73 (C.C.D. Nev. 1897); Hansen v. Galiger, 208 P.2d 1049, 1054 (Mont. 1949); White Bros. & Crum Co. v. Watson, 117 P. 497, 498-99 (Wash. 1911); Kreiger v. Pacific Gas & Electric Co., 119 Cal. App. 3d 137, 143 (1981). A R.S. 2339 ROW extends only to "maintenance and use of the ditch, substantially as then constructed, for the purpose of diverting and carrying the volume of water theretofore appropriated, and did not give any right to enlarge the ditch, or to change its location, or to use it in diverting and carrying a largely increased volume of water." Sydner, 181 F. at 70. Applying this rule, courts have held that lining an earthen ditch with gunite exceeded the scope, Kreiger, 119 Cal. App. 3d at 143-45, and converting a

ditch to a pipeline exceeds the scope, White Bros. & Crum Co., 117 P. at 479; Oliver v. Agasse, 64 P. 401 (Cal. 1901).

In addition, we note that the Department takes the position that it may regulate the exercise of a R.S. 2339 ROW so long as such regulation does not unreasonably interfere with enjoyment of the ROW. The Department's position is premised on its role as the underlying land owner and its authority to regulate private property interests on public lands pursuant to the Federal Land Policy and Management Act of 1976 (43 U.S.C. §§ 1701 et seq.) (FLPMA). Cf. Adams v United States, 3 F.3d 1254, 1258 n.1 (9th Cir. 1993) (stating that a R.S. 2477 ROW is subject to reasonable Forest Service regulations), citing United States v. Vogler, 859 F.2d 638, 642 (9th Cir. 1988), cert. denied, 488 U.S. 1006 (1987).

In sum, Mr. Wilson, in our opinion, has not demonstrated that he has unilateral authority to construct the diversion structure and pipeline associated with water right certificate No. 1656.

3. "What is the appropriate mechanism to authorize the diversion structure and pipeline, and how much authority does BLM have in deciding where and how these structures should be built?"

In light of the foregoing, the appropriate mechanism for approving these facilities is that provided for obtaining a right-of-way permit under Title V of FLPMA and its implementing regulations. The BLM would need to assure that any permit issued is consistent with the Interim Management Policy for Land Under Wilderness Review. The BLM would have the same authority in approving, denying, or conditioning the permit as it has in considering any Title V application within a WSA.

4. "Should the water be diverted by means of a small earth and rock dam, and conveyed to the land to be irrigated by means of ditches and laterals as described in Application 4613, or can different construction techniques be used?"

Again, in light of the foregoing, this is a question best answered through the FLPMA Title V process. The means of diversion and conveyance indicated in water right certificate No. 1656 does not bind the BLM. If the BLM's needs conflict with those means, the burden is on the water right holder to obtain the State Engineer's approval of the facilities the BLM is willing to authorize, if necessary (see the response to question No. 1).

5. "If FLPMA rights-of-way are required to construct the diversion structures and pipeline, is the existing rubber-tire dam a FLPMA trespass?"

Based on the information provided to this office, we believe that a trespass notice is justified.

6. "The description of land to be irrigated in Application 4613 includes 80 acres of public land. How should this issue be addressed?"

The water right certificate itself cannot be read to give the holder the right to irrigate public land. To the extent that the certificate evidences a R.S. 2339 ROW, the Supreme Court has said that R.S. 2339 recognizes not only a ROW for ditches and canals, but protects the right to use water for mining and agricultural purposes on public land. Jennison v. Kirk, 98 U.S. 453, 456-57, 460-61 (1876). However, we know of no case where it has been held that R.S. 2339 provides a right to use public lands, i.e., to irrigate certain acreage.[1] In any event, as discussed above, we do not think that Mr. Wilson has made the threshold showing that he has a R.S. 2339 ROW.

7. "Should the BLM request forfeiture of Application 4613 and file to appropriate the water now associated with Application 4613?"

At this point, we see no immediate need to request the State Engineer to find the subject water right forfeited. Should Mr. Wilson provide additional information sufficient to make a colorable R.S. 2339 claim, this alternative might be warranted. Forfeiture of the water right most likely would result in relinquishment of the alleged R.S. 2339 ROW. However, be aware that the Nevada Supreme Court has held that a forfeited right can be "cured" by resuming substantial use of the right before a forfeiture proceeding has begun. Town of Eureka, 826 P.2d at 952. Mr. Wilson's recent construction of the diversion structure may be sufficient to defeat a forfeiture action.

With respect to filing to appropriate the water now associated with certificate No. 1656, we do not understand what the BLM would hope to achieve in undertaking such action. If the BLM needs the water for a beneficial use, it should file to appropriate it.

---

[1] The court of claims in Hage v. United States, 42 Fed. Cl. 249, 250 (1998), preliminarily ruled that a R.S. 2339 ROW for grazing purposes supports a limited forage right, but this is not a final decision and is contrary to well-established case law. For example, the Tenth Circuit in Diamond Bar Cattle Co. v. United States, 168 F.3d 1209 (10th Cir. 1999), found that this theory "is contrary not only to the language of [R.S. 2339] itself, which simply recognizes the use of water, but also to the well-settled body of law holding no private right exists to graze public lands." Id. at 1215. The court stated that R.S. 2339 "cannot fairly be read to recognize private property rights in federal lands, regardless whether proffered as a distinct right or as an inseparable component of a water right," and that "[v]irtually every attempt" to persuade a court to do so "has been soundly rejected." Id. See also, e.g., Hunter v. United States, 388 F.2d 148, 153-54 (9th Cir. 1967) (rejecting the argument that a water right for grazing cattle includes an appurtenant right to forage in the vicinity of the water); Clearly v. Skiffich, 65 P. 59, 62-63 (Colo. 1901) (holding that, under the 1866 Mining Act, an owner of a vested water right for purposes of mill operation had the right to use water and a ditch to divert the water, but did not have the right to the land on which the mill was situated); Thomas Ormachea, et al., 73 I.D. 339, 346 (1966) (recognizing and applying the Department's earlier holding that state "water rights do not vest in the holder thereof any right to graze livestock in the areas serviced by his waters where land is the base for granting privileges"), following M.P. Depaoli and Sons, I.G.D 552 (1951), and William Sellas, I.G.D. 677 (1958).

The Field Solicitor has reviewed and concurs in the conclusions of this memorandum. If you have any questions, please call me at 801-524-5677 ext. 233.

John Steiger
Attorney-Advisor

cc: Deputy State Director, Natural Resources, Lands & Planning