IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNDERWOOD LIVESTOCK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 05-162 L |
| | ) | |
| v. | ) | Judge Mary Ellen Coster Williams |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

KATHLEEN L. DOSTER
HELENANNE LISTERMAN
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0481 (phone)
(202) 305-0506 (fax)
Kathleen.Doster@usdoj.gov

Of Counsel:
JAMES KARKUT
United States Department of the Interior
Office of the Regional Solicitor
Suite 6201, Federal Building
125 South State Street
Salt Lake City, Utah 84138

# TABLE OF CONTENTS


DEFENDANT'S MOTION FOR SUMMARY . . . . . . . . . . 1

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . 3

I. INTRODUCTION . . . . . . . . . . 3

II. BACKGROUND . . . . . . . . . . 5

A. Water Certificate 1656 and the Brackney Water Diversion Structure . . . . . . . . . . 5

B. The Wilson Water Diversion Structure . . . . . . . . . . 7

C. The Interior Board of Land Appeals Decision . . . . . . . . . . 9

III. ARGUMENT . . . . . . . . . . 11

A. Summary Judgment Standard . . . . . . . . . . 11

B. Plaintiff Does Not Have Standing to Sue For the Alleged Taking . . . . . . . . . . 12

C. Plaintiff Has Failed to Allege a Taking of a Legally Compensable Property Interest . . . . . . . . . . 13

1. The IBLA Decision Collaterally Estops Plaintiff From Re-Litigating the Issue of Whether it Held a Valid Right-of-Way That Entitled It to Construct a Water Diversion Structure . . . . . . . . . . 15

2. Even If Plaintiff Held a Valid 1866 Act Right-of-Way, Dalton Wilson Had No Right to Build a New Water Diversion Structure Without BLM Authorization . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . 26

## TABLE OF AUTHORITIES

### CASES


Adams v. United States,
3 F.3d 1254 (9th Cir. 1993) . . . . . . . . . . 20, 23

Air Pegasus of D.C., Inc. v. United States,
424 F.3d 1206 (Fed. Cir. 2005) . . . . . . . . . . 12

American Pelagic Fishing Co. v. United States,
379 F.3d 1363 (Fed. Cir. 2004) . . . . . . . . . . 14, 16

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 12

Andrus v. Charlestone Stone Prods. Co.,
436 U.S. 604 (1978) . . . . . . . . . . 20

Aulston v. United States,
823 F.2d 510 (Fed. Cir. 1987) . . . . . . . . . . 16

Austin Fed. Savings & Loan Ass'n v. Solimino,
501 U.S. 104 (1991) . . . . . . . . . . 19

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 11

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . 15

Conti v. United States,
291 F.3d 1334 (Fed. Cir. 2002) . . . . . . . . . . 14, 15

Danforth v. United States,
308 U.S. 271 (1939) . . . . . . . . . . 12

Elko County Bd. of Supervisors v. Glickman,
909 F. Supp. 759 (D. Nev. 1995) . . . . . . . . . . 21, 24

FW/PBS, Inc. v. City of Dallas,
493 U.S. 215 (1990) . . . . . . . . . . 12

Hafen v. United States,
30 Fed. Cl. 470 (1994) . . . . . . . . . . 16

Hage v. United States,
51 Fed. Cl. 570 (2002) . . . . . . . . . . 23

Hunt v. United States,
52 Fed. Cl. 810 (2002) . . . . . . . . . . 19

Jenison v. Kirk,
98 U.S. 453 (1878) . . . . . . . . . . 21

Klump v. United States,
38 Fed. Cl. 243 (1997) . . . . . . . . . . 18

Kneiper v. United States,
38 Fed. Cl. 128 (1997) . . . . . . . . . . 12

Kroeger v. U.S. Postal Serv.,
865 F.2d 235 (Fed. Cir. 1988) . . . . . . . . . . 18

Lakewood Assocs. v. United States,
45 Fed. Cl. 320 (1999) . . . . . . . . . . 17

Maritrans v. United States,
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . 15

Montana v. United States,
440 U.S. 147 (1979) . . . . . . . . . . 17

Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,
723 F.2d 1566 (Fed. Cir. 1983) . . . . . . . . . . 18

Penn Central Transportation Co. v. City of New York,
438 U.S. 104 (1978) . . . . . . . . . . 15

Snyder v. Colorado Gold Dredging Co.,
181 F. 62 (8th Cir. 1910) . . . . . . . . . . 21

Southern Utah Wilderness Alliance v. Bureau of Land Management,
425 F.3d 735 (10th Cir. 2005) . . . . . . . . . . 21, 22

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Thomas v. Gen. Servs. Admin.,
794 F.2d 661 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States v. Dow,
357 U.S. 17 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Gates of the Mountains Lakeshore Homes,
732 F.2d 1411 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. General Motors Corp.,
323 U.S. 373 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Utah Construction and Mining Co.,
384 U.S. 394 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Vogler,
859 F.2d 638 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Utah Power & Light Co. v. United States,
243 U.S. 389 (1917) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Ware v. United States,
57 Fed. Cl. 782 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Wyatt v. United States,
271 F.3d 1090 (Fed. Cir. 2001), cert. denied, 122 S. Ct. 1960 (2002) . . . . . . . . . . . . . . . 15

**STATUTES**

28 U.S.C. § 1491(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

43 U.S.C. § 1701 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 21

43 U.S.C. § 1732(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

43 U.S.C. § 1761(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22

43 U.S.C. § 661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

43 U.S.C. § 932 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**REGULATIONS**

70 Fed. Reg. 20970 (Apr. 22, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

43 C.F.R. Part 2800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

43 C.F.R. Subpart 2808 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

43 C.F.R. § 2801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

43 C.F.R. § 2801.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

43 C.F.R. § 2801.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

43 C.F.R. § 2801.9(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

43 C.F.R. § 2808.11(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**OTHER AUTHORITIES**

Dalton Wilson, Don Bowman, 156 IBLA 89 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## EXHIBIT LIST

