# Defendant's Exhibit A

DEPOSITION OF DALTON WILSON
FEBRUARY 27, 2002



UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
-oOo-

DON BOWMAN and DALTON WILSON, )
Plaintiffs, ) CV-N-00-0506-HDM(RAM)
-vs- )
BRUCE BABBITT, ET AL., )
Defendants. )

DEPOSITION OF DALTON WILSON,

called for examination by counsel for Defendants, at the offices of Mackedon & McCormick, 179 S. LaVerne Street, Fallon, Nevada, Wednesday, February 27, 2002, at 10:18 a.m., before Cindy Lee Brown, a Notary Public.

APPEARANCES: (See separate page.)

Reported by: Cindy Lee Brown, CCR #486



APPEARANCES

For the Plaintiffs: MACKEDON & McCORMICK
Attorneys at Law
BY MICHAEL F. MACKEDON
& JOHN R.S. McCORMICK
179 S. LaVerne Street
Fallon, Nevada

For the Defendants: ANNE R. TRAUM
Assistant United States
Attorney
333 Las Vegas Blvd. South
Suite 5000
Las Vegas, Nevada

Also Present: DON BOWMAN



INDEX


EXAMINATION:
By Ms. Traum: PAGE: 4

EXHIBITS: PAGE:
1. Deed 15
2. Quitclaim Deed 17
3. State of Nevada Certificate of Appropriation of Water 22
4. Map 24
5. Lease Agreement with Option to Purchase 39
6. Map 49
7. Map 58
8. Application for Transportation and Utility Systems and Facilities on Federal Lands 62
9. Decision 70
10. Drawing by Dalton Wilson 84
11. 10/26/98 Letter to Michael Anderson, Division of Water Resources from Dalton Wilson 84
12. Trespass Decision 100




FALLON, NEVADA; WEDNESDAY, FEBRUARY 27, 2002; 10:18 A.M.
-oOo-

DALTON WILSON,
having been sworn, testified as follows:

EXAMINATION

BY MS. TRAUM:

Q Mr. Wilson, can you state your full name and your address, please.

A Dalton Warren Wilson, PO Box 74, Austin, Nevada.

Q Okay. Thank you.
Since you've been listening to this other deposition, a lot of this initial part is going to be repetition for you, and some other parts as well. Just so that we can make a clean record for your deposition, I'd like to repeat this information, so please be patient with me.
My name is Anne Traum. This deposition concerns Bowman and Wilson versus Babbitt, and I represent the Bureau of Land Management. I may refer to them as the BLM.
Have you been deposed before?

A Yes, I have.

Q How many times have you been deposed?



cc FLG

Q Okay. Now, are you currently employed?
A Self-employed.
Q Self-employed. Do you have your own business?
A Well, I do some ranching out there, and I do some woodcutting. But I don't have to milk no more cows.
Q How long have you been self-employed?
A All my life.
Q Since you got out of the Navy?
A Yeah.
Q Okay. And you've been self-employed then for the last 20 years, at least?
A Yeah, or more.
Q Okay. And do you have a corporation that you founded?
A Yes.
Q What's the name of that corporation?
A Underwood Livestock, Inc.
Q Underwood Livestock, Inc.?
A Yes.
Q Are you involved in any other corporations?
A No.
Q Okay. Now, are you -- do you own Underwood Livestock, Inc.?
A Yes.
Q A hundred percent?



A Yes.
Q Are there any other employees of the company?
A No.
Q Okay. Is there anyone who helps you out with your Underwood Livestock, Inc., in any way?
A No.
Q Okay. Do you do all of their correspondence?
A I do it all, yes.
Q Okay. And what is -- what does Underwood Livestock, Inc., do?
A What does it do?
Q Yes.
A Well, it is involved in ranching business to the extent that it's in, and that's it.
Q Okay. Now, does Underwood Livestock, Inc., have any holdings, assets?
A It has water rights that it owns.
Q It does. And what are those water rights?
A Well, they're on outlying springs on federal range, on federal land.
Q Now, are those springs at issue in this case?
A No.
Q Okay. They're related to ranching activity?
A Yes.
Q To grazing, in particular?



A Yes.
MS. TRAUM: Okay. I'm going to -- I'd like to mark this as Exhibit 1.
(Exhibit 1 marked for identification.)
BY MS. TRAUM:
Q Do you recognize this exhibit?
A Yes, I do.
Q What is it?
A It's a deed from Dalton Wilson to Underwood Livestock, Inc.
Q And this deed was entered on the 1st day of February, 1990?
A Yes.
Q Now, when you deeded this land to Underwood Livestock, Inc., how long had you owned it?
A It's not land.
Q Oh, it's not land?
A No.
Q Maybe you could describe what it is that's being deeded.
A It's water.
Q Is this the water that you just mentioned?
A Yes.
Q So it's associated with grazing?
A Yes.



