# Defendant's Exhibit C

United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals

DALTON WILSON

DON BOWMAN

IBLA 2000-232 and 2000-250

Decided December 14, 2001

INDEX CODE:

43 CFR 2800.0-7

43 CFR 2801.3(a)&(b)

***89** Consolidated appeals from a decision of the Battle Mountain (Nevada) Field Office, Bureau of Land Management, rendering final determination of trespass, and requiring payment of trespass damages and cessation of trespass stemming from construction and maintenance of water diversion structure on public lands. NVN-66189.

Affirmed.

1. Federal Land Policy and Management Act of 1976: Rights-of-Way-- Trespass: Generally--Trespass: Measure of Damages

BLM properly finds that a water diversion structure has been erected in trespass on Federally-owned public lands where, even though the structure is intended to serve State water rights which predate the Oct. 21, 1976, passage of FLPMA, no right-of-way or other authorization for the construction and maintenance of the structure has since been obtained. In these circumstances, BLM also properly holds the builder of the structure and the party on whose behalf the structure was built jointly and severally liable for the administrative costs incurred by BLM in resolving the trespass and requires that arrangements be made to remove the structure and rehabilitate the affected lands.

Appearances: Dalton Wilson, Pro Se; Michael F. Mackedon, Esq., Fallon, Nevada, for Don Bowman; John W. Steiger, Esq., Office of the Field Solicitor, U.S. Department of the Interior, Salt Lake City, Utah, for the Bureau of Land Management.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

OPINION BY ADMINISTRATIVE JUDGE HUGHES

Dalton Wilson and Don Bowman have separately appealed from the April 10, 2000, decision of the Battle Mountain (Nevada) Field Office, Bureau of Land Management (BLM), rendering a final determination of trespass and requiring them to pay trespass damages and cease the trespass. The trespass stems from the construction and maintenance of a water ***90** diversion structure on public lands in central Nevada. [FN1] By order dated May 26, 2000, we consolidated the two appeals for final disposition by the Board.

The structure consists of an earthen dam, reinforced with 19 stacked heavy equipment rubber tires, about 69 feet in length, crossing the creek that flows down Underwood Canyon, thus virtually impounding the water. The impoundment is located in the NE 1/4 sec. 7, T. 22 N., R. 48 E., Mount Diablo Meridian, Lander County, Nevada. The total surface disturbance associated with the structure is about 0.13 acres.

The record does not demonstrate exactly when the water diversion structure was constructed. However, it is undisputed that construction was recent, having first been noted by BLM in its August 26, 1998, letter to Wilson, stating that it "was investigated on 8/6/98 after [Nevada Department of Wildlife (NDOW)] reported seeing a bulldozer in the canyon." (Initial Report of Unauthorized Use dated Jan. 19, 2000.)

There is no doubt that the water diversion structure was constructed by Wilson, on behalf of Bowman, and was being maintained by Wilson on public lands in Underwood Canyon. There is also no doubt that there was no right-of-way authorizing the diversion structure in effect. [FN2] Unless appellants are able to show that there was other authority for it, construction of the diversion is properly held to have been in trespass. [FN3]

It is undisputed that Wilson and Bowman both own parcels of land not far from the mouth of Underwood Canyon within the Simpson Park WSA. Bowman acquired his land from the Western Farm Credit Bank (WFCB) by quitclaim deed dated May 23, 1994, and has since leased it to Wilson and/or Underwood Livestock, Inc. (ULI), of which Wilson is President, Secretary, and Treasurer.

***91** It is also undisputed that Bowman acquired water rights from the WFCB that are appurtenant to part of his private lands in the S 1/2 NW 1/4 sec. 12 (as well as part of the public lands in the NE 1/4 SW 1/4 sec. 12), which are recognized by NDWR under State law. [FN4] Those rights afforded Bowman (and his predecessors-in-interest) the right to divert 0.323 cubic feet per second (cfs) of surface waters of the Canyon during the period from April 1 to October 1 of each year from a point of diversion situated in the NW 1/4 NE 1/4 sec. 7, T. 22 N., R. 48 E., Mount Diablo Meridian, Lander County, Nevada, and to use them for irrigation and domestic purposes on the appurtenant private lands in the S 1/2 NW 1/4 sec. 12 (as well as public lands in the NE 1/4 SW 1/4 sec. 12). Bowman applied to the State on January 17, 1995, to transfer these water rights to Wilson and/or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ULI, but, at all relevant times herein, the transfer had not yet been approved.

