# Defendant's Exhibit L

DEPOSITION OF DAN BOWMAN
FEBRUARY 26, 2002

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
-oOo-

DON BOWMAN and DALTON WILSON, )
)
Plaintiffs, ) CV-N-00-0506-HDM(RAM)
)
-vs- )
)
BRUCE BABBITT, ET AL., )
)
Defendants. )
)

DEPOSITION OF DON BOWMAN,

called for examination by counsel for Defendants, at the offices of Mackedon & McCormick, 179 S. LaVerne Street, Fallon, Nevada, Tuesday and Wednesday, February 26 and 27, 2002, before Cindy Lee Brown, a Notary Public.

APPEARANCES: (See separate page.)

Reported by: Cindy Lee Brown, CCR #486

Page 2

APPEARANCES

For the Plaintiffs: MACKEDON & McCORMICK
Attorneys at Law
BY MICHAEL F. MACKEDON
179 S. LaVerne Street
Fallon, Nevada

For the Defendants: ANNE R. TRAUM
Assistant United States Attorney
333 Las Vegas Blvd. South
Suite 5000
Las Vegas, Nevada

Also Present: DALTON WILSON

Page 3

INDEX


| | |
|---|---|
| EXAMINATION: | PAGE: |
| By Ms. Traum: | 4 |
| CONTINUED EXAMINATION | |
| By Ms. Traum: | 49 |
| EXHIBITS: | PAGE: |
| 1. Quitclaim Deed | 16 |
| 2. Lease Agreement with Option to Purchase | 23 |
| 3. The State of Nevada Certificate of Appropriation of Water | 31 |
| 4. Map | 33 |
| 5. Map | 34 |
| 6. Map | 48 |
| 7. Map | 49 |
| 8. Trespass Decision | 77 |
| 9. Decision | 80 |


Page 4

FALLON, NEVADA; TUESDAY, FEBRUARY 26, 2002; 3:55 P.M.

-oOo-

DON BOWMAN,

having been sworn, testified as follows:

EXAMINATION

BY MS. TRAUM:

Q Mr. Bowman, can you state your full name and address.

A My middle name too?

Q Sure.

A Don Clifford Bowman, address is 2040 Reno Highway, Fallon, Nevada.

Q Okay. We're going to go over some preliminaries here just for a few minutes, so I'd just ask for your patience. My name is Anne Traum. I represent the Bureau of Land Management, which we may refer to as the BLM. I'm sure you're familiar with that term, so we'll be using that during the deposition.

Have you been deposed before?

A No.

Q Okay. Do you understand that the oath that you just took and your obligation to testify truthfully just as though you were sitting in a witness chair in a courtroom?

there more than one culture map?
A I know of one.
Q And do you know the date of that culture map?
A No, I'd have to look.
Q Okay. And what did you intend -- and did you discuss -- pardon me. Can you strike that.
Did you discuss the location of the water rights with anybody before purchasing the property?
A No. After I researched it, I did not.
Q Okay. Did you discuss the water -- any of the ditches or water rights with Dalton Wilson?
A No. I just verified the water rights existed and made sure they were there so it was a secured piece of property.
Q Okay. And just to review, you looked at water certificates that evidenced how the water was used?
A Yes.
Q Okay. Did you look at any documents that specifically described a right-of-way for a ditch or for a pipeline?
A Yes, a parcel map.
Q Okay. Did you look at anything else?
A No.
Q Okay. And once you acquired the property, what did you do with it?



A I immediately contracted it to Dalton Wilson.
Q Now, did you contract -- when you say you contracted, you entered a lease?
A A lease purchase.
Q A lease purchase. And since the time that you entered that lease purchase, what activities -- have you used the property at all?
A No.
Q Not at all?
A Not a bit.
Q Okay. Now, before you purchased the property, did you inspect the property?
A No.
Q You didn't physically go out there and take a look?
A No, I didn't.
Q Okay. And ~~have you been out there~~?
A Yes.
Q Since you purchased it?
A Yes.
Q When did you go out there?
A Oh, sometime after the purchase, probably, maybe two or three months.
Q After you purchased it?
A Uh-huh.



