IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNDERWOOD LIVESTOCK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 05-162 L |
| | ) | |
| v. | ) | Judge Mary Ellen Coster Williams |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

Dated: June 1, 2006

Respectfully submitted,

KATHLEEN L. DOSTER
HELENANNE LISTERMAN
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0481 (phone)
(202) 305-0506 (fax)
Kathleen.Doster@usdoj.gov

Of Counsel:
JAMES KARKUT
United States Department of the Interior
Office of the Regional Solicitor

## TABLE OF CONTENTS


I. INTRODUCTION . . . . . 1

II. BACKGROUND . . . . . 3

A. In 1998, Dalton Wilson Built An Unauthorized, New Water Diversion Structure on BLM Managed Lands, And Subsequently Refused to Remove the Structure and Rehabilitate the Riparian Area Damaged by His Unauthorized Activities . . . . . 3

B. The "Barricade" Does Not Block Access to the Point of Diversion Described in Certificate 1656 . . . . . 7

III. ARGUMENT . . . . . 7

A. Plaintiff Does Not Have Standing to Sue For The Alleged Taking Because It Did Not Own the Water Right at the Time of the Alleged Taking . . . . . 7

B. The United States Has Not Taken Plaintiff's Certificated Water Right . . . . . 9

C. Plaintiff Does Not Have a Compensable Property Interest in Constructing and Maintaining a Water Diversion Structure on Federal Land . . . . . 11

D. Plaintiff is Not Entitled to Recover Consequential Damages in a Fifth Amendment Takings Claim . . . . . 14

CONCLUSION . . . . . 15

# TABLE OF AUTHORITIES

## CASES

American Pelagic Fishing Co. v. United States,
379 F.3d 1363 (Fed. Cir. 2004) . . . . . . . . . . 14

Cottrell v. United States,
42 Fed. Cl. 144 (1998) . . . . . . . . . . 9

Creppel v. United States,
33 Fed. Cl. 590 (1995) . . . . . . . . . . 8

Dalton Wilson, Don Bowman,
156 IBLA 89 (2001) . . . . . . . . . . passim

Danforth v. United States,
308 U.S. 271 (1939) . . . . . . . . . . 8

Georgia-Pacific Corp. v. United States,
640 F.2d 328 (Ct. Cl. 1980) . . . . . . . . . . 15

Kirby Forest Indus., Inc. v. United States,
467 U.S. 1 (1984) . . . . . . . . . . 14

Klump v. United States,
38 Fed. Cl. 243 (1997) . . . . . . . . . . 13

NL Indus., Inc. v. United States,
12 Cl. Ct. 391 (1987), aff'd, 839 F.2d 1578 (Fed. Cir. 1988) . . . . . . . . . . 15

Rith Energy, Inc. v. United States,
270 F.3d 1347 (Fed. Cir. 2001) . . . . . . . . . . 9

Turntable Fishery & Moorage Corp. v. United States,
52 Fed. Cl. 256 (2002) . . . . . . . . . . 13

United States ex rel. Tenn. Valley Auth. v. Powelson,
319 U.S. 266 (1943) . . . . . . . . . . 15

United States v. 91.90 Acres of Land,
586 F.2d 79 (8th Cir. 1978) . . . . . . . . . . 15

United States v. Dow,
357 U.S. 17 (1958) . . . . . . . . . . 8

United States v. General Motors Corp.,
323 U.S. 373 (1945) . . . . . . . . . . 14, 15

Yuba Natural Res., Inc. v. United States,
821 F.2d 638 (Fed. Cir. 1987) . . . . . . . . . . 14