| Exhibit No. | Exhibit Description |
|---|---|
| A | Excerpts of Dalton Wilson Deposition, dated February 27, 2002 |
| B | Letter dated October 5, 1998 to Dalton Wilson from Gerald M. Smith |
| C | IBLA Decision dated December 14, 2001 (156 IBLA 89) |
| D | Plaintiff's Response to Defendant's First Set of Requests for Admission, Interrogatories and Production of Documents |
| E | Declaration of Dalton Wilson |
| F | Defendant's Responses to Plaintiff's First Set of Requests For Admissions |
| G | The State of Nevada Certificate of Appropriation of Water dated June 17, 1930 |
| H | Affidavit of Labor Improvements, dated April 14, 1919 |
| I | Declaration of Gail Givens |
| J | Patent, dated February 19, 1924 |
| K | Lease Agreement with Option to Purchase |
| L | Excerpts of Deposition of Dan Bowman, dated February 26, 2002 |
| M | Trustee's Deed Upon Sale |
| N | Complaint in Don Bowman and Dalton Wilson v. Bruce Babbitt, et al. (USDC Nev.) |
| O | Judgment in Don Bowman and Dalton Wilson v. Bruce Babbitt, et al., CV-N-00-506-HDM (RAM), dated August 29, 2003 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNDERWOOD LIVESTOCK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 05-162 L |
| | ) | |
| v. | ) | Judge Mary Ellen Coster Williams |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States of America, respectfully moves for summary judgment on the basis that plaintiff did not obtain an interest in the subject property until 2002. Thus, plaintiff does not have standing to sue because it did not acquire any interest in the subject property until almost two years after the alleged date of taking.

In addition, assuming plaintiff does have standing to sue, plaintiff has failed to allege a taking of a legally compensable property interest. Plaintiff contends that it acquired a pre-existing right-of-way across federal land pursuant to the Act of July 26, 1866 ("1866 Act"), ch. 262, § 9, 14 Stat. 253, codified at 43 U.S.C. § 661, repealed in part by Federal Land Policy and Management Act, Oct. 21, 1976, 90 Stat. 2793 ("FLPMA"), which entitled it to build a new water diversion structure in 1998, without authorization by the Department of the Interior, Bureau of Land Management ("BLM"). However, an Interior Board of Land Appeals ("IBLA") decision by an Administrative Law Judge has already found that Dalton Wilson, the owner of plaintiff Underwood Livestock, Inc., did not hold a pre-existing right-of-way at the time of the alleged taking, thereby precluding plaintiff's takings claim in this Court.

Moreover, even assuming that this Court finds that plaintiff held a valid 1866 Act right-of-way, plaintiff has still failed to allege a taking of a legally compensable property interest because the scope of an 1866 Act right-of-way does not include the type of new construction plaintiff engaged in here. Indeed, plaintiff is essentially seeking a ruling from this Court that the scope of an 1866 Act ditch right-of-way includes the right to engage in new construction, without authorization from BLM, of a substantially different water diversion structure than what had been constructed when the water right to which the right-of-way is appurtenant vested. Since, as a matter of law, the scope of an 1866 Act right-of-way does not include this right, plaintiff's Fifth Amendment takings claim must fail.

Accordingly, for all of these reasons, defendant's motion for summary judgment should be granted. A brief in support of this motion follows.

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION[1]

Dalton Wilson is the President of Plaintiff Underwood Livestock, Inc. ("Underwood"),[2] a Nevada Corporation formed in 1989. Amended Complaint, ¶¶ 1, 7 ("Amend. Compl."). In or around 1998, Mr. Wilson, on behalf of Mr. Don Bowman,[3] hauled nineteen heavy equipment tires into and adjacent to a stream in Underwood Canyon, on BLM-managed public lands, in order to construct a water diversion structure ("Wilson Water Diversion Structure"). See Def. Ex. B at p. 1. The diversion structure "consist[ed] of an earthen dam, reinforced with 19 stacked heavy equipment rubber tires, about 69 feet in length, crossing the creek that flows down Underwood Canyon, . . . virtually impounding the water." Dalton Wilson, Don Bowman, 156 IBLA 89, 90 (2001) (attached for the Court's convenience at Def. Ex. C). Plaintiff admits that at

---

[1] Unless otherwise indicated, plaintiff's factual allegations contained in the Amended Complaint are assumed to be true solely for purposes of this motion. In addition, the declarations and deposition transcripts cited in this brief were prepared and taken in connection with the lawsuit Don Bowman & Dalton Wilson v. Bruce Babbitt, et al., CV-N-00-0506-HDM (D. Nev. Sept. 26, 2000). See infra p. 11.

[2] Throughout this motion, Dalton Wilson and Plaintiff Underwood Livestock, Inc. are sometimes used interchangeably. Mr. Wilson is the owner and President of Underwood Livestock, Inc., and is its only employee. See Amend. Compl. at p. 1; Def. Ex. A (Dalton Wilson Deposition ("Wilson Dep.") at pp. 13-14). However, it should be emphasized that Mr. Wilson is not a plaintiff in this litigation.

[3] Mr. Bowman is not a party to this litigation. However, as discussed infra Part II, at the time of the alleged taking, Mr. Bowman purportedly orally leased 80 acres of fee land, water rights, and any accompanying rights-of-way to Mr. Wilson, which plaintiff contends entitled it to build a water diversion structure on BLM-managed lands.

no time prior to the construction of the Wilson Water Diversion Structure did it seek authorization from the BLM. Def. Ex. D at pp. 8-9 (Pl.'s Resp. to Request for Admission ("RFA") No. 7). In fact, BLM only became aware of the structure after the Nevada Department of Wildlife reported seeing a bulldozer in Underwood Canyon. Def. Ex. C (156 IBLA at 90).

Between October 5, 1998 and January 27, 2000, after the new construction was discovered, BLM encouraged Mr. Wilson and Mr. Bowman to seek a "right-of-way pursuant to Title V of FLPMA . . . that would authorize some manner of impoundment of the surface waters of the creek in Underwood Canyon and their conveyance to the appurtenant private lands owned by" Mr. Bowman. Def. Ex. C (156 IBLA at 91). Plaintiff does not dispute that it chose not to seek a right-of-way authorization from BLM because it "felt none was needed." Def. Ex. A (Wilson Dep. at p. 95). BLM disagreed and subsequently made an administrative determination that the water diversion structure was constructed in trespass. See Def. Ex. C (156 IBLA at 89). Mr. Bowman and Mr. Wilson appealed the trespass decision to the IBLA. Id. In September 2000, BLM removed the tire dam. Def. Ex. F at pp. 7-8 (Def.'s Resp. to RFA No. 12). On December 14, 2001, the IBLA held that neither Mr. Bowman nor Mr. Wilson held a valid 1866 Act right-of-way that supported the construction of the Wilson Water Diversion Structure, and therefore, since neither Mr. Bowman nor Mr. Wilson had a right-of-way permit, the water diversion structure was constructed in trespass in violation of 43 C.F.R. § 2801.3.[4/] Def. Ex. C (156 IBLA at 98-99).