Q And it's not related to any of the springs that might be at issue in this litigation?
A It was. They were described in this deed --
Q Okay.
A -- I'm sure. I can look and check for sure, but I think they were described in this deed.
Q Okay. Now, you've said that this deed granted water rights to Underwood Livestock Company, and you mentioned earlier that Underwood Livestock Company still owns those water rights.
A The ones that I didn't lose through forfeiture.
Q Which ones did you lose through forfeiture?
A Well, they relate to the certificates here.
Q Okay. Now, does -- let me -- does Underwood Livestock Company own any of the water rights, still own any of the water rights that are at issue in this case?
A No.
MR. MACKEDON: Let me clarify what you mean by forfeiture. Do you mean foreclosure?
THE DEPONENT: Foreclosure, pardon me.
BY MS. TRAUM:
Q That's okay. Now, were you living on -- there is a piece of property at issue, a piece of private property that's surrounded by federal land or at least one piece of

(Whereupon an off-the-record discussion was had.)
BY MS. TRAUM:
Q So let me just make sure that I'm clear on what you've described. You've described what is an iron gate that provides a framework for boards.
A Yes.
Q And there is several -- there is two boards that are inserted into this gate?
A There could have been half a dozen inserted. There was at least three or four on the sides of it that went out into the dirt berms that I described to you.
Q Okay. And that was for support or just extra boards?
A The dirt berms support the dam.
Q Right.
A Then depending on the flow of water, as long as one board was two inches above this hole in them boards of the pipeline, it fed the pipeline.
Q Okay.
A If they wanted more pressure on the pipeline, they could have put more boards above or they just --
Q So it's adjustable?
A Yes. And, basically, if they had a flood come in above it, it was the same principle as what I did. It was just more or less what you call a self-adjusting head



gate, self-regulating head gate. In other words, if you've got a big runoff above it, a cloud burst, it flowed over and went on down the channel. If the water receded and quit flowing over, then the pipeline carried the max.
Q Okay. Now, I understand that the boards that you placed in this iron gate framework are adjustable. But can you tell me again what the dimensions of the iron gate itself were?
A I think five feet five inches.
Q Square? How high?
A From this point, and it was, approximately, oh, I'd say it was probably higher than this desk, might be.
Q So at least three feet high?
A 30 inches, 36 inches high. And that's a guess because I don't recall the width -- the height of it.
Q Have you seen evidence of this iron gate?
A And everybody else, including the BLM, in their notations of it.
Q So your answer is yes?
A Yes.
Q Is it intact or has it fallen apart?
A They took part of it apart and used it in their rehab where they removed the dam. So they had to be aware of it because they were all over the top of it. Basically, in '85, it got washed down. When I first seen it



in '80, it was standing.
Q It was standing.
A In '85, there was as much water as half the width of this desk and deeper than this went through there and washed it down. So now it is -- silt and everything has come down that channel in the high water, why it's laying there flat. But it could be raised up and looked at and measured and was by several people.
Q Okay. Now, there is also remnants of the boards?
A They're still there.
Q They are?
A Yes.
Q How many boards have you seen in this area?
A I'd say two positively of the wide ones and parts of the wings.
Q Okay. Now, have you seen the boards with the half-moon shape in it?
A It was there when this flood come.
Q They were there in 1980?
A Yes.
Q And you saw it intact at that point?
A Yeah, it even had a pipe sticking in it.
Q Now, it did have a pipe sticking in it?
A Sure it did. The pipe are laying right there,



right below it right now.
Q Now, there was a pipe sticking in the board in 1980. Was the pipeline itself operational at that time?
A I would say no.
Q No. And why would you say no?
A I would say that it was rusted out down below for at least 75 feet after it went out of the canyon, and it was buried down the canyon. There was two places that the erosion had washed the bank out and dropped the pipeline out of it. So, no, it couldn't have been operable.
Q So the pipeline -- when you first saw this structure in 1980, that was the first time you saw it, right?
A Yeah.
Q The pipeline fixture was intact at this head gate that you're talking about?
A Yes.
Q But below that the pipeline was in disrepair and nonfunctional?
A In disrepair.
Q Now, since you've been on the property, has the pipeline ever functioned?
A If it wasn't functioning then, it ain't functioning now. No.
Q Could you tell, when you arrived on the