At various times between October 5, 1998, and January 27, 2000, BLM discussed with Wilson and/or Bowman whether to grant a right-of-way pursuant to Title V of FLPMA, as amended, supra, that would authorize some manner of impoundment of the surface waters of the creek in Underwood Canyon and their conveyance to the appurtenant private lands owned by Bowman in the S 1/2 NW 1/4 sec. 12. [FN5] Despite repeated written requests by BLM starting in August 1999, no right-of-way application was ever submitted by Wilson or Bowman.

Accordingly, in the continuing absence of a right-of-way allowing the diversion, BLM issued a Notice of Trespass/Notice to Cease and Desist to Wilson and to Bowman on March 8, 2000. BLM stated therein that, by virtue of having failed to obtain appropriate authorization for construction and maintenance of the water diversion structure, Wilson (who had erected the structure) and Bowman (on whose behalf the structure had been erected) were each deemed to have violated FLPMA, as amended, 43 U.S.C. § 1701-1785 (1994), as implemented by 43 CFR 2801.3. [FN6] BLM noted that ***92** Wilson and Bowman were thus liable for the fair market rental value of the public lands affected by the structure, as well as the rehabilitation/stabilization costs associated with rectifying the damage to those lands and the administrative costs incurred by BLM in resolving the trespass. It required Wilson and Bowman each to immediately cease and desist from the existing trespass, as well as the planned erection of a head gate and diversion pipeline intended to carry water to the appurtenant private and public lands in sec. 12, noting that such activity would constitute a willful trespass. Further, BLM required Wilson and Bowman, within 30 days, to either arrange the settlement of their trespass liability or demonstrate the absence of any trespass. It stated that the failure to comply with the Notice, including the resolution of their trespass liability, might result in trespass penalties, as well as criminal liability.

Wilson and Bowman responded to BLM's March 2000 trespass notices, challenging its finding of trespass. Bowman asserted that he enjoyed a right to construct and maintain a water diversion structure on public lands, arguing that such construction/maintenance is permitted "within existing rights-of-ways granted by state laws, local customs and by the original patent for the land signed by [the] President" granting Federal lands to Bowman's predecessor-in-interest. (Letter to BLM, dated Mar. 27, 2000.)

BLM issued its April 2000 trespass decision ruling that, although both Wilson and Bowman had denied any violation of 43 CFR 2801.3, they had failed to provide sufficient evidence that the water diversion structure was authorized. As they had not removed the structure, BLM issued its decision determining that Wilson and Bowman were trespassing on the public lands and again required Wilson and Bowman to immediately cease and desist from any additional construction associated with the structure, especially the imminent construction of a diversion ditch running from the structure to Bowman's private lands. In addition, BLM required Wilson and Bowman to make arrangements for removal of the structure and rehabilitation of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

affected site on or before May 10, 2000, in accordance with a plan to be submitted to and approved by BLM in advance of any work (given the sensitive nature of any work within a WSA). It stated that, absent such arrangements, BLM would remove the structure and rehabilitate the site at their expense pursuant to 43 CFR 2801.3(b)(3).

Finally, BLM required Wilson and Bowman to pay trespass damages on or before May 10, 2000, in the amount of $6,722.16 representing the BLM's administrative costs incurred in investigating and attempting to abate the trespass, pursuant to 43 CFR 2801.3(b) (1). BLM noted that failure to pay this charge timely and to arrange for satisfactory removal of the structure might result in trespass penalties, as well as criminal liability. BLM ***93** enclosed Bill for Collection No. A446112, directed to both Wilson and Bowman, seeking payment of the $6,722.16 in administrative costs. [FN7]

Wilson and Bowman each appealed timely from BLM's April 2000 Trespass Decision.