Q So maybe in the summer of 1994?
A Probably.
Q Okay. And that was -- was that the first time you had been out there?
A Yes. It was the first time I was on that property. It wasn't the first time I was in that valley.
Q Okay. And what was the purpose of that visit?
A Just to stop and see how Dalton was getting along.
Q Okay.
(Exhibit 2 marked for identification.)
BY MS. TRAUM:
Q I've shown you an exhibit which we've marked as Exhibit 2 for this deposition. Do you recognize this document?
A Yes.
Q What is it?
A It's the lease purchase for Dalton Wilson.
Q And you leased the property to Dalton Wilson on May the 20th, 1994; is that correct?
A Yes, that's what this says.
Q Okay. And can you say again why you leased the property to Dalton Wilson?
A So he could remain on his ranch.
Q Okay. And the lease covers all of the



property that was described in the deed that you got?
A Yes.
Q Okay. And the lease is for a term of two years, correct?
A Yes.
Q And it contains an option to purchase before the end of the two-year term?
A Yes.
Q Now, did Dalton Wilson ever exercise that option to purchase?
A Not yet.
Q Did you extend the lease after the two-year period?
A Yes.
Q Was there a document evidencing that extension?
A No.
Q You just did it orally?
A Yes.
Q So you agreed?
A Uh-huh.
Q Okay. Now, are the terms of the current lease the same as the terms of this lease?
A Yes.
Q The rent is the same?

Page 73

Q Okay. Now, based on your inspection of the property, was this dam built in the exact area that this previous structure that you've said you've seen evidence of? Was it in that same area?
A It was built within the -- it was built within the centerline of the ditch easement.
Q Okay. Was it built in the same area of the structure that you earlier described as having seen evidence of that?
A Right next to it.
Q Was it upstream or downstream?
A Downstream.
Q Do you know approximately how far downstream it was?
A Just a few feet.
Q Less than 20 feet?
A Yes.
Q Okay. Do you know how long it took to build the dam?
A No.
Q And you've already said that you could not accurately mark on this map, number 6, where the dam was.
A No, I can't.
Q And you cannot accurately mark on this map, number 5, where the dam was.

Page 74

A No.
Q And you personally observed the dam after it was built?
A Yes.
Q Do you know when that was?
A No.
Q Do you know how long it was after the dam was built?
A Just after they finished it.
Q Within a week or two weeks?
A Within a couple of months.
Q Within a couple of months, okay. Do you know if the dam was ever used?
A No, because the BLM asked Dalton to stop construction until they could decide what they wanted to do, and he agreed to.
Q Okay. When you say "stop construction," what other construction was intended for the site?
A The pipeline was going to go in next.
Q Do you know if Dalton Wilson purchased the pipeline that he was going to install?
A No, because they, the BLM asked him to stop, and so he didn't get the pipe.
Q Okay.
A He borrowed the money to do it, he said, and

Page 75

he was going to.
Q Okay. When was the last time that you observed the dam in place?
A It was that time, shortly after it was constructed.
Q So you only saw the dam once?
A Right.
Q Have you been back to the property since then?
A Yeah, to see where it was.
Q Okay. After it was removed by the BLM?
A Yes.
Q Okay. Now, did you -- you knew that Dalton Wilson planned to install this dam before he did it?
A Yes.
Q And did you know -- did you know whether Mr. Wilson had applied for a permit to do this work?
A No.
Q Did you ever ask him?
A No, because I didn't believe a permit was necessary.
Q Why didn't you believe a permit was necessary?
A Because we had a certified water right. And, according to my belief of the way those things work, those water rights that existed before FLPMA and those other land management policies went in, those were protected rights,

Page 76

and you didn't need a permit.
Q Okay. And you believed that this right-of-way to a ditch and/or a spring was not subject to the BLM regulations?
A Yes, that's correct.
Q Okay. You didn't need any kind of permit or authorization to do work?
A That's correct.
Q And you believe that you didn't need any authorization to do any kind of work on these, on this right-of-way that you claim?
A As long as you stayed within the right-of-way, I believe you don't need one.
Q What if you went outside of the right-of-way?
A You would need one.
Q And in what instances would you personally, and I'm not asking about sort of your view of the law, would you personally think that you would need to apply for a permit? What circumstances?
A Only on new construction, on construction of something that you were trying to acquire a new right-of-way for.
Q Okay. Now, the BLM issued a trespass citation, trespass decision for the construction of this dam?