**STATUTES**

43 U.S.C. § 1733 . . . . . . . . . . 11

**REGULATIONS**

43 C.F.R. Part 2800 . . . . . . . . . . 6

43 C.F.R. § 2801.3 . . . . . . . . . . 11, 13

43 C.F.R. § 2801.3(b)(3) . . . . . . . . . . 10, 12

43 C.F.R. § 2808.10(a) . . . . . . . . . . 10

43 C.F.R. § 2808.11(a)(3) . . . . . . . . . . 6, 11

43 C.F.R. § 4130.2(d) . . . . . . . . . . 10

## EXHIBIT LIST

| Exhibit No. | Exhibit Description |
|---|---|
| P | Notice of Trespass/Notice to Cease and Desist issued by the Bureau of Land Management ("BLM") to Dalton Wilson, dated March 8, 2000 |
| Q | Trespass Decision issued by BLM to Dalton Wilson and Don Bowman, dated April 10, 2000 |
| R | Declaration of Gerald M. Smith |
| S | Letter from BLM to Dalton Wilson regarding delinquent payment of trespass, structure removal, and site rehabilitation costs, dated January 6, 2006 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNDERWOOD LIVESTOCK, INC., Plaintiff, | ) | No. 05-162 L |
| v. | ) | Judge Mary Ellen Coster Williams |
| UNITED STATES OF AMERICA, Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff's motion for summary judgment rests on its allegations that "defendant, without due process of law, *wrongfully* entered plaintiff's certificated water source, fenced it off, and destroyed plaintiff's diversion structure." Pl.'s Mot. for Summ. J. p. 1 (emphasis added). Plaintiff contends that "any right which had been established prior to the passage of [the Taylor Grazing Act in 1934 and the Federal Land Policy and Management Act ("FLPMA") in 1976] was to be respected and was to be unaffected by the passage of these acts," (id.), even though plaintiff admits that the original water diversion structure constructed by Thomas Brackney had not been used for at least thirty years before FLPMA was enacted, and plaintiff's new, substantially different, water diversion structure was not constructed until 1998, over twenty years after the enactment of FLPMA. Although plaintiff does not articulate in any detail the legal basis for its takings claim, it appears that plaintiff is contending that the United States has taken two property rights owned by plaintiff – a certificated water right, and its personal property, a water diversion

structure.

With respect to the certificated water right, as defendant explained in its Motion for Summary Judgment, plaintiff Underwood Livestock, Inc., did not have an ownership interest in the certificated water right at issue here – Certificate 1656 – in May or September 2000, the dates when plaintiff alleges its property was taken. Accordingly, plaintiff's allegation that *its* "certificated water source" was taken is fundamentally flawed, and plaintiff's motion for summary judgment should be denied.

In addition, even assuming that plaintiff held an ownership interest in Certificate 1656 at the time of the alleged taking, plaintiff has not provided any factual support for its assertion that it has been denied access to the point of diversion for Certificate 1656 as a result of a "fence" or "barricade[]." Pl.'s Mot. for Summ. J. at p. 1. In fact, plaintiff has never sought access to the point of diversion allowed under Certificate 1656 from the Department of the Interior, Bureau of Land Management ("BLM"). Instead, plaintiff's President and owner, Dalton Wilson, has attempted to gain access only through trespass; namely, building a new water diversion structure on BLM-managed lands without authorization. Moreover, the Interior Board of Land Appeals ("IBLA"), in affirming a trespass decision issued by the BLM to Mr. Wilson in April 2000, held that Mr. Wilson was not entitled to construct the structure without obtaining permission from BLM and, hence, his unauthorized construction activities constituted trespass.

With respect to the alleged taking of the water diversion structure, plaintiff never had a compensable property right to construct and maintain the water diversion structure on federal land, and, therefore, plaintiff has failed to state a takings claim upon which relief can be granted.

Accordingly, plaintiff's motion for summary judgment concerning BLM's removal of the unauthorized water diversion structure should be denied.

Finally, plaintiff's compensation demand seeks "damage[s]" in "excess of 300,000.00" from "loss of income." Id. Since consequential damages are not recoverable in a Fifth Amendment takings claim, plaintiff's motion for summary judgment with respect to its just compensation claim should be denied.

## II. BACKGROUND

The following factual discussion is in response to plaintiff's Motion for Summary Judgment.[1/]

### A. In 1998, Dalton Wilson Built an Unauthorized, New Water Diversion Structure On BLM-Managed Lands, and Subsequently Refused to Remove the Structure and Rehabilitate the Riparian Area Damaged by His Unauthorized Activities

In 1917, Thomas Brackney applied to the Nevada State Engineer, Division of Water Resources, for a permit ("Permit 4613"), to appropriate water from Underwood Canyon. See Def. Ex. G at 2.[2/] On or about April 16, 1919, Mr. Brackney submitted an Affidavit of Labor and Improvements for Permit 4613 to the State Engineer. Def. Ex. H. In that Affidavit, Mr. Brackney affirmed that he developed his water right represented by Permit 4613, among other things, by making improvements, consisting of an "[e]arth dam . . . and ditch . . ." ("Brackney

---

1/ Defendant respectfully refers the Court to pages 5-11 of its Motion for Summary Judgment filed on May 5, 2006, for a more extensive discussion of the facts underlying this case.