Thus, it is clear that plaintiff does not have a valid 1866 Act right-of-way to support its

---

[4/] BLM's current trespass regulations are found at 43 C.F.R. Part 2800, Subpart 2808.

takings claim. Further, assuming for purposes of this motion that plaintiff does hold a valid 1866 Act right-of-way, plaintiff's actions fall outside the scope of an 1866 Act right-of-way.

## II. BACKGROUND

### A. Water Certificate 1656 and the Brackney Water Diversion Structure

In 1917, Thomas Brackney applied to the Nevada State Engineer, Division of Water Resources, for a permit ("Permit 4613"), to appropriate water from Underwood Canyon. See Def. Ex. G at p. 2. Mr. Brackney amended his application for Permit 4613 on December 5, 1917. Id. The amended application indicated that "[w]ater will be diverted by means of small earth and rock dam, and conveyed to the land to be irrigated by means of ditches, and laterals." Id. at p. 3. The State Engineer approved Permit 4613 as amended on February 25, 1919. Id.

On or about April 16, 1919, Mr. Brackney submitted an Affidavit of Labor and Improvements for Permit 4613 to the State Engineer. Def. Ex. H. In that Affidavit, Mr. Brackney affirmed that he developed his water right represented by Permit 4613, among other things, by making improvements, consisting of an "[e]arth dam constructed at about NE corner Section 6, T. 22 N., R. 48 E., and ditch constructed through said section approximately to SE ½ of NW ¼ Section 12, T. 22 N., R. 47 E. ("Brackney Water Diversion Structure")." Id. Sometime in the 1920s, a pipeline was installed in part of the ditch.[5] See Def. Ex. I (Gail Givens Declaration ("Givens Decl.") at ¶4). On June 17, 1930, the State Engineer issued a Certificate of Appropriation of Water (No. 1656) to Mr. Brackney, signifying that Permit 4613 had been

---

[5] Mr. Wilson testified during his deposition that the pipeline was operational through the 1940s, but does not have any knowledge of it being used after that. See Def. Ex. A (Wilson Dep. at pp. 36-37).

developed to the extent that it was a vested water right. Def. Ex. G at p. 1.

On or about February 19, 1924, the United States issued a patent to Mr. Brackney under the Act of Congress of May 20, 1862 (a homestead act), for 80 acres of land described as the "south half of the northwest quarter of Section twelve in Township twenty-two north of Range forty-seven east of the Mount Diablo Meridian, Nevada, containing eighty acres . . . ." Def. Ex. J.

Mr. Wilson contends that he purchased this land in 1980 and the land "has an appurtenant Nevada water right being water right Certificate 1656." Def. Ex. E (Wilson Decl. at ¶ 6). In 1989, the 80 acres of land and Certificate 1656 were foreclosed upon and acquired by Western Farm Credit Bank. Id. at ¶¶ 21-22. Mr. Wilson's friend, Don Bowman, acquired the land and Certificate 1656 from Western Farm Credit Bank in or around 1994. Id. at ¶¶ 22-23. On May 20, 1994, Mr. Bowman and Mr. Wilson (not Underwood Livestock, Inc.) entered into a two-year lease agreement with an option to purchase the land and water rights described in the lease agreement. Def. Ex. D at p. 7 (Pl.'s Resp. to RFA No. 4); Def. Ex. K. Although the lease agreement was set to expire on May 20, 1996, and Mr. Bowman and Mr. Wilson did not extend the lease agreement in writing, Mr. Wilson contends that he and Mr. Bowman orally extended the lease agreement, and Underwood Livestock, Inc. purchased the property on or about April 4, 2002. See Def. Ex. D at p. 8 (Pl.'s Resp. to RFA No. 6); Def. Ex. A (Wilson Dep. at pp. 40-41); Def. Ex. L (Don Bowman Deposition ("Bowman Dep." at pp. 23-24). Plaintiff subsequently lost the property by default in June 2005. See Def. Ex. M.

### B. The Wilson Water Diversion Structure

By 1998, "scraps of old wood, which might be remnants of the spring box," and a pipeline that appears to have "been abandoned for at least 10 years . . . [with] small aspen trees growing through the metal[,]" were the only things that remained of the Brackney Water Diversion Structure. Def. Ex. C (156 IBLA at 98 n.12) (internal quotations and citations omitted); see also Def. Ex. B at p. 2; Def. Ex. I (Givens Decl. at ¶ 4). Around this time, Mr. Wilson constructed a new water diversion structure in the general area of the Brackney Water Diversion Structure, consisting of nineteen heavy equipment tires in Underwood Canyon on BLM-administered land in the NE1/4 of Section 7, Township 22 North, Range 48 East, Mount Diablo Meridian, in Underwood Canyon, Lander County, Nevada. Def. Ex. C (156 IBLA at 90). Mr. Wilson used an "old military four-by-four" to haul the tires three at a time onto BLM-administered land to build the dam. Def. Ex. A (Wilson Dep. at p. 80). He then "took a 933 [CAT] loader, crawler loader in there with a front-bucket on it and back grippers on it [and] installed the dam, just within 20 feet[6] below the original [Brackney] structure [downstream]." Id. Mr. Wilson chose the alternative location because "[i]t was narrower, plus there was a big chokecherry tree and a bunch of willows growing . . . ." Id. at p. 81. Mr. Wilson also chose to

---

[6] Defendant believes that the Wilson Water Diversion Structure was built more than 20 feet away from the Brackney Water Diversion Structure, but will assume plaintiff's assertion as true for purposes of this motion. See Def. Ex. I (Givens Decl. at ¶ 3) (finding that the Wilson Water Diversion Structure was built 46 feet away from the place where an old board and piece of metal were found and 377 feet from the original point of diversion described in Application No. 4613). The exact distance does not need to be decided for purposes of this motion since it is undisputed that the Brackney and Wilson diversion structures are separate structures, one built before, and one built after, the revision of the 1866 Act in 1976, and one built as a "small earthen dam" and the other built with nineteen heavy equipment tires.

use heavy equipment tires, instead of replicating the Brackney Water Diversion Structure, because he wanted to prevent the wash out of the dam from weather and floods (similar to what happened to the original dam), and believed that the tires were "foolproof and indestructible, other than fire. It don't rot. It don't deteriorate. It don't crack." Id. at p. 92.