Page 37

property in 1980, how long ago it had been it had ever functioned, when was the last time?
A No, I couldn't tell because I had never been there before.
Q And in talking to the people that you bought the property from, did you have a conversation about whether the pipeline had been functioning?
A He had never been there before either. He didn't know where this point of diversion was.
Q I see. This is the Smiths, right?
A Yes.
Q Do you know how long the Smiths owned the property?
A I'd be a guessing, but I'd say five or six years.
Q And, to your knowledge, they never used this pipeline?
A No.
Q Okay. Now, do you have any knowledge of when this pipeline might have been operational?
A Well, it had to be operational in the 1940s because there was a stack of alfalfa hay sitting there when Mary Jean Etcheverry bought the place in the 1940s. There was a stack of alfalfa hay sitting there, so it had to have been operational then.

Page 38

Q How do you know there was alfalfa stacked up then?
A She was a girl there, and her dad fed the hay.
Q And do you know her?
A Yeah, I know her.
Q So you've talked to her about this?
A Yes. It's her old family ranch.
Q Do you know of any later time, other than the 1940s, when this pipeline was operational?
A No, I don't.
Q Have you ever used water from this pipeline to irrigate?
A No.
Q You run cattle out there?
A Yes.
Q And you don't do any farming out there?
A I'm unable to farm because you can't control the water when the water comes, and there may be seven years there will be no water. That scenario has happened since I've been there. But when the water comes, it's just like trying to control me when I'm on the town, just impossible.
Q Now, just -- if it's a high runoff year, does the water in the natural flow, does it flow all the way down to the private property?

Page 39

A And clear across the county road.
Q Oh, it does.
A There will be 5,000 inches of water or 10,000 inches of water up here. And then it will graduate down through the leaking streambed to maybe there will be 500 inches of water going through the place.
In 1998, the bureau was fully aware of this. It eroded that floor of that canyon below this diversion structure that I put in two feet deeper than it had ever been in the history of the canyon. If the diversion structure hadn't had been there, it would have eroded it two feet deeper to the top of the mountain.
Q Okay. Now, you said earlier that you lost this property through foreclosure in approximately 1989.
A Yes.
Q And that Mr. Bowman acquired the property in 1994.
A Yes.
Q And we saw that deed.
Now, did Mr. Bowman lease the property to you --
A Yes.
Q -- after he acquired it?
A Yes.
(Exhibit 5 marked for identification.)

Page 40

BY MS. TRAUM:
Q And do you recognize this document?
A Yes.
Q Is this a copy of -- what is this document?
A It describes the lease and the terms and the conditions between Mr. Bowman and me.
Q Okay. And does this lease contain an option to purchase?
A Yes.
Q And do you know what the term of this lease was?
A Yes, I know what the terms were.
Q It was a two-year term lease?
A Yes, it was a two-year term lease.
Q And the option to purchase was to be exercised before the end of that two-year term?
A Yes.
Q Did you exercise it?
A No.
Q Did you continue the lease after the two-year term?
A We made other arrangements on the terms and the conditions as Don described yesterday to you.
Q Now, am I correct in saying that you changed the interest rate?

A Yes.
Q And did you change anything else about the lease?
A Basically, no. He still owns the property, and I still have the same agreement with him.
Q And you still have an option to purchase?
A Yes.
Q Now, that agreement, what you call the adjustment to the lease, that's a verbal agreement between you and Mr. Bowman?
A Yep.
Q Okay. And so you, at this point you still have not exercised that option to purchase?
A No.
Q And it's your understanding that if you were to exercise that option to purchase, you would get everything that Mr. Bowman had in that quitclaim deed that we looked at?
A Yes, all appurtenances.
Q Okay.
MS. TRAUM: I just need a minute just to regroup where I am.
BY MS. TRAUM:
Q Now, we looked at that cultural map that showed where you marked the spring and the pipeline and the



ditch. Do you know of any other map that shows the pipeline or the ditch?
A Yes.
Q What map is that?
A Several that the BLM prepared.
Q And do you have those -- when were those prepared?
A Oh, in between 1987, '88 and '89.
Q Okay. Other than those prepared -- the BLM prepared those maps, right --
A Yes.
Q -- you're talking about?
A Yes.
Q Other than those maps, are you aware of any other map filed with the State Engineer's Office or any other non-BLM map that depicts the pipeline and the ditch that you're claiming in this litigation?
A Not that I'm aware of. There could be, but not that I'm aware of, no.
Q Now, is the cultural map, is that the clearest depiction that you've ever seen of the pipeline and the ditch?
A Yes, it describes it fully as to what extent was there. It clearly speaks for itself in the water certificate.