Appellants contend on appeal that they are not required to obtain any authorization from BLM for the water diversion structure at issue here, since that structure is already permitted under their existing "property rights," which assertedly stem from their ownership of private lands and appurtenant water rights and a related "easement" or "right-of-way" arising under State law. (Bowman NA/SOR at 1; Wilson NA/SOR at 1.) They argue that, since such rights were acquired and perfected prior to the enactment of FLPMA (as well as promulgation of its implementing regulations) and are protected by that statute, they are not required to also obtain any authorization under that statute and regulations:

> Mr. Bowman advises me that he intends to continue to use his water rights to benefit the lands to which they are appurtenant and that he believes he is entitled to use and make repairs to the diversionary and transportation structures which serve and implement the right. I am of the opinion that he is entitled to do this under applicable law[.]

(Bowman NA/SOR at 2; see Wilson NA/SOR at 1-2.) Further, appellants assert that requiring such an authorization constitutes an ultra vires act on the part of BLM and/or a condemnation of their existing property rights. They claim that such deprivation, absent the payment of just compensation, violates the Fifth Amendment to the U.S. Constitution. (Bowman NA/SOR at 2; Wilson NA/SOR at 2.)

[1] It is well established that any person who desires, on or after October 21, 1976, to use, occupy, or develop the public lands for the purposes of impounding, storing, transporting, or distributing water is required to obtain a right-of-way or other authorization pursuant to Title V of FLPMA and its implementing regulations. 43 U.S.C. §§ 1761(a) and 1770 (1994); 43 CFR 2800.0-7; Wayne D. Klump, 130 IBLA 98, 101 (1994), [FNb] and cases cited therein. Further, if no right-of-way grant or other authorization has been issued by BLM, it may properly determine that a structure erected on public lands is being maintained in trespass. 43 CFR 2801.3(a), which provides:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Any use, occupancy, or development of the public lands that requires a right-of-way, temporary use permit, or other authorization pursuant to [43 CFR Part 2800] * * * and that has not been so authorized * * * is prohibited and shall constitute a trespass * * *.

***94** Finally, the person or persons responsible for that trespass may be held liable in accordance with 43 CFR 2801.3(b), which provides:

Anyone determined by the authorized [BLM] officer to be in violation of [43 CFR 2801.3(a)] shall be notified in writing of such trespass and shall be liable to the United States for:

(1) Reimbursement of all costs incurred by the United States in the investigation and termination of such trespass;

* * * * * *

(3) Rehabilitating and stabilizing any lands that were harmed by such trespass. If the trespasser does not rehabilitate and stabilize the lands within the time set by the authorized officer in the notice, he/she shall be liable for the costs incurred by the United States in rehabilitating and stabilizing such lands. [Emphasis added.]

See Caughman Lumber, Inc., 142 IBLA 192, 198 (1998); [FNc] Douglas Noland, 139 IBLA 337, 341 (1997); [FNd] Wayne D. Klump, 130 IBLA at 101; Double J Land and Cattle Co., 126 IBLA 101, 105 (1993), [FNe] aff'd, Double J Land & Cattle Co. v. U.S. Department of Interior, (D. Colo.), aff'd in part, rev'd in part on other grounds, 91 F.3d 1378 (10th Cir. 1996). [FN8]

Underlying appellants' appeals from BLM's April 2000 Trespass Decision is a fundamental misconception regarding the nature and extent of their water rights under State law, which concern only the proper use and dispensation of the water to which they are entitled. Such rights do not include any automatic right to use Federally-owned lands for the construction and maintenance of a structure, even where it is utilized in connection with those water rights. Utah Power & Light Co. v. United States, 243 U.S. 389, 410-11 (1917); Roger G. Gervais, 128 IBLA 43, 46 (1993); [FNf] John V. Hyrup, 15 IBLA 412, 420 (1974), [FNg] rev'd on other grounds, Hyrup v. Kleppe, 406 F. Supp. 214 (D. Colo. 1976), aff'd, No. 76-1452 (10th Cir. Nov. 7, 1977); William A. Lester, 2 IBLA 172, 175 (1971); [FNh] Howard C. Brown, 73 I.D. 172, 175, 178 (1966); Robert J. Edwards, 54 I.D. 144, 147-48 (1933). Water rights acquired under State laws do not carry with them, as necessary incidents, rights-of-way over public lands. Sol. Op., "Rights-of-Way for Ditches and Canals," 58 I.D. 29, 30 (1942). No vested interest in a right of way over public lands is obtained as an incident to the appropriation of waters under State authority. Jackson Hole Irrigation Co., 48 L.D. 278, 279 (1921).