2/ Defendant's Exhibits A-O were previously produced by defendant in support of its Motion for Summary Judgment. Defendant's Exhibits P-S refer to exhibits produced in support of defendant's opposition to plaintiff's Motion for Summary Judgment.

Water Diversion Structure"). Id. Sometime in the 1920s, a pipeline was installed in part of the ditch. See Def. Ex. I (Gail Givens Declaration ("Givens Decl.") at ¶ 4).[3] On June 17, 1930, the State Engineer issued a Certificate of Appropriation of Water (No. 1656) to Mr. Brackney, signifying that Permit 4613 had been developed to the extent that it was a vested water right. Def. Ex. G at p. 1. Under Certificate 1656, a total of 117 acre-feet of water may be diverted and used for domestic use and the irrigation of 32.27 acres from April 1 to October 31 of each year. Id.

By 1998, "scraps of old wood, which might be remnants of the spring box," and a pipeline that appears to have "been abandoned for at least 10 years[4] . . . [with] small aspen trees growing through the metal[,]" were the only things that remained of the Brackney Water Diversion Structure. Dalton Wilson, Don Bowman, 156 IBLA 89, 98 n.12 (2001) (footnote added; internal quotations and citations omitted) (attached for the Court's convenience at Def. Ex. C); see also Def. Ex. B at p. 2; Def. Ex. I (Givens Decl. at ¶ 4). In or around 1998, Mr. Wilson hauled nineteen heavy equipment tires into and adjacent to a stream in Underwood Canyon, on BLM-managed public lands, and constructed a new water diversion structure ("Wilson Water Diversion Structure"). See Def. Ex. B at p. 1. It "consist[ed] of an earthen dam,

---

[3] The Gail Givens Declaration and the deposition testimony of Dalton Wilson and Don Bowman discussed and cited herein were prepared and taken in connection with the lawsuit Don Bowman & Dalton Wilson v. Bruce Babbitt, et al., CV-N-00-0506-HDM (D. Nev. Sept. 26, 2000).

[4] In fact, Mr. Wilson testified during his deposition that he does not have any knowledge of the pipeline being used after the 1940s. See Def. Ex. A (Dalton Wilson Deposition ("Wilson Dep.") at pp. 36-37).

reinforced with 19 stacked heavy equipment rubber tires, about 69 feet in length, crossing the creek that flows down Underwood Canyon, . . . virtually impounding the water." Def. Ex. C (156 IBLA at 90). Plaintiff admits that at no time prior to the construction of the Wilson Water Diversion Structure did it seek authorization from the BLM. Def. Ex. D at pp. 8-9 (Pl.'s Resp. to Req. for Admis. ("RFA") No. 7).

Between October 5, 1998 and January 27, 2000, after the new construction was discovered, BLM encouraged Mr. Wilson and Mr. Bowman[5] to seek a "right-of-way pursuant to Title V of FLPMA . . . that would authorize some manner of impoundment of the surface waters of the creek in Underwood Canyon and their conveyance to the appurtenant private lands owned by" Mr. Bowman. Def. Ex. C (156 IBLA at 91). Plaintiff does not dispute that it chose not to seek a right-of-way authorization from BLM because it "felt none was needed." Def. Ex. A (Wilson Dep. at p. 95). BLM disagreed and on March 8, 2000, issued a Notice of Trespass / Notice to Cease and Desist to Mr. Wilson and Mr. Bowman. See Def. Ex. P. On April 10, 2000, BLM issued a final decision that the construction of the Wilson Water Diversion Structure constituted a trespass on public land, and required Mr. Wilson and Mr. Bowman to cease the trespass, pay certain damages, and make arrangements to remove the structure and rehabilitate the site. See Def. Ex. Q. After Mr. Wilson refused to resolve the trespass, BLM removed the tire dam in September 2000, and stored the tires at a wareyard at BLM's Battle Mountain District

---

[5] Mr. Bowman is not a party to this litigation. However, as discussed infra at Part III.A, at the time of the alleged taking, Mr. Bowman purportedly orally leased 80 acres of fee land, water rights, and any accompanying rights-of-way to Mr. Wilson, which plaintiff contends entitled it to build a water diversion structure on BLM-managed lands.

Field Office, where they remain today. See Def. Ex. R (Gerald M. Smith Declaration ("Smith Decl.") at ¶¶ 5-7).