Mr. Wilson used the 933 CAT loader to excavate the area where the tires were placed, and then "packed each layer with earth and worked all of the earth into the center of the tires so they was solid." Id. at p. 88. Mr. Wilson continued:

> So I had these all packed, and I put earth over the top of them. And then I picked this tire up from the bottom of the bucket. And when I jammed that tire with that bucket with the weight of that 933 in there, it shut the flow of water off. And I immediately had some dirt already set up here, some rock fill and stuff that I had already - - was all ready for it. When I jammed that into that water to the level of these other two, I immediately went to bucket and fill into it, and we get on it with a bar and worked that gravel and stuff until we sealed the water, until the water all come over the tire. And then we backfilled in again these tires and cleaned the rest of the fill up that we had excavated.

Id. at pp. 88-89.

Mr. Wilson admits that he did not seek authorization from BLM to build the water diversion structure, or to use a CAT loader in the area, because he "felt none was needed." Def. Ex. A (Wilson Dep. at p. 95). Mr. Wilson contends that he did not need authorization to construct this new water diversion structure because he had a pre-existing right-of-way that entitled him to construct a new water diversion structure in 1998. Id.

However, plaintiff fundamentally misunderstands the scope of a right-of-way established pursuant to the Act of 1866. "When Congress revised the 1866 Act, effective Oct. 21, 1976, it precluded the creation of new rights-of-way under that statute after that date. After that time, the

[Federal Land Policy and Management Act of 1976 ("FLPMA"), as amended, 43 U.S.C. § 1701, et seq.] was the only authority for granting a diversion." Def. Ex. C (156 IBLA at 97 n.10). Even assuming that plaintiff could establish that the 1866 Act right-of-way that was attached to Certificate 1656 had not lapsed by 1976 when FLPMA was enacted, plaintiff had no right to construct a substantially different water diversion structure at a different location, from what was originally allowed under the right-of-way. The undisputed facts, described above, show that Mr. Wilson constructed an entirely new and substantially different (albeit improved) water diversion structure to replace the washed out and unusable Brackney Water Diversion Structure. As described infra Part II.C., plaintiff had no right to construct this water diversion structure without authorization from BLM.

**C. The Interior Board of Land Appeals Decision**

On March 8, 2000, as a result of the unauthorized construction of the Wilson Water Diversion Structure, Mr. Wilson and Mr. Bowman were advised that trespass proceedings against them had begun, pursuant to 43 C.F.R. § 2801.3.[7] Id. at 91. On April 10, 2000, BLM issued a final decision that the construction of the Wilson Water Diversion Structure constituted a trespass on public land, requiring Mr. Wilson and Mr. Bowman to pay trespass damages and to cease the trespass. Id. at 89, 92. After Mr. Wilson refused to resolve the trespass, BLM removed

---

[7] 43 C.F.R. § 2801.3(a) was properly adopted under the authority of the FLPMA, 43 U.S.C. 1701, et seq. 43 C.F.R. 2801.3 stated: "Any use, occupancy, or development of the public lands that requires a right-of-way, temporary use permit, or other authorization pursuant to the regulations of that part and that has not been so authorized, or that is beyond the scope and specific limitations of such an authorization, or that causes unnecessary or undue degradation, is prohibited and shall constitute a trespass . . . ." BLM's trespass regulations are now found at 43 C.F.R. Part 2800, Subpart 2808.

the water diversion structure on or about September 26, 2000. See Def. Ex. F at p. 7 (Def.'s Resp. to RFA No. 12); 43 C.F.R. § 2808.11(a)(3) ("If you do not rehabilitate and restore the lands and resources within the time frame set by BLM in the [trespass] notice, you will be liable for the costs the United States incurs in rehabilitating and restoring the lands and resources.").

Mr. Wilson and Mr. Bowman appealed BLM's final decision to the Interior Board of Land Appeals ("IBLA"), where they argued – as they do here – that they were not required to obtain authorization from BLM to construct the Wilson Water Diversion Structure since they had a pre-FLPMA right-of-way established under local customs and laws. Def. Ex. C (156 IBLA at 93). The IBLA held on December 14, 2001, that it had found no evidence in the record that appellants "hold an R.S. 2339 right-of-way[8] that supports the construction of the [Wilson Water Diversion Structure]. . . . It is clear from the record that the only structures that had ever been erected for use incident to exercise of [Certificate 1656] were a spring box and pipeline. *Thus it does not appear that appellants' predecessors-in-interest ever had an R.S. 2339 right-of-way that would have entitled them to maintain a water diversion/impoundment structure of the size or effectiveness at issue here.*" Def. Ex. C (156 IBLA at 97) (emphasis added) (footnote omitted).

Accordingly, Mr. Wilson and Mr. Bowman failed to establish that they held a pre-existing right-of-way that would entitle them to build a water diversion structure:

> We conclude that BLM properly determined in its April 2000 Trespass Decision, under 43 CFR 2801.3, that the [Wilson] water diversion structure at issue here was constructed and is being maintained in trespass on the public lands, and that, consequently, Wilson, who had erected the structure, and Bowman, on whose

---

[8] This is another name for a Section 9 1866 Act right-of-way. R.S. 2339 refers to the Revised Statute section where it was once codified.

> behalf the structure was erected, are appropriately deemed to be jointly and severally liable for the trespass damages, in the amount of the administrative costs of investigating and terminating the trespass. Further, we find that BLM was entitled to require that arrangements be made for removal of the [Wilson Water Diversion] structure and rehabilitation of the affected lands.

Id. at 98-99 (internal citations omitted).