Q And you mentioned that you had seen evidence of a pipeline on the property since you've been there, since 1980, downstream from the head gate structure that you described.
A No, I never said I seen evidence of a pipeline on the property.
Q Not on the property. Leading from the head gate area to the property.
A Yes.
Q And does that -- what exactly have you seen?
A The pipe.
Q The pipe?
A Yeah. It's very clear. The berm is still there where -- what Mr. Brackney evidently did, he put it in with horses. And evidently what -- in my use of -- we leveled down with horses, so he used what we called a grade plow that they built these pioneer roads and railroad right-of-ways and everything with.
There was a plow that was approximately -- it was a beam as long as these desks and, approximately, 30-inch shoe.
Q And can you just say how long this desk is that you're talking about.
A Oh, I'd say this desk is probably 12 feet long, just guessing, but I'd say that.



Q So, approximately, 12 feet by three feet, roughly?
A Well, it had a shoe. I don't know if you ever seen a plow or not. It had a set of handles back here on it. And apparently what he did, it was for breaking ground for old-time construction. And evidently what he did, he had to be a good surveyor because he put it in on grade.
He plowed a series of furrows, and then he vee'd them out with an old vee blade of some type and buried that. And the reason I know this is because his youngest son showed up there on the property.
Q What's his name?
A His name was Jimmy Brackney, and I don't know where the man is or where he went or anything. But he came to see the old original family homestead where he was born. He was born on the property.
Q When was it that you had this encounter with him?
A Let's see. It had to have been about six years ago, five, six years ago, something like that. He came, and he had a video camera and was taking pictures of the old original things that still existed and drove up there and looked at the old original pipeline where you could still see the berm.
And that's the way he described to me that his

Q When exactly in 1998 did you build the dam?
A I can't tell you exactly, but it was in late April, early May.
Q Okay. And did you construct the dam yourself?
A Yes, I did.
Q Did somebody help you?
A Yes, there was.
Q Who helped you?
A There was a kid there by the name of -- his last name was Brackenberry, Howard Brackenberry.
Q How do you know Mr. Brackenberry?
A He was indigent on the streets of Eureka and asked me for a place to stay, for board and room, so I paid him some wages to help me while I constructed that and fed the man.
Q Does he still live up there?
A I don't know where he is. I think he's in the Montana Penitentiary.
Q Okay. Did anybody else work with you on the dam?
A No.
Q And why did you build the dam?
A Why did I build the dam?
Q Yes.
A To put this water right back to work and



improve my lifestyle a little and the value of the ranching operation and become more productive, the general reasons that you would enter into any business or improve any business.
Q Okay. Using this pen on this map number 6, Exhibit Number 6, could you mark with this green pen where the dam was located.
A Just put it right over that other X.
Q Would you mind doing that?
A No, ma'am, I wouldn't.
Q And write in "dam."
A "New dam?"
Q Yeah.
Okay. Now, you just mentioned this was within 10 feet of what you've marked as the old berm.
A Yeah, 10, less than 20 feet.
Q Did you, in constructing the new dam, did you rely on any of the features from the old berm?
A I'll be honest with you, I borrowed the GPS and shot it into the legal description of that water certificate. And within 10 days after it was built, the BLM confirmed that it was on it with a GPS.
Q Okay. So you used the GPS system.
A To make sure that was the exact location of the water certificate because, like I say, this was



unsurveyed ground. And where you're dealing with new, modern techniques and changing land managers periodically, why if you go and build a diversion structure that you're intending on using, you're going to spend the money, then common sense is check the location, that that is the exact location.
Q It's my recollection that you were just explaining how you GPS'd the site. Maybe you could just restate that.
A In my viewpoint, it was unsurveyed ground at the time, and maybe still is. Why, common sense will tell you that you better check the location and make sure it's on the legal description of the water certificate, and so that's what I did. I borrowed a GPS and made sure that my location matched the legal description of the water.
Q And did you do that GPS work before or after you built the dam?
A Before, certainly.
Q Okay. And can you describe the dam.
A Could I describe the dam?
Q Yes.
A I'm the author and the manager and the builder, yes.
Q Would you?
A Yes. I took these haul pack tires. Joe Ramos