***95** As the court stated in Snyder v. Colorado Gold Dredging Co., 181 F. 62, 69 (8th Cir. 1910),

[t]he right to appropriate the waters of a stream does not carry with it the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

right to burden the lands of another with a ditch for the purpose of diverting the waters and carrying them to the place of intended use, for that cannot be done without a grant from the landowner or a lawful exercise of the power of eminent domain; and this although the particular circumstances be such that the proposed appropriation cannot be effected without the ditch. [Emphasis added.]
The United States, as landowner, has the power to afford the necessary grant to the holder of a right to appropriate the waters.

Although appellants' State water rights (like other valid rights predating the passage of FLPMA) were protected by section 701 of FLPMA, Pub. L. No. 94- 579, 90 Stat. 2786 (1976), such rights do not control the use and dispensation of Federally-owned lands. Wayne D. Klump, 130 IBLA at 101. Nor can it be said that BLM's requirement that appellants obtain proper authorization for construction and maintenance of the structure, which concerns public land usage, directly conflicts with the "pre-existing right to utilize the water from Underwood Canyon adjudicated under State of Nevada Water Law, certificate number 1656." (Wilson NA/SOR at 1.)

Although appellants refer to an existing "easement" and "right-of-way" that assertedly entitle them to place the structure on public lands, they present no evidence on appeal of the existence of such an easement or right-of-way deriving either from State or Federal law. The record does indicate that Wilson stated at meetings with BLM that the original 1924 patent (No. 932407) from the United States to Thomas Brackney, Bowman's predecessor-in-interest, had authorized construction of the structure at issue here as part of a right-of-way for ditches or canals. (Notes of Nov. 2, 1998, Meeting at 1; Notes of July 14, 1999, Meeting at 2.)

The patent provides as follows:

NOW KNOW YE, That there is, therefore, granted by the United States unto the said claimant the tract of land above described, TO HAVE AND TO HOLD the said tract of Land, with the appurtenances thereof, unto the said claimant and to the heirs and assigns of the said claimant forever; subject to any vested and accrued water rights for mining, agricultural, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, and decisions of courts; and there is reserved from the lands hereby granted a right of way thereon for ditches or canals constructed by the authority of the United States.

We find no such authorization from the reservation for ditches and canals. The patent states that "there is reserved from the lands hereby ***96** granted a right of way thereon for ditches or canals constructed by the authority of the United States." (Emphasis added.) The reservation of a right-of-way to the United States across what are now private lands in the S 1/2 NW 1/4 sec. 12 clearly does not afford to the patentee, or his successors-in-interest, a right-of-way extending onto the public lands at issue here in the NE 1/4 sec. 7, thus authorizing the instant structure.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Similarly, the fact that the patent was made "subject to any vested and accrued water rights * * * and rights to ditches and reservoirs used in connection with such water rights" cannot provide such a right-of-way. (Emphasis added.) Roger G. Gervais, 128 IBLA at 45-46. Rather, that language also acts as a limitation on what Brackney received in the original patent. His rights were expressly made "subject to any vested and accrued water rights" that were held by others at the time of patent. [FN9]

The only language in the patent suggesting that Brackney received more than title to the lands specifically named therein is a general statement that the land was assigned to him "with the appurtenances thereof." Appellants suggest that the right to construct the diversion is such an "appurtenance." See Wilson NA/SOR at 1; Letter to BLM from Wilson, dated Feb. 25, 2000, at 3.