In addition, BLM installed a small fence less than 4 feet high, and 50 feet by 50 feet around the site, in order to protect and allow rehabilitation of the riparian area that had been damaged by Mr. Wilson's trespass. See Def. Ex. F at pp. 7-8; Def. Ex. R (Smith Decl. at ¶ 8); Def. Ex. C (156 IBLA at 99) (finding that "BLM was entitled to require that arrangements be made for removal of the structure and rehabilitation of the affected lands."). Moreover, at the time BLM installed the fence, Mr. Wilson was illegally grazing cattle in the immediate vicinity without a grazing permit, and the cattle were congregating around and trampling the riparian area. Def. Ex. R (Smith Decl. at ¶ 9). Thus, the fence was installed to protect the sensitive riparian area from further damage by the unauthorized cattle. Id. At no time since the small fence has been installed has plaintiff been denied access to the point of diversion allowed under Certificate 1656. See id. at ¶ 11.

Mr. Bowman and Mr. Wilson appealed the trespass decision to the IBLA. Def. Ex. C (156 IBLA at 89). On December 14, 2001, the IBLA held that neither Mr. Bowman nor Mr. Wilson held a valid pre-FLPMA right-of-way that supported the construction of the Wilson Water Diversion Structure and, since neither Mr. Bowman nor Mr. Wilson obtained the required authorization from BLM, the Structure was constructed in trespass in violation of 43 C.F.R. § 2801.3.[6] See Def. Ex. C (156 IBLA at 97) ("It is clear from the record that the only structures that had ever been erected for use incident to exercise of [Certificate 1656] were a spring box and

[6] BLM's current trespass regulations are found at 43 C.F.R. Part 2800, Subpart 2808.

pipeline. *Thus it does not appear that appellants' predecessors-in-interest ever had [a pre-FLPMA] right-of-way that would have entitled them to maintain a water diversion/impoundment structure of the size or effectiveness at issue here.*") (emphasis added) (footnote omitted)).

### B. The "Barricade" Does Not Block Access to the Point of Diversion Described in Certificate 1656

Sometime in the Fall of 2000, after BLM had removed the Wilson Water Diversion Structure, Gail Givens, the Assistant Field Manager for Nonrenewable Resources in BLM's Battle Mountain Field Office, moved two small dead logs across a primitive two-track road adjacent to the creek in Underwood Canyon, and upstream of the Wilson Water Diversion Structure and the point of diversion allowed under Certificate 1656. See Def. Ex. R (Smith Decl. at ¶ 12). He did so in order to deter vehicles from attempting to drive through a "wet meadow," where, because of the moisture, the vehicles would likely get stuck. See id. The logs are easily movable. Id. In any event, this alleged "barricade" is approximately a quarter mile upstream from the point of diversion allowed under Certificate 1656, and therefore, does not prevent access to the point of diversion allowed under Certificate 1656.[7] Id.

## III. ARGUMENT

### A. Plaintiff Does Not Have Standing to Sue For the Alleged Taking Because It Did Not Own the Water Right at the Time of the Alleged Taking

"[I]t is undisputed that '[since] compensation is due at the time of the taking, the owner at that time, not the owner at an earlier or later date, receives the payment.'" United States v. Dow,

---

[7] Moreover, plaintiff no longer has any property interest in Certificate 1656. See Def. Ex. M.

357 U.S. 17, 20-21 (1958) (quoting Danforth v. United States, 308 U.S. 271, 284 (1939)); Creppel v. United States, 33 Fed. Cl. 590, 599-600 (1995) ("It is well settled that a viable takings claim may only be asserted by those individuals who owned the subject property on the date of the taking. . . . [I]ndividuals who did not acquire their interests in the subject property until after the date of the taking may not obtain just compensation.").