Neither Mr. Wilson nor Mr. Bowman appealed the IBLA decision. However, on September 26, 2000, Mr. Wilson and Mr. Bowman filed the lawsuit captioned Don Bowman & Dalton Wilson v. Bruce Babbitt, et al., CV-N-00-0506-HDM (D. Nev. filed Sept. 26, 2000), in which they alleged causes of action under the Mining Act of 1866, FLPMA, the Declaratory Judgment Act, the Quiet Title Act, and the Fifth and Fourteenth Amendments of the U.S. Constitution. See Def. Ex. N. In essence, they alleged that they owned a right-of-way across public land that was free from BLM regulation. Id. On August 29, 2003, the court dismissed plaintiff's Quiet Title Act claim, and granted the United States' motion for summary judgment as to all other claims. Def. Ex. O.

## II. ARGUMENT

### A. Summary Judgment Standard

Summary judgment is a "salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotation marks omitted). In this regard, the summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the 'just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317,

327 (1986) (quoting Fed. R. Civ. P. 1).

Summary judgment is appropriate under Rules of the Court of Federal Claims ("RCFC") 56 when there are no genuine issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude entry of summary judgment." Anderson, 477 U.S. at 248-49; see also Kneiper v. United States, 38 Fed. Cl. 128, 134 (1997) ("Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment.").

**B. Plaintiff Does Not Have Standing to Sue For the Alleged Taking**

Plaintiff, Underwood Livestock, Inc., has the burden to demonstrate that it is the "proper party to invoke judicial resolution of the dispute." FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990). If plaintiff fails to allege facts necessary to show jurisdiction, it has no standing to sue. See id. In a takings case, the "proper party to invoke judicial resolution" is the owner of the property interest at the time of the alleged taking. Id.; see United States v. Dow, 357 U.S. 17, 20 (1958) (". . . it is undisputed that '[since] compensation is due at the time of the taking, the owner at that time, not the owner at an earlier or later date, receives the payment.'" (quoting Danforth v. United States, 308 U.S. 271, 284 (1939))); Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1215 (Fed. Cir. 2005) (claimant "must, at a minimum, assert that *its* property interest was actually taken . . .") (citing United States v. General Motors Corp., 323 U.S. 373, 379 (1945)) (italics in original).

Plaintiff appears to contend that the date of the alleged taking was May 10, 2000, the date on which BLM instructed Mr. Wilson and Mr. Bowman to "arrange for the satisfactory removal of the dam by May 10, 2000 or face additional trespass penalties. . ." Amend. Compl. at ¶ 10, p. 1 (seeking just compensation from May 10, 2000 to the present). However, plaintiff also appears to view the date when BLM removed the Wilson Water Diversion Structure as the date on which plaintiff's property was allegedly taken. See id. at ¶ 11, p. 6 (seeking "damages in excess of $300,000.00 with interest thereon from September 25, 2000[9] at the legal rate"). As a result, plaintiff must show that it had a compensable property interest on May 10, 2000, or September 25, 2000, in order to have standing to sue for the taking alleged in plaintiff's Amended Complaint.

Plaintiff will be unable to do this because in 2000, Mr. Wilson, and not Underwood Livestock, Inc., leased fee property and water rights (with any accompanying valid, existing rights-of-way), from Mr. Bowman. Def. Ex. K. A copy of the lease clearly shows that on May 20, 1994, Mr. Bowman and Mr. Wilson (not Underwood Livestock, Inc.), entered into a two-year lease agreement with an option to purchase land and water rights. Def. Ex. K. It is undisputed that Mr. Bowman and Mr. Wilson did not extend the lease agreement in writing, but according to Mr. Wilson's and Mr. Bowman's deposition testimony, they orally extended the lease agreement past the two-year expiration date. See Def. Ex. A (Wilson Dep. at pp. 40-41); Def. Ex. L (Bowman Dep. at pp. 23-24). It was not until April 2002, almost two years after the date of

---

[9] BLM removed the tire dam on September 26, 2003. See Def.'s Ex. F at p. 7 (Def.'s Resp. to RFA No. 12).

alleged taking, that Underwood Livestock, Inc. purchased the property described in the lease agreement. See Amend. Compl. ¶ 7. Accordingly, it does not appear that Underwood Livestock, Inc. had any interest in the water right or right-of-way at issue in this case at the time of the alleged taking, and therefore, does not have standing to sue. Thus, defendant's motion for summary judgment should be granted.

### C. Plaintiff Has Failed to Allege a Taking of a Legally Compensable Property Interest

Even assuming plaintiff does have standing to sue, plaintiff will be unable to show that it had a valid 1866 Act right-of-way that entitled it to construct the type of water diversion structure at issue here.[10] Otherwise, if it did not, beginning on October 21, 1976 (the date Congress repealed in part the 1866 Act), plaintiff was required to seek a right-of-way or other authorization from BLM, pursuant to Title V of FLPMA and its implementing regulations, to construct the water diversion structure. See 43 U.S.C. § 1761(a). If a plaintiff cannot establish a "legally cognizable property interest, the court's task is at an end." American Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (citation omitted); Conti v. United States,

---

[10] In addition to plaintiff's allegations regarding the seizure of its water diversion structure, plaintiff also appears to contend that BLM has taken its water right by fencing the area around where the water diversion structure was installed in order to avoid additional damage to the area by livestock. See Amend. Compl. at ¶¶ 12-13; see Def. Ex. F at pp. 7-8 (Def.'s Resp. to RFA No. 12) ("Following the removal of the dam, BLM installed a small fence around the area to prevent livestock from eating and trampling the riparian area; the fence does not 'prohibit entrance to that area by anyone.'"). Since plaintiff will be unable to show that plaintiff has been denied access to its water (assuming plaintiff has a right to the water pursuant to Certificate 1656), as a result of the fence, plaintiff's allegations regarding the fencing do not bolster plaintiff's takings claim. Moreover, the IBLA held that BLM had the right to rehabilitate the federal lands affected by plaintiff's trespass, since plaintiff refused to do so. See Def. Ex. C (156 IBLA at 99).

291 F.3d 1334, 1339 (Fed. Cir. 2002) ("[I]f a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in Penn Central [Transportation Co. v. City of New York, 438 U.S. 104 (1978)]").

As a matter of law, in every Fifth Amendment takings case the issue of whether the plaintiff possesses a compensable property interest is a threshold element of plaintiff's claim. See Maritrans v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003) ("First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment.") (citation omitted); Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003).[11/] In determining the nature and scope of a plaintiff's alleged property interest, the Federal Circuit, following Supreme Court precedent, has repeatedly emphasized that,

> [t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking. Lucas [v. South Carolina Coastal Council], 505 U.S. [1003, 1030 (1992)].