had them there in Austin.
Q They were already packed?
A No, they're haul pack tires. They're what they haul this ore from these big haul pack trucks, these hundred-ton trucks. They're a tire, approximately, two feet and maybe an inch wide by, approximately, six feet and an inch or something tall. And they're just like a tire. They're hollow inside and got a hole approximately that size.
Q How big is it that you're describing it?
A How big would that be? 18 inches.
Q Two feet, maybe.
A Yeah. So I took them tires up in that canyon.
Q How did you get them up there?
A I have an old military four-by-four. I didn't have an excavator to build a nice road to get in with a truck. I took an old military four-by-four, and I took them in three tires at a time.
Q How many tires did you use total?
A I used 19 tires total.
Q I took a 933 loader, crawler loader in there with a front-end bucket on it and back grippers on it. And where I installed the dam, just within 20 feet below the original structure to the west.
Q Downstream?

Page 81

A Downstream. It was narrower, plus there was a big chokecherry tree and a bunch of willows growing here, and there was a great big bunch of willows growing here.
Q Can you explain what you mean by "here."
A In the banks.
Q On either side of the canyon bottom?
A Yeah, of the channel. And so I just dug out the width of the tire, approximately, the six feet in a V. Do you want me to draw this for you?
Q That would be useful.
A It won't be accurate, but I'll just draw it out for you.
Q This is an easier pen to draw with, a little smaller, a little narrower.
A All right. We'll say this is the channel.
Q Okay.
A Let's say this is going downstream, okay? We'll just put an arrow for downstream.
Q Can you just write "creek" somewhere?
A I'll let you do the writing. I only got through the eighth grade.
Q Okay.
A So I took this 933 CAT loader. As I say, there was a bunch of willows right here, and there was a big chokecherry tree and more willows and rose bushes right

Page 82

basically like that. So I measured it all out for a six-foot tire to set right exact in the center of this channel. And so I took this CAT loader, and I went back approximately the width of the bucket, which was just a six-foot bucket.
Q Okay. Let me -- can I just ask you a question?
A Yes.
Q How wide is the creek at that point where you've drawn it?
A It varied from six inches wide, 18 inches wide to two feet wide.
Q Depending on the time of year?
A Depending on the time of year and depending on how far the water spread out. At this point it was probably six feet wide, just a more flat area.
Q Okay. And can you just tell me how -- can you write "trees" somewhere off of where you're going to be drawing, and we'll point an arrow to the trees that you've drawn. And then put a longer arrow to the other tree that you drew.
Okay. Now, how far are those trees apart?
A How far are they apart?
Q Yeah.
A Oh, maybe 15 feet.

Page 83

Q Okay. And there is two trees on the one side, the south side that you've drawn?
A Well, there was a whole cluster of trees.
Q And there is a cluster of trees on the other side too?
A Are you familiar with willows?
Q Yes.
A Do you know how willows grow?
Q Yeah.
A There is a willow cluster and one chokecherry tree.
Q Okay. Continue. I'm sorry, I have one more question. What is this that you've drawn here in the center of the stream?
A That's the spillway tire --
Q Spillway tire.
A -- of the bottom layer. So here's what I did. You'll be able to follow me right along here.
Q Actually, it may be more useful if --
A See what's there? I don't have to draw it. You've already got it.
Q I don't actually have on this document how it was all situated. But I'm not sure that the diagram is going to help too much. So this is Exhibit 10.
A What do you want me to do now?

Page 84

Q Actually, what I'd like you to do on there is to draw where you think the old berm is and to mark it on there.
A When in doubt just --
Q Can you write "old berm" next to that.
And what is the distance between that V that you've drawn as the old berm and where you've placed that center tire? What's the distance between those two?
A Less than 20 feet.
Q Okay. That's fine.
Let's admit this one as 11, and we'll make this diagram number 10.
(Exhibits 10 and 11 marked for identification.)
BY MS. TRAUM:
Q Now, let's just spend a minute on Exhibit 11. Do you recognize this document?
A Yes.
Q What is it?
A It's a letter to the state engineer.
Q A letter that you wrote after you completed the dam?
A Yes.
Q And you say in the letter that you performed the work by using heavy equipment tires laid on their side and filled with compacted earth?

A Yes.
Q Now, on the second page of the document there is a diagram. And I regret that this is my copy of the document that you sent to me and I made some markings on the diagram, so let me just identify which of those markings are mine so that we're clear.
I drew in this 42 feet at the top. I drew in this four feet and the two feet to the right side of the diagram, and I drew in some figures below where you've written in six feet across, below the one tire that you diagramed to show the dimensions, just so we're clear on what I've added here.
You made this diagram, correct?
A Yeah, I compiled this diagram.
Q Okay. You show on here what you had just described in your other -- in your diagram that you were drawing for us, that there is one center tire. And can you describe the function of that center tire?
A It's a spillway.
Q It's a spillway. So is that center tire installed into the creek bottom?
A Yes.
Q Is it below the surface?
A Flush with the surface.
Q Flush with the surface, okay.