The only possibility that we can see that such a right could have existed as an "appurtenance" afforded by the patent would be by virtue of a right-of-way under section 9 of the Act of July 26, 1866 (R.S. 2339), ch. 262, 14 Stat. 251, 253 (codified at 43 U.S.C. § 661 (1970)). The 1866 Act, which was substantially revised by FLPMA in 1976, provided:

[W]henever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed[.] [Emphasis added.]

14 Stat. at 253. Effective October 21, 1976, Congress deleted the underscored passage pursuant to section 706(a) of FLPMA, Pub. L. No. 94-579, 90 Stat. 2793 (1976).

Accordingly, by its own terms, until its amendment in 1976, the 1866 Act afforded those holding vested water rights recognized under State law a separate and independent right-of-way for the construction of ditches ***97** and canals. Further, that right-of-way has been held to include as well dams, reservoirs, pipes, and other structures incident to their usage. Broder v. Water Company, 101 U.S. 274, 275 (1879); Utah Light & Traction Co. v. United States, 230 F. 343, 345-46 (8th Cir. 1915); Martin Hackworth, 141 IBLA 249, 251-52 (1997). [FNj] Moreover, one who had appropriated water under State law could (up until October 21, 1976) [FN10] acquire such right-of-way pursuant to the 1866 Act merely by constructing such improvements, no application to the Federal Government being necessary. R. W. Offerle, 77 IBLA at 85; John V. Hyrup, 15 IBLA at 420.

In the present case, we accept the fact that Bowman's predecessors-in-interest held a vested State water right as of October 21, 1976, and before. Accordingly, appellants can prevail here only if they can show that they are successors to a right-of-way gained under the 1866 Act for a water diversion structure incident to their water rights that is similar to what is presently in place. See Martin

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hackworth, 141 IBLA at 252 (construing sec. 509(a) of FLPMA, 43 U.S.C. § 1769(a) (1994)); Bumble Bee Seafoods, Inc., 65 IBLA 391, 398 (1982). [FNk] The extent of any right-of-way afforded by the 1866 Act is limited by the extent to which the vested water rights owner had constructed and maintained ditches, canals, and related structures prior to the effective date of FLPMA. Further, appellants must show that such right-of-way (if it arose) was preserved by FLPMA and was not abandoned.

Appellants have made no effort to show that they hold an R.S. 2339 right-of-way that supports the construction of the water impoundment here. Nor do we find evidence in the record so showing. It is clear from the record that the only structures that had ever been erected for use incident to exercise of appellants' successor-in-interest's water rights were a spring box and pipeline. [FN11] Thus, it does not appear that appellants' predecessors-in-interest ever had an R.S. 2339 right-of-way that would have entitled them to maintain a water diversion/impoundment structure of the size or effectiveness at issue here.

***98** Further, any structure that might have been erected in connection with an R.S. 2339 right-of-way prior to October 21, 1976, had seemingly fallen into such a state of disrepair [FN12] that the right-of-way had ceased to exist, since the right-of-way was coextensive with the constructed structures. Compare Roger G. Gervais, 128 IBLA at 44-46, 48 (remnants of pre-FLPMA water diversion system not sufficient to establish existing R.S. 2339 right-of-way thereafter) with R. W. Offerle, 77 IBLA at 81 and 86 (R.S. 2339 right-of-way for irrigation ditch recognized where ditch had been constructed and was maintained continuously since before FLPMA), and Bumble Bee Seafoods, Inc., 65 IBLA at 395-96, 398-99 (R.S. 2339 right-of-way for reservoirs, pipeline, and ditches recognized where structures constructed and maintained continuously since before FLPMA). In these circumstances, any right-of-way would have been abandoned. See James D. Perkins, 13 IBLA 74, 75-76 (1973); [FNl] Lincoln County Water Supply & Land Co. v. Big Sandy Reservoir Co., 32 L.D. 463, 464 (1904); see also United States v. W.H.I., Inc., 855 F. Supp. 1207, 1210 (D. Colo. 1994), and Anderson v. Richards, 608 P.2d 1096, 1099 (Nev. 1980) (R.S. 2477 public road right-of-way); see generally 25 Am. Jur.2d, Easements and Licenses in Real Property §§ 112-14 (1996).