Here, plaintiff alleges that the taking occurred on either May 10, 2000, the date by which BLM instructed Mr. Wilson to "arrange for the satisfactory removal of the dam . . . or face additional trespass penalties. . .", or September 25, 2000, the date when BLM removed the unauthorized water diversion structure. Amend. Compl. at ¶¶ 10, 11. In 2000, Mr. Wilson, and not Underwood Livestock, Inc., purportedly was the lessee of the property rights at issue here. Def. Ex. K. It is undisputed that Mr. Wilson, "an unmarried man, of Lander and Eureka Counties," and Mr. Bowman, "a married man dealing in his sole and separate property," entered into a two-year lease agreement with an option to purchase fee property and water rights (and any accompanying valid rights-of-way), on May 20, 1994. Id. Mr. Wilson did not purchase the property within the two-year lease period and the parties did not extend the lease agreement in writing. Def. Ex. D at p. 8 (Pl.'s Resp. to RFA No. 6). However, both Mr. Wilson and Mr. Bowman testified that they orally extended the lease agreement past the two-year expiration date. Def. Ex. A (Wilson Dep. at pp. 40-41); Def. Ex. L (Don Bowman Deposition ("Bowman Dep.") at pp. 23-24). It was not until April 2002, almost two years after the date of the alleged taking, that Underwood Livestock, Inc. purchased the property described in the lease agreement. See Amend. Compl. ¶ 7.

Accordingly, it does not appear that plaintiff Underwood Livestock, Inc. was the owner of the property interest alleged to have been taken and therefore plaintiff lacks standing to sue. Thus, plaintiff's motion for summary judgment should be denied.

**B. The United States Has Not Taken Plaintiff's Certificated Water Right**

Even if plaintiff was the owner of the property interest in Certificate 1656 at the time of the alleged taking, there can be no dispute that the United States has not physically taken plaintiff's alleged water right; the government itself did not physically divert or occupy the water, nor did it appropriate the water for its own use. Instead, plaintiff complains that BLM "wrongfully" "barricaded access to the certificated water source" and installed a "fence [which] does not include any type of gateway for cattle and equipment to pass through to access the point of diversion." Pl.'s Mot. for Summ. J. at 1; see Pl.'s Ex. A (Dalton Wilson Declaration ("Wilson Decl.") at ¶ 4).

First, plaintiff's allegation that BLM "wrongfully" fenced the area surrounding Mr. Wilson's activities in trespass sounds in tort and does not properly allege a takings claim. See Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001) ("[I]n a takings case we assume that the underlying governmental action was lawful . . . [and therefore] complaints about the wrongfulness of the permit denial are . . . not properly presented in the context of its takings claim."); Cottrell v. United States, 42 Fed. Cl. 144, 149 (1998) ("The Court does not have jurisdiction over claims that defendant engaged in negligent, fraudulent, or other wrongful conduct when discharging its official duties."). Second, BLM has not denied plaintiff lawful access to the point of diversion of water allowed under Certificate 1656. Def. Ex. R (Smith Decl.

at ¶¶ 11-12).

Further, plaintiff has no right to bring cattle or equipment into the area surrounding the point of diversion allowed under Certificate 1656, since the point of diversion is situated on federal public lands.[8] In order to lawfully graze cattle on the public lands in the vicinity of the trespass site in 2000 and afterwards, plaintiff was required to obtain a grazing permit, which it did not. Although Mr. Wilson early on held a grazing permit, it was cancelled on May 26, 1995, as a result of Mr. Wilson's continued refusal to comply with the terms and conditions of the permit, including the payment of grazing fees. See 43 C.F.R. § 4130.2(d); Def. Ex. R (Smith Decl. at ¶ 10). Nor does plaintiff have an unfettered right to bring equipment onto BLM-managed public lands for purposes of constructing an unauthorized diversion structure. A plaintiff has no right to "us[e], occupy[], or develop[] the public lands or their resources without a required authorization or in a way that is beyond the scope and terms and conditions of [his] authorization." 43 C.F.R. § 2808.10(a).

Here, Mr. Wilson has been found to have constructed and maintained a water diversion structure in trespass on BLM-managed lands. See Def. Ex. C. After Mr. Wilson refused to remove the structure and rehabilitate the affected lands, or make arrangements for such actions, BLM removed the structure and took steps to rehabilitate the area, which it undisputedly has the authority to do. See 43 C.F.R. § 2801.3(b)(3).[9] Pursuant to this authority, BLM installed a fence

---

[8] In addition, stock watering is not allowed under Certificate 1656. See Def. Ex. G (water is to be used beneficially for irrigation and domestic purposes, not stock watering purposes).