Maritrans, 342 F.3d at 1352; see also Conti, 291 F.3d at 1340.

Therefore, the Court must determine whether plaintiff's claimed property right is a legally compensable property interest based on "background principles" derived from state, federal, or

---

11/ The question of whether plaintiff has a compensable property interest presents "a question of law based on factual underpinnings." Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 535 U.S. 1077, 122 S. Ct. 1960 (2002).

common law. Stated another way, the Court must determine whether plaintiff's claimed property right is "a stick in the bundle of property rights" possessed by the plaintiff. American Pelagic, 379 F.3d at 1376; M&J Coal Co. v. United States, 47 F.3d 1148,1153 (Fed. Cir. 1995) (noting that the "threshold inquiry before the court must be to inquire into the nature of the land owner's estate to determine *whether the use interest proscribed by the governmental action was part of the owner's title to begin with, i.e., whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner*") (emphasis added) (citing Lucas, 505 U.S. at 1029).

As defendant's motion makes clear, plaintiff will be unable to show either that (1) plaintiff had a valid 1866 Act right-of-way, or (2) assuming that plaintiff can show that it had such right-of-way, the scope of the 1866 Act right-of-way entitled it to build a new, substantially different, water diversion structure without authorization from BLM.

1. The IBLA Decision Collaterally Estops Plaintiff From Re-Litigating the Issue of Whether it Held a Valid Right-of-Way That Entitled It to Construct a Water Diversion Structure

The jurisdiction of this Court to hear plaintiff's takings claim is premised upon the Tucker Act, 28 U.S.C. § 1491(a)(1). This Court has recognized that its jurisdiction does not extend to reviewing administrative decisions, such as the IBLA decision in this case. See Aulston v. United States, 823 F.2d 510, 513 (Fed. Cir. 1987) ("Although judicial review of the IBLA determination is not precluded, Congress has vested review in the district courts, not in the Claims Court."); Ware v. United States, 57 Fed. Cl. 782, 786, n. 3 (2003) ("In contrast to the district court, this Court has no power under the APA to review the type of agency action at issue here."); see also Hafen v. United States, 30 Fed. Cl. 470, 474 (1994) ("[T]he IBLA decision

exhausts plaintiff's remedies and constitutes a final agency decision.").

Here, the IBLA had already determined that plaintiff did not hold a valid pre-existing 1866 Act right-of-way. Def. Ex. C (156 IBLA at 97) ("Appellants have made no effort to show that they hold an R.S. 2339 right-of-way that supports the construction of the water impoundment here. Nor do we find evidence in the record so showing."). Accordingly, plaintiff cannot re-litigate this issue before the Court of Federal Claims. Nor may plaintiff ask the Court of Federal Claims to review the IBLA's decision.

It is a bed-rock principle that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979) (citations omitted). Collateral estoppel, also referred to as issue preclusion, "operate[s] to prevent the relitigation of a claim or issue that has already had its day in court." Lakewood Assocs. v. United States, 45 Fed. Cl. 320, 335 (1999). Simply put, "[t]o preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana, 440 U.S. at 153-54.

As the Federal Circuit has recognized, collateral estoppel is applicable if:

> (i) the issue previously adjudicated is identical with that now presented, (ii) that issue was "actually litigated" in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action.

Kroeger v. U.S. Postal Serv., 865 F.2d 235, 239 (Fed. Cir. 1988) (quoting Thomas v. Gen. Servs. Admin., 794 F.2d 661, 664 (Fed. Cir. 1986)); accord Mother's Restaurant, Inc. v. Mama's Pizza, Inc., 723 F.2d 1566, 1569 (Fed. Cir. 1983); see also Klump v. United States, 38 Fed. Cl. 243, 247 (1997) (finding that issues resolved by IBLA estopped plaintiff from re-litigating those issues before the Court of Federal Claims). In the instant case, these four requirements have been met.

First, the issue of whether plaintiff had a valid 1866 Act right-of-way is identical to an issue adjudicated, and "actually litigated," before the IBLA. In its review of BLM's decision that Mr. Dalton and Mr. Wilson trespassed on public lands, the IBLA framed the issues before it, in part, by stating:

> Appellants contend on appeal that they are not required to obtain any authorization from BLM for the water diversion structure at issue here, since that structure is already permitted under their existing "property rights," which assertedly [sic] stem from their ownership of private lands and appurtenant water rights and a related "easement" or "right-of-way" arising under State law. They argue that, since such rights were acquired and perfected prior to the enactment of the FLPMA . . . and are protected by that statute, they are not required to also obtain any authorization under that statute and regulations[.]

Def. Ex. C (156 IBLA at 93). In other words, the IBLA had to determine whether the appellants (that is, Mr. Wilson and Mr. Bowman) had a valid right-of-way under state or federal law, including the 1866 Act. After carefully evaluating this issue in its decision, the IBLA specifically stated: "Although appellants refer to an existing 'easement' and 'right-of-way' that assertedly [sic] entitle them to place the structure on public lands, they present no evidence on appeal of the existence of such an easement or right-of-way deriving either from State or Federal law." Id. at 95. Thus, not only was the issue of whether plaintiff had a valid pre-existing right-

of-way that entitled it to build a water diversion structure addressed by the IBLA, it was also "actually litigated" before the IBLA.

Additionally, the IBLA's finding that a valid 1866 right-of-way did not exist was necessary for its ultimate decision, i.e., that BLM properly determined that Mr. Wilson and Mr. Bowman trespassed on public lands because, in part, they did not have a valid right-of-way. Id. at 93-99. Finally, plaintiff's interests in this case were fully represented in the IBLA action by both Mr. Wilson, proceeding pro se, and Mr. Bowman, represented by counsel. Id. at 89; see Hunt v. United States, 52 Fed. Cl. 810, 814-15 (2002) (finding that collateral estoppel applies to parties who appear pro se); Pacetti v. United States, 50 Fed. Cl. 239, 247 (2001) (finding collateral estoppel applied since plaintiff's interests were fully represented in previous litigation by his corporation, where plaintiff was the president and sole shareholder).