And can you explain how the other 18 tires were arranged?
A Yes.
Q Would you?
A See, this gives you the idea that it was straight across. It was in a V.
Q It this was not in a V?
A It was in a V. So what I did is, this was the last tire I put in. I took a water hose, and I leveled this tire. I had my foundation already dug out, the trough or trench. I did the excavation work already.
Q Now, what exactly had you excavated?
A Just the place for these tires to sit.
Q And you did that using this loader?
A A 933 CAT loader.
Q And you operated the machine, or did somebody --
A I operated the machine.
Q Okay.
A So I took a water hose, and I leveled this tire. You understand what I mean?
Q Uh-huh.
A Okay. I took the same water hose, and I leveled this tire to this tire.
Q Uh-huh.



A So that I was level, this tire and this tire had a level line. And then I placed these tires in on level. I put the bottom three on each side in, leveled, and I packed them with earth.
Q And you used earth that you had excavated from the creek?
A Yes.
Q And did you use some other earth in addition to that?
A Whatever I excavated was more than enough.
Q I see.
A So I packed them with earth, and I had them leveled and solid. And then I took that 933 loader and I drove on them and compacted them so they were embedded down like the diagram shows, into the dirt.
Q And the top of this first layer of tires would have been, approximately, flush with the surface?
A Yes.
Q And it's two feet high. I see.
A Yes, yes. Then I proceeded to stack this tire, this tire and this tire, and I packed them with earth.
Q Okay.
A And then I put this tire, this tire and this tire, and I packed them with earth.
Q Okay.



A And I made sure that I measured my tire that I was going to use for the spillway because there was, at this time, from a dry streambed, three or four or five days before that, it was running two feet of water.
Q Uh-huh.
A Okay. I did the same procedure on these tires, and I packed each layer with earth and worked all of the earth into the center of the tires so they was solid. And I checked my levels so I had a flat level on both sides.
Q On each level?
A It was each level.
Q Okay.
A Did a pretty job. So I had these all packed, and I put earth over the top of them. And then I picked this tire up from the bottom of the bucket. And when I jammed that tire with that bucket with the weight of that 933 in there, it shut the flow of water off.
And I immediately had some dirt already set up here, some rock fill and stuff that I had already -- was all ready for it. When I jammed that into that water to the level of these other two, I immediately went to bucket and fill into it, and we get on it with a bar and worked that gravel and stuff until we sealed the water, until the water all come over the tire. And then we backfilled in again these tires and cleaned the rest of the fill up that we had

Page 89

excavated.
Q Now, when you say you backfilled those tires, where were you putting that fill in? Behind the tires?
A Behind the tires, yes.
Q Okay. To seal it up?
A To seal the water off.
Q So that none of the water could creep between the tires.
A No water went underneath. There was no erosion. There was no silt. There was nothing.
Q Okay. Now, did you use any other materials to reenforce this structure, other than dirt and the tires?
A No.
Q No wood?
A No wood.
Q On either side of the tires, you have a thick black line shown on this diagram. What does that black line indicate?
A All that does is indicate what was below the surface of the ground.
Q Okay.
A And behind them is those trees I "drawed." Those willows was on the southwest, on the west. Downstream beside of them was backed up right again on those willows and those trees, and in 30 days there was willows and trees

Page 90

growing right out of the tires and a canopy of willows and trees growing down each side of them. They were totally crowded in. By the time they removed it, there was willows and trees growing out of them eight feet high.
Q On either side of this structure, what was on the border of these outer tires?
A If we call this the north border of the tires, why the cherry-stemmed road went right by right there. And so using their own measurement, I was 20 feet in the wilderness study area.
Q Now, can you just -- since we've added something to this exhibit, can you -- do you have the original? Let's substitute this picture and the original one.
Can you diagram on there the road.
A I just did.
Q Can you draw the word "road" and then point an arrow to what it is you just diagramed.
Okay. Now, there is a little segment here between the road and the tire. Is that just dirt? Is it rock?
A Just dirt.
Q Okay. And what about on the far side, the far side away from the road, what is on the border of that tire?
A They're into the hillside bank.