Although a water right itself may be deemed to have persisted under State law despite the cessation of water use even for many years, we find no indication that Congress intended that an R.S. 2339 right-of-way similarly persist when it has ceased to be employed for any useful purpose. In any event, we do not think that such a right-of-way survived repeal by FLPMA of the originating statutory language, where there was no useful structure in existence on October 21, 1976, that might have served to support a valid existing right preserved by FLPMA.

In conclusion, we hold that, in order to construct and maintain a new water diversion structure on the public lands, and thus to "use, occup[y], or develop [[]" such lands, appellants were required, by Title V of FLPMA and 43 CFR Part 2800, to obtain a right-of-way or other authorization from BLM. Further, absent such authorization, appellants' construction and maintenance of a structure

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

clearly constituted a trespass under 43 CFR 2801.3(a), and properly subjected them to trespass liability.

We conclude that BLM properly determined in its April 2000 Trespass Decision, under 43 CFR 2801.3, that the water diversion structure at issue ***99** here was constructed and is being maintained in trespass on the public lands, and that, consequently, Wilson, who had erected the structure, and Bowman, on whose behalf the structure was erected, are appropriately deemed to be jointly and severally liable for trespass damages, in the amount of the administrative costs of investigating and terminating the trespass. Wayne D. Klump, 130 IBLA at 101-03. Further, we find that BLM was entitled to require that arrangements be made for removal of the structure and rehabilitation of the affected lands. Double J Land and Cattle Co., 126 IBLA at 105, 109-10.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decision appealed from is affirmed.

David L. Hughes

Administrative Judge

I concur:
Gail M. Frazier
Administrative Judge

FN1. The appeals filed by Wilson and Bowman from BLM's April 2000 trespass decision were docketed as IBLA 2000-232 (Wilson) and IBLA 2000-250 (Bowman).

FN2. We note that Wilson at one time held a 30-year right-of-way (N-46557), issued by BLM effective Mar. 29, 1989, which authorized construction, operation, and maintenance of a "surface water pipeline" from the NE 1/4 sec. 17, T. 22 N., R. 48 E., down through Underwood Canyon, to private land situated in the S 1/2 NW 1/4 sec. 12, T. 22 N., R. 47 E., Mount Diablo Meridian, Lander County, Nevada. The right-of-way also authorized an existing "access road" which ran from that private land to private land situated in the NW 1/4 SE 1/4 sec. 17, T. 22 N., R. 48 E. That right-of-way, which was issued pursuant to Title V of the Federal Land Policy and Management Act of 1976 (FLPMA), as amended, 43 U.S.C. §§ 1761-1771 (1994), did not authorize construction, operation, and maintenance of a structure such as the one at issue here. In any event, it was cancelled by BLM on Feb. 15, 1996, due to failure to pay required rental.

FN3. We note that it is not clear that BLM may properly issue a right-of-way for this structure, as it appears that it is situated within the Simpson Park Wilderness Study Area (WSA). WSA's were designated by BLM pursuant to section 603 of FLPMA, as amended, 43 U.S.C. § 1782 (1994), for the purpose of preserving the wilderness characteristics of areas of the public lands from impairment pending a final determination whether such lands should be afforded formal protection under the Wilderness Act, as amended, 16 U.S.C. §§ 1131- 1136 (1994), by virtue of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inclusion within the National Wilderness Preservation System. See, e.g., Natural Guardian LP, 152 IBLA 295, 298-99 (2000). [FNa] Although the issue is not presented in the present appeal, it appears that construction of a diversion such as has been constructed would violate the non-impairment standards.

FN4. Such rights are recognized by virtue of the issuance of Nevada Certificate of Appropriation of Water (Certificate) No. 1656 by the State on June 17, 1930.

FN5. BLM made it clear that such a right-of-way had to be consistent with requirements for non-impairment of the WSA, including being temporary and capable of being removed and the site reclaimed without detracting from the suitability of the lands for inclusion in a Wilderness Area.