[9] 43 C.F.R. § 2801.3(b)(3) was amended and re-numbered in April 2005. The current regulation is found at 43 C.F.R. § 2808.11(a)(3).

to rehabilitate the area and prevent Mr. Wilson's cattle – which were on public lands illegally – from trampling the sensitive riparian area that had been damaged by Mr. Wilson's unauthorized water diversion structure. Although BLM attempted to work with Mr. Wilson and encouraged him to obtain a right-of-way pursuant to Title V of FLPMA, which would have authorized him to legally exercise his water right, Mr. Wilson declined to do so, asserting that no such authorization was required. Given that the structure was not authorized by any permit, it was BLM's responsibility to remove the water diversion structure and rehabilitate the riparian area. See Def. Ex. R (Smith Decl. at ¶¶ 4-8). The IBLA held that BLM was proper in doing so:

> We conclude that BLM properly determined in its April 2000 Trespass Decision, under 43 CFR 2801.3, that the water diversion structure at issue here was constructed and is being maintained in trespass on the public lands, and that consequently, Wilson, who had erected the structure, and Bowman, on whose behalf the structure was erected, are appropriately deemed to be jointly and severally liable for trespass damages, in the amount of the administrative costs of investigating and terminating the trespass. . . . *Further we find that BLM was entitled to require that arrangements be made for removal of the structure and rehabilitation of the affected lands.*

Def. Ex. C (156 IBLA at 98-99) (emphasis added).

Accordingly, defendant has not taken plaintiff's certificated water right, and therefore, plaintiff's motion for summary judgment should be denied.

### C. Plaintiff Does Not Have a Compensable Property Interest in Constructing and Maintaining a Water Diversion Structure on Federal Land

Plaintiff contends that defendant "destroyed plaintiff's water diversion structure." Pl.'s Mot. For Summ. J. at p. 1. However, the facts clearly show that BLM removed the unauthorized water diversion pursuant to its enforcement authority under Section 303 of FLPMA, 43 U.S.C. § 1733, and its trespass regulations set forth in 43 C.F.R. § 2801.3, only after plaintiff refused to

remove the structure from BLM-managed public lands. Indeed, on April 10, 2000, BLM informed Mr. Wilson and Mr. Bowman that they were required to remove the unauthorized water diversion structure by May 10, 2000, or

> [BLM] will remove the unauthorized structure and rehabilitate the site at your expense, as provided in 43 C.F.R. § 2801.3(b)(3). [BLM] will also take possession of and remove any personal property of value that may be found on the premises after May 10, 2000, and will store said personal property at the owner's expense at the Battle Mountain Field Office. . . . Such property may be claimed within 30 days after removal, upon payment of the trespass liability, including any additional expenses as may accrue. Failure to claim said property within the specified time will constitute abandonment, and said property shall become the property of the United States.

See Def. Ex. Q.

It is undisputed that neither Mr. Wilson nor Mr. Bowman made any arrangements to remove the water diversion structure, and, as a result, on or about September 26, 2000, BLM removed the structure and placed the nineteen heavy-equipment tires in storage at BLM's Battle Mountain District Field Office, where they remain today pending a request by Mr. Wilson to take possession of the tires, and payment of outstanding trespass fees.[10] See Def. Ex. R (Smith Decl. at ¶¶ 5-7). The IBLA confirmed that "BLM was entitled to require that arrangements be made for removal of the structure and rehabilitation of the affected lands." See Def. Ex. C (156 IBLA at 99).

Consequently, any property interest that plaintiff held in the water diversion structure at the time of the alleged taking never included "the unfettered right to maintain that property on

---

[10] To this day, plaintiff has continuously refused to pay for the trespass costs incurred by BLM in removing the water diversion structure and rehabilitating the site. See Def. Ex. S; Def. Ex. R (Smith Decl. at ¶ 13).

federal land," and therefore, plaintiff has failed to state a takings claim for which relief can be granted. See Turntable Fishery & Moorage Corp. v. United States, 52 Fed. Cl. 256, 262 (2002); see also Klump v. United States, 38 Fed. Cl. 243, 248 (1997) (finding no takings occurred where BLM impounded cattle grazing in trespass on federal lands pursuant to its regulations); Def. Ex. C (156 IBLA at 97) ("Thus it does not appear that [Mr. Wilson's] predecessors-in-interest ever had an R.S. 2339 right-of-way that would have entitled them to maintain a water diversion/ impoundment structure of the size or effectiveness at issue here.").

Turntable involved a takings claim brought against the United States Forest Service by plaintiffs who had been allowed to build boathouses and other improvements on federal land pursuant to special use permits. 52 Fed. Cl. at 257. The special use permits directed that in the event of revocation, the plaintiffs were obligated to remove any structures placed on federal land. Id. at 262. The court held that the "only property right enjoyed by plaintiffs at the time of the [alleged taking] was the right to remove the improvements that they had built." Id. at 263.