Because the IBLA already considered and resolved the issue of whether plaintiff had a valid 1866 Act right-of-way, plaintiff is estopped from re-litigating this issue before the Court of Federal Claims, and defendant's motion for summary judgment should be granted. See Austin Fed. Savings & Loan Ass'n v. Solimino, 501 U.S. 104, 107-08 (1991) ("The principle [of collateral estoppel] holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal, . . . which acts in a judicial capacity."); United States v. Utah Construction and Mining Co., 384 U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.").

2. Even If Plaintiff Held a Valid 1866 Act Right-of-Way, Dalton Wilson Had No Right to Build a New Water Diversion Structure Without BLM Authorization

Section 9 of the 1866 Act succinctly authorized rights-of-way for the construction of ditches and canals: ". . . the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed. . .".[12] 43 U.S.C. § 661. It is well established that a right-of-way under Section 9 of the 1866 Act was a limited grant which, like all federal grants, must be strictly construed against the grantee and passes nothing except that which is conveyed in clear and explicit language. Andrus v. Charlestone Stone Prods. Co., 436 U.S. 604, 617 (1978); Utah Power & Light Co. v. United States, 243 U.S. 389, 405 (1917) (Section 9 of 1866 Act strictly construed); United States v. Gates of the Mountains Lakeshore Homes, 732 F.2d 1411, 1413 (9th Cir. 1984) ("Any doubt as to the scope of the grant under R.S.

---

[12] Effective October 21, 1976, pursuant to Section 706(a) of FLPMA, Congress repealed this authorization but retained a preceding clause dealing with water rights. As originally enacted, Section 9 stated:

> [W]henever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; *and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed. . .*"

FLPMA deleted the italicized language.

2477[13] must be resolved in favor of the government.").

In Jenison v. Kirk, 98 U.S. 453, 456-47, 460-61 (1878), the Supreme Court made clear that Section 9 of the 1866 Act mentions and sanctions only two possessory rights: the right to the use of water on public lands for mining, agricultural, manufacturing, or other purposes, "acquired by priority of possession, when recognized by local customs, laws, and decisions of the courts"; and, in the second clause, a right of way for the construction of ditches and canals to carry water for those purposes. Id. at 460. The right accorded under the 1866 Act extended only to the "maintenance and use of the ditch, substantially as then constructed . . . and did not give any right to enlarge the ditch or to change its location. . .". Snyder v. Colorado Gold Dredging Co., 181 F. 62, 70 (8th Cir. 1910).

Congress amended the 1866 Act on October 21, 1976 with the enactment of the FLPMA, 43 U.S.C. §§ 1701-84, and repealed all right-of-way authorizations, including the one for ditches under Section 9. As a result, it is well established that "any person who desires, on or after October 21, 1976, to use, occupy, or develop the public lands for the purposes of impounding, storing, transporting, or distributing water is required to obtain a right-of-way or other authorization pursuant to Title V of FLPMA and its implementing regulations." Def. Ex. C (156 IBLA at 97 n.10); Elko County Bd. of Supervisors v. Glickman, 909 F. Supp. 759, 763 (D. Nev. 1995) (beginning on October 21, 1976, rights-of-way cannot be established under Section 9 of

---

[13] R.S. 2477 was enacted as Section 8 of the 1866 Act. "Because all parts of a grant statute are to be read together," cases concerning the scope of grants under R.S. 2477 are "especially strong authority on the scope of" grants under R.S. 2339. Gates of Mountains Lakeshore Homes, 732 F.2d at 1413, n. 4; see also Adams v. United States, 3 F.3d 1254, 1260 (9th Cir. 1993) (noting that the provisions of 43 U.S.C. § 661 should be read together with the provisions of R.S. 2477).

the 1866 Act).

In Southern Utah Wilderness Alliance v. Bureau of Land Management, 425 F.3d 735 (10th Cir. 2005), the Tenth Circuit discussed the scope of a right-of-way under Section 8 of the 1866 Act (otherwise known as R.S. 2477), which, as explained supra, note 13, is instructive here. Section 8 granted a "right of way for the construction of highways over public lands, not reserved for public uses," and was repealed in 1976, with the enactment of FLPMA. See Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by FLPMA, § 706(a), 90 Stat. 2743. Similar to Section 9, no new rights-of-way under Section 8 could be established after October 21, 1976, but any valid, existing rights-of-way would continue in effect. See Southern Utah, 425 F.3d at 741. The Tenth Circuit held that after October 21, 1976, "the holder of an R.S. 2477 right of way across federal land must consult with the appropriate federal land management agency before it undertakes any improvements to an R.S. 2477 right of way beyond routine maintenance." Id. at 745. The Court explained:

> We therefore hold that when the holder of an R.S. 2477 right of way across federal land proposes to undertake any improvements in the road along its right of way, beyond mere maintenance, it must advise the federal land management agency of that work in advance, affording the agency a fair opportunity to carry out its own duties to determine whether the proposed improvement is reasonable and necessary in light of the traditional uses of the rights of way as of October 21, 1976, to study potential effects and if appropriate, to formulate alternatives that serve to protect the lands.

Id. at 749.

The Court adopted the following guidelines for distinguishing between "routine maintenance" and "construction of improvements":

> Defined in terms of the nature of the work, 'construction' . . . includes the

> widening of the road, the horizontal or vertical realignment of the road, the installation (as distinguished from cleaning, repair, or replacement in kind) of bridges, culverts and other drainage structures, as well as any significant change in the surface composition of the road (*e.g.*, going from dirt to gravel, from gravel to chipseal, from chipseal to asphalt, etc.), or any 'improvement,' 'betterment,' or any other change in the nature of the road that may significantly impact Park lands, resources, or values. 'Maintenance' preserves the existing road, including the physical upkeep or repair of wear or damage whether from natural or other causes, maintaining the shape of the road permits drainage [, and] keeping drainage features open and operable – essentially preserving the status quo.

Id. at 748-49 (citations omitted).

Here, by analogy, there can be no doubt that plaintiff engaged in more than "routine maintenance," but instead constructed a new, substantially different water diversion structure at a different location than what had been built in perfecting the water right represented by Certificate 1656. This type of new construction required plaintiff to consult with BLM and receive authorization. See id.; see generally, 43 C.F.R. Part 2800.