Page 91

Q So it goes right up against the bank.
A Right into the bank. So there was no way the water could erode around it from either direction, and that was the reason I put it the 15 feet or 20 feet, whatever it was, so it was below the other ones because up here it would have took a wider structure to achieve the same purpose.
Q I understand. And the old berm, was that wider than the structure, the dam that you built?
A Certainly.
Q It was?
A Certainly.
Q About how much wider?
A Oh, I'd have to be guessing because I didn't measure it. But I'd say the wings of it, the berm of it, or whatever you would call it, because all it did was form wings to where if there was more water it -- put it to one source. I'd say if you measured from this point to this point, it could have been 75 feet.
Q And how -- so the old berm, you say, was, approximately, 75 feet across?
A It could have been.
Q I understand it's an estimate.
A Its intent and purpose was exactly the same as what I did. Only what I did was un-washable out. And I'll tell you honestly why I used tires and why it's the only

Page 92

feasible construction for that canyon or any canyon.
Q Why is that?
A You're familiar with frost. And frost heaves stuff up. And the BLM's little idea was to put a nice little cement deal there that cost $100,000, and not go down below the frost line. I've seen frost in that canyon 10 feet deep, okay?
Then you'd have to go 15 feet deep with the footings of this cement structure, or the frost is going to heave it up. And no matter how much reenforcing, that frost is stronger than anything else. It's going to break it.
These tires, frost heaves, that rubber gives, just like the sole of your shoe. When that frost goes out, that rubber pushes back down and reseals, and it's foolproof and indestructible, other than fire. It don't rot. It don't deteriorate. It don't crack.
Until they got this bone in their throat, they got nothing but praises to say about it, recommended it to other people to use.
Q Let me ask you, how far -- what was the complete diameter of this --
A Of what I built?
Q Yes.
A Okay. You got 18 feet on each wing, on each side, six feet in the middle. And we both know that if you

took total, it wouldn't match the diameter of what they swore under testimony. It wouldn't be 69 feet. Your figures only come up 42. They got 69. So I'd say from this end to this end would have been the widest diameter.
Q Okay.
A And I'd say that it couldn't have been over 30 feet across there from --
Q Because it was in a V shape?
A In a V shape, yes.
Q I see.
A I didn't measure it to be exact. I ain't going to sit here and --
Q These tires were very close together, right? There was no distance between each tire?
A Not a drop.
Q Okay. So the diameter, if you were to measure from tire to tire, is into the shape of a smile, tracing along the V, that would be more or less 42 feet. Do you agree with that?
A No, I don't agree with that. If you're going to measure the V out, the V, you're probably correct. I have to figure it up. But if you take, from this distance right here, which is the end of the wing --
Q I understand that.
A That's the diameter of the dam. It's not to



measure in here 18 feet, out here 18 feet, and add six feet to it. That ain't the diameter of the width of the dam. The width of the dam is from this wing to the end of this wing.
Q Maybe we're just interchanging terminology here. I understand that you're saying and it's your testimony that if you measure from sort of the tip of the V upstream to the other side of the tip of the V upstream, that that distance between those two points would be approximately 30 feet.
A It could be 30 feet, yes.
Q Okay. Now, when we're looking, if we were to look from above down on this V shape, does the center tire, does that stick out ahead of the other tire so that it actually looks like a V, or does the tip look like a U?
A It probably looks more like a U. What I did is, I come right off on the leading edge of -- I'm not going to scribble on this no more. But I just come around here and come off of the leading edge of this, so it might have been like a U. Because I come off the leading edge with my other tires this way, see, and off the leading edge this way.
Q So at that center point, does it -- it forms a very gradual curve with the other tires that it's next to?
A No, it is just one tire sitting right there.



Q Does it stick out like a point?
A No.
Q Or does it run flush with the tires that are next to it?
A Basically, flush.
Q Into a curve shape?
A Yeah.
Q Okay. Now, did you get authorization from the BLM to build this dam?
A No, I felt none was needed.
Q Did you get authorization from the BLM to use a loader in this area?
A No, I felt none was needed.
Q Did you get authorization from any other agency to do any of this work inside of the creek?
A No, I didn't. It was a dry streambed when I started.
Q Now, did you -- was your overall intent in building this dam to eventually restore the pipeline below the dam?
A Yes, ma'am.
Q Did you ever do that?
A No. They asked me to cease work until they could review it, and I accommodated them. And Wayne King wrote me a letter after they had their GPS on it. They had



more vehicles than has ever been in Underwood Canyon in 50 years up there looking at it and appraising it, and they asked me to cease work until they could make a determination.