FN6. BLM also stated that Wilson and Bowman had each violated BLM's Interim Management Policy and Guidelines for Lands Under Wilderness Review (IMP) (BLM Handbook H-8550-1 (Rel. 8-67 (July 5, 1995))), but did not specify how the structure at issue violated the IMP. But see BLM's IMP Violation Discovery Notice, dated Oct. 30, 1998. In addition, BLM stated that Wilson and Bowman had each violated "laws including, but not limited to, [FLPMA]" (Mar. 8 Notices at 2), but did not specify these other laws.

FN7. On May 16, 2000, BLM explained to Wilson that its administrative costs reflected the expenditure of 234 hours by seven BLM employees in connection with the trespass action during the period ending Apr. 8, 2000, which hours were then billed according to the employees' normal hourly rates of pay.

FN8. BLM may also collect the fair market rental value of the affected lands accruing during the period of the trespass. See 43 CFR 2801.3(b). Although BLM stated in its March 2000 trespass notices that appellants were liable for such value, it did not seek to collect such value in its April 2000 trespass decision.

FN9. As explained below, other parties might have acquired rights to cross Federally-owned lands under authority of sec. 9 of the Act of July 26, 1866 (R.S. 2339). The quoted provision expressly made the grant to Brackney subject to those other parties' rights. See R. W. Offerle, 77 IBLA 80, 83 (1983). [FNi]

FN10. When Congress revised the 1866 Act, effective Oct. 21, 1976, it precluded the creation of new rights-of-way under that statute after that date. After that time, FLPMA was the only authority for granting a diversion. As a result, as we held above, any person who desires, on or after Oct. 21, 1976, to use, occupy, or develop the public lands for the purposes of impounding, storing, transporting, or distributing water is required to obtain a right-of-way or other authorization pursuant to Title V of FLPMA and its implementing regulations. 43 U.S.C. §§ 1761(a) and 1770 (1994); 43 CFR 2800.0-7; Wayne D. Klump, 130 IBLA at 101, and cases cited therein.

FN11. There may have been a "spring box," from which a pipeline ran, near the site of the current structure, which was constructed in connection with the original

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appropriation, later recognized with the issuance of Certificate No. 1656 by the State in 1930. (Letter to Wilson from BLM, dated Oct. 5, 1998, at 2; see Certificate; "Culture Map of Thomas Brackney," dated July 13, 1926; Memorandum to BLM Realty Specialist from BLM Forester, dated July 17, 1987 (Forester Memorandum), at 1; Letter to Wilson from NDWR, dated Oct. 8, 1998, at 1 ("[C]ertificate 1656[] makes no reference to a dam of any sort and the various proofs filed therein indicate only an improved spring and pipeline"); Memorandum to Field Manager from BLM Wilderness Coordinator, dated Apr. 5, 2000 ("Th[e] point of diversion is upstream of the one where the rubber tire dam is constructed").)

FN12. By October 1998, only "[s]craps of old wood," which might be "remnants of the spring box," were evident at that site. (Letter to Wilson from BLM, dated Oct. 5, 1998, at 2.) Further, as early as July 1987, the pipeline was virtually non-existent: "It appears that the pipeline has been abandoned for at least 10 years. The sheep troughs at the point of diversion had small aspen trees growing through the metal." (Forester Memorandum at 1-2.)

FNa. GFS(MISC) 24(2000)

FNb. GFS(MIN) 47(1994)

FNc. GFS(MISC) 26(1998)

FNd. GFS(MIN) 82(1997)

FNe. GFS(MISC) 29(1993)

FNf. GFS(MISC) 3(1994)

FNg. GFS(MISC) 44(1974)

FNh. GFS(MISC) 44(1971)

FNi. GFS(MISC) 6(1984)

FNj. GFS(MISC) 6(1998)

FNk. GFS(MISC) 129(1982)

FNl. GFS(MISC) 76(1973)

GFS(MISC) 6(2002), 156 IBLA 89

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.