Here, plaintiff's construction and maintenance of the water diversion structure were not done pursuant to a special use permit, or any other type of authorization by BLM. Instead, Mr. Wilson constructed and maintained the water diversion structure in trespass, in violation of 43 C.F.R. § 2801.3. Nevertheless, BLM afforded Mr. Wilson an opportunity to remove the water diversion structure from federal land, but he refused. As a result, BLM removed the unauthorized water diversion structure for Mr. Wilson, at his expense (although Mr. Wilson has refused to pay any costs incurred by BLM in removing the water diversion structure). Moreover, the nineteen heavy-equipment tires continue to be stored at the Battle Mountain District Field Office where

Mr. Wilson could reclaim them, if he pays his outstanding trespass fees. See Def. Ex. R (Smith Decl. at ¶ 7).

In sum, plaintiff does not have a compensable property interest in constructing and maintaining a water diversion structure on federal land. See Def.'s Mot. for Summ. J. at pp. 14-26. Since plaintiff has failed to allege the taking of a legally compensable property interest, "the courts task is at an end," American Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (citation omitted), and plaintiff's Motion for Summary Judgment should be denied.

### D. Plaintiff is Not Entitled to Recover Consequential Damages in a Fifth Amendment Takings Claim

Plaintiff seeks "damage[s]" in "excess of 300,000.00" from "loss of income." Pl.'s Mot. for Summ. J. at p. 1; Amend. Compl. at ¶ 16 ("The taking which has prevented [plaintiff] from raising feed for the livestock or for the sale of feed to others has resulted in lost earnings of at least the sum of $300,000.00 and other such damage according to proof."). Business losses such as these are not directly compensable in a Fifth Amendment takings case, and therefore, plaintiff's motion for summary judgment with respect to just compensation should be denied.

The proper measure of just compensation in a takings case is fair market value of the property interest taken. See Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 9-10 (1984); Yuba Natural Res., Inc. v. United States, 821 F.2d 638, 641 (Fed. Cir. 1987). Fair market value is defined as what a willing buyer would pay in cash to a willing seller at the time of the taking. Id. It is well established that just compensation does not include business losses and lost profits, which are considered consequential damages. United States v. General Motors Corp., 323 U.S.

373 (1945) (business losses not recoverable in actions for takings); NL Indus., Inc. v. United States, 12 Cl. Ct. 391, 405 (1987), aff'd, 839 F.2d 1578 (Fed. Cir. 1988) (corporations have no right enforceable by law to anticipated profits); Georgia-Pacific Corp. v. United States, 640 F.2d 328, 360 (Ct. Cl. 1980) (business losses or loss of future profits are not compensable); United States v. 91.90 Acres of Land, 586 F.2d 79, 87 (8th Cir. 1978) (landowners are not entitled to be compensated for such consequential damages as loss of business). As the Supreme Court has stated:

> The sovereign ordinarily takes the fee. The rule in such a case is that compensation for that interest does not include future loss of profits . . . or other like consequential losses which would ensue the sale of the property to someone other than the sovereign.

General Motors Corp., 323 U.S. at 379 (1945). The "Fifth Amendment allows the owner only the fair market value of his property; it does not guarantee him a return of his investment." United States ex rel. Tenn. Valley Auth. v. Powelson, 319 U.S. 266, 285 (1943).

Accordingly, since plaintiff's compensation claim is based solely on "lost income," plaintiff's motion for summary judgment with respect to just compensation should be denied.[11/]

**CONCLUSION**

For the foregoing reasons, and the reasons set forth in defendant's Motion for Summary Judgment, plaintiff's Motion for Summary Judgment should be denied.

---

[11/] In addition, defendant respectfully requests that it be given an opportunity to seek the assistance of an expert to determine the proper amount of just compensation, if the Court finds the United States liable for a taking under the Fifth Amendment.

Dated: June 1, 2006

Respectfully submitted,

/s/ Kathleen L. Doster
KATHLEEN L. DOSTER
HELENANNE LISTERMAN
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0481 (phone)
(202) 305-0506 (fax)
Kathleen.Doster@usdoj.gov

Of Counsel:
JAMES KARKUT
United States Department of the Interior
Office of the Regional Solicitor