With the enactment of FLPMA, Congress authorized the Secretary of the Interior to grant, issue or renew rights of way across public lands for, among other things, ditches which impound, transport or distribute water. See 43 U.S.C. § 1761(a). In 1980, the Department of the Interior promulgated 43 C.F.R. Part 2800.[14] Pursuant to 43 C.F.R. § 2801.9(a), a person "must have a grant under this part when you plan to use public lands for systems or facilities over, under, on, or through public lands. . . [including] . . . canals, ditches, flumes, laterals, pipelines, tunnels, and other systems which impound, store, transport, or distribute water. . ." See Hage v. United States, 51 Fed. Cl. 570, 584 (2002) ("Under the 1866 Act, vested ditch rights-of-way are subject

---

[14] In 2005, the Part 2800 regulations were amended by Final Rule published in the Federal Register. See 70 Fed. Reg. 20970 (Apr. 22, 2005).

to Forest Service regulations, including the need to obtain special use permits when necessary."); Adams, 3 F.3d at 1260 (R.S. 2339 rights of way are subject to Forest Service regulation); United States v. Vogler, 859 F.2d 638, 642 (9th Cir. 1988) ("Congress has made it clear that the Secretary [of the Interior] has broad power to regulate and manage national parks. The Secretary's power to regulate within a national park to conserve the scenery and the nature and historic objects and wildlife therein . . . applies with equal force to regulating an established [R.S. § 2477] right of way within the park.") (internal quotations and citation omitted).[15]

A Nevada district court case discussing when permits or other types of authorization are necessary in connection with work done within an 1866 Act right-of-way on Forest Service land, is also instructive here. In Elko County Bd. of Supervisors v. Glickman, 909 F. Supp. at 766, ranchers claimed that they were not subject to Forest Service regulations because everything they planned to do was within their 1866 Act rights-of-way and that even if they were subject to some type of regulation, the Forest Service acted illegally. The court did not find the ranchers' arguments persuasive, noting:

> What the ranchers ignore, however, is the fact that their rights of way ran across national forest lands. We assume that FLPMA, for the reasons stated above, does not limit in any way the ranchers' 1866 ditch rights. Entirely apart from FLPMA, however, Congress has delegated to the Secretary of Agriculture the authority [to] make "rules and regulations" (violation of which is a criminal offense) regarding

---

[15] Since it is undisputed that plaintiff did not seek authorization from BLM to construct the water diversion structure, in addition to the arguments raised by defendant in this motion, plaintiff's takings claim is also not ripe for adjudication, since it is possible that BLM, if requested, would have granted such authorization. See Volger, 859 F.2d at 642 (finding that plaintiff's contention that the government's regulation of a R.S. § 2477 right-of-way was not ripe "because [plaintiff] never attempted to apply for a permit and he never submitted a mining plan. . . The very existence of a permit system implies that permission may be granted.").

> the occupancy and use of the national forests. 16 U.S.C. § 551. *The authority is considerable, and includes the right to reasonably regulate the exercise of vested water rights and accompanying rights of way obtained under 43 U.S.C. § 661 where such right and right of way lie within a national forest.*

Id. at 764 (emphasis added).

The Court went on to hold:

> This answers the ranchers' argument that, so long as they act within the scope of their vested 1866 ditch rights, their actions are not subject to Forest Service regulation, even if they take place on Forest Service land. On the contrary: though we assume that the ranchers have vested rights-of-way under § 661, and that vested rights are protected property interests, a vested right-of-way which runs across Forest Service lands is nevertheless subject to reasonable Forest Service regulation, where "reasonable" regulation is defined as regulation which neither prohibits the ranchers from exercising their vested rights nor limits their exercise of those rights so severely as to amount to a prohibition.

Id. at 765.

The Elko Co. analysis applies to this case. In FLPMA, Congress has granted the Secretary of the Interior broad authority to manage public lands pursuant to the principles of multiple use and sustained yield. FLPMA also imposes the duty on the Secretary of the Interior to "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the land." 43 U.S.C. § 1732(b); see also 43 C.F.R. § 2801.

Here, plaintiff hauled nineteen heavy equipment tires onto federal land and constructed a new water diversion structure using heavy machinery, causing substantial surface disturbance, all without notifying or seeking authorization from BLM. When BLM became aware of the structure, it attempted to work with plaintiff to obtain a right-of-way, and plaintiff refused. As a result, plaintiff was found to be in trespass on BLM-managed lands. Def. Ex. C (156 IBLA at 98) ("In conclusion, we hold that, in order to construct and maintain a new water diversion

structure on the public lands, and thus to 'use, occupy, or develop[] such lands, [Wilson was] required, by Title V of FLPMA and 43 CFR Part 2800, to obtain a right of way or other authorization from BLM. Further, absent such authorization, [Wilson's] construction and maintenance of a structure clearly constituted a trespass . . . .").

Since none of these facts are in dispute, this case comes down to plaintiff's misunderstanding of the law. See Def. Ex. A (Wilson Dep. at pp. 107) ("New construction within the right-of-way I'm legal to do as long as I do it in a workman-type manner and don't create any unnecessary disturbance or detriment to the premises."); Def. Ex. L (Bowman Dep. at p. 76) (testifying that he did not believe that Mr. Wilson needed a permit to construct the water diversion facility "[a]s long as you stayed within the right-of-way" and did not engage "on new construction . . . of something that you were trying to acquire a new right-of-way for"). Since, as a matter of law, after the enactment of FLPMA, plaintiff was not free to engage in new construction on an 1866 Act right-of-way without authorization from BLM, plaintiff's actions constituted a trespass on federal land.

Accordingly, since plaintiff is seeking a taking of a right it never had – the right to engage in new construction within an 1866 Act right-of-way without authorization from BLM – plaintiff's takings claim must fail.

## CONCLUSION

In sum, plaintiff does not have standing to sue and has failed to allege a taking of a legally compensable property interest. For these reasons, defendant's motion for summary judgment should be granted.

Dated: May 5, 2006

Respectfully submitted,

/s/ Kathleen L. Doster
KATHLEEN L. DOSTER
HELENANNE LISTERMAN
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0481 (phone)
(202) 305-0506 (fax)
Kathleen.Doster@usdoj.gov

Of Counsel:

JAMES KARKUT
United States Department of the Interior
Office of the Regional Solicitor
Suite 6201, Federal Building
125 South State Street
Salt Lake City, Utah 84138