So Wayne King wrote me a letter and asked me if I would come up and explain to him exactly why I felt that no permit was required. And I laid the documentation down to Wayne King.

I'm a little lax about getting my mail. So I probably didn't pick it up early enough, the first letter he wrote me and asked me to come up and sit down with him and talk to him. So he issued a decision. In the meantime, he went to the state engineer and everybody for information.

And I went up and sat down with him, when I got these next notices to cease and desist or whatever he termed it. So I laid my information down to him. What I felt made it a preexisting right prior to FLPMA, that it was fully qualified under 2339 right-of-way under the 1866 Act.

And Wayne looked at it. And there was him and me and Walt Brown at this meeting. And he said, Well, I told you, Walt, that he felt he was legal to do it or he wouldn't have done it. And it looks to me like he's provided us with accurate proof; that we would have to get somebody else to make the determination, or it would have to

A No, I don't.
Q Okay. Was it within a month or two after receiving this decision, do you think?
A No. I don't know. Without reviewing it, I couldn't -- I'd be guessing.
Q Now, in this litigation, you are challenging, you are still challenging the BLM's authority to tell you whether or not you can build this dam where you built it?
A Yes, I am.
Q Okay. And it's your view that you could build a dam in the site where you built this dam that we're talking about without authorization from the BLM?
A Yes, it is.
Q Okay. And it's also your position that it wouldn't matter in terms of building this dam whether or not it was in a wilderness study area?
A No, it wouldn't.
Q Okay. And it's also your position that if you were to do any new construction in this area or any other area, that you would need authorization from the BLM?
A Rephrase that.
Q If you were to do any new construction in this area or another area, that you would need authorization from the BLM?
A No, that's not my view.



Q What is -- maybe you could correct what I've said that you think is inaccurate.
A Well, you said new construction, and they're claiming this dam was new construction, that I didn't just get me a pick and shovel and build up the berms and cut me some willows and redo the old dam back in the same manner and same thing and go get me a team of horses and put the berm in. New construction, this is a new age. We have modern technique and modern equipment to use.
They said this was new construction. I feel that it was just replacing a deteriorated prior construction. So, no, I don't -- that's not my position, the way you phrased it.
Q Okay. Now, when we were talking about -- earlier when we were talking about the permit application that you filed in 1987, we had discussed that you agreed that if you were building new construction, that you would need authorization.
A Above the existing pipeline and that, yes.
Q Okay. So putting aside for the minute whether you believe the dam was new construction or not, let's put that aside for just a second. We'll come back to that.
Generally, you believe that -- you agreed that if it's new construction, you do need authorization, but if it's not new construction, you don't need authorization?



A If it's new construction outside of the existing 2339 right-of-way under the 1866 Act, yes, I would agree it needs a permit. If it's construction within the right-of-way of the 2339 right-of-way, protected under the 1866 Act and the savings clauses in FLPMA and the Taylor Grazing Act both, no, I do not need a permit.
Q Now, when you say if it's within the right-of-way, I understand that you may not know -- in terms of legal terms, that's maybe a question that's for your attorney. But in terms of your own understanding of what you're permitted to do within a right-of-way, if you have one, what does that mean to you? What are you allowed to do to that right-of-way?
A It means that I can do the same things I did to construct the dam. It don't mean that I can go and do unnecessary harm or unnecessary destruction of anything that exists within the right-of-way.
But it means that I don't have to go and ask for permission to go put a shovel full of more dirt in one of those tires to seal a leak, or I don't have to go and get a team of horses and rebuild it with a team and that. New construction within the right-of-way I'm legal to do as long as I do it in a workman-type manner and don't create any unnecessary disturbance or detriment to the premises.
Q Okay. And based on what you've explained,



this construction does not need to be in the same location as a prior structure?
A It was so close to the same location and was put in with less disturbance than it would have took to put it on the exact original berms, that common sense entered into it that you don't go and tear the wall down when you can just go and butt one up against it.
Q Well, I understand your motivations for putting the dam where you did, but I'm just asking you the question of what you understand, in your own mind you understand about the term new construction. And as I understand your testimony, you can build, you believe that you can build a dam without authorization from the BLM, and it does not have to be on precisely the same site as the previous structure.
A Yes.
Q Okay.
A As long as it surveys into the location.
Q Okay. So, in your mind, would it have made a difference -- and I'm just speaking hypothetically here. I'm just making an assumption. This is not my version of the facts, and I don't think it's your version of the facts either. If you were to move the dam, say, a hundred yards downstream from where the old berm is or was, do you think that you would need authorization to do that from the BLM?