IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNDERWOOD LIVESTOCK, INC., Plaintiff, | ) | No. 05-162L |
| v. | ) | Judge Mary Ellen Coster Williams |
| UNITED STATES OF AMERICA, Defendant. | ) | |

**PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

During a conference call with this Honorable Court of Federal Claims on July 5, 2006, it was requested that plaintiff respond to defendant's Proposed Findings of Fact submitted with its Motion for Summary Judgment and to supplement plaintiff's Opposition to defendant's Motion for Summary Judgment in three particular regards.

The first question this Court wished to have answered is whether or not there is any evidence other than the addendum to the lease and the copies of letters written by previous legal counsel for the plaintiff which would further prove Underwood Livestock, Inc.'s property interest in the property at the time of the alleged taking. In addition to the foregoing, as is illustrated in the attached Exhibit A, (which is a copy of the lease between Don Bowman and Dalton Wilson), additional security beyond the lease price and option to purchase price was pledged to solidly secure an interest in the property. AUMs (Animal Unit Months) plus additional water rights were pledged by Mr. Wilson and when the addendum which has been offered demonstrating the property interest the additional pledges of security were automatically included within the addendum.

There is also the finding of the IBLA in its decision of December 14, 2001, in which the Board found that:

> "It is undisputed that Wilson and Bowman both own parcels of land not far from the mouth of Underwood Canyon within the Simpson Park WSA. Bowman acquired his land from the e Western Farm Credit Bank by quitclaim deed dated May 23, 1994, and has since leased it to Wilson and/or Underwood Livestock, Inc., of which Wilson is the President, Secretary, and Treasurer." (IBLA 2000-232 and 2000-250, 156 IBLA 89, p. 90)

Attached to this supplemental pleading, as Exhibit B, is a copy of correspondence from Underwood Livestock, Inc. to the BLM concerning the decision of the BLM to initiated trespass proceedings against the plaintiff over the maintenance and construction of the water diversion structure which is one of the main subjects of the within case. It is dated February 25, 2000 and is clearly typed on Underwood Livestock, Inc. Stationary. The correspondence requests an apology to both Dalton Wilson and Underwood Livestock, Inc. from the BLM for numerous reasons including the fact that it was the position of the plaintiff then as it is now that no permission of the BLM was needed to construct and maintain the water diversion structure.

Finally, the Trespass Decision itself mailed on April 10, 2000, from the BLM is addressed to "Dalton Wilson, President, Underwood Livestock." A copy is attached hereto as Exhibit C.

Thus, it is respectfully suggested that there is ample corroborative evidence that Underwood Livestock, Inc. did have a well proven property interest in the matters pertinent to this case.

The second question raised by this Court was weather or not 2005 Regulation of the Department of the Interior previously cited by the plaintiff in these proceedings is to be applied retroactively to cover the events in September 2000? Plaintiff's response is simply that the regulation simply clarifies the effect of FLPMA on the 1866 act and the subject of preexisting

rights. Plaintiff simply included reference to the 2005 regulation found in the Federal Register, Volume 70, number 77 (Federal Register 20979) to demonstrate that Department of the Interior has correctly set forth the history of the 1866 Act with regard to rights for ditches, canals, and structures relating to the use of water which were established prior to the passage of FLPMA in 1976. As stated previously by the plaintiff, the Department of the Interior itself states, in the regulation, that, "The right of way vested once a ditch or canal was constructed and a water right acquired . Once the right-of-way was created, it existed in perpetuity and included the right to operate and maintain the ditch, canal or conduit within the right-of-way." It also states, again at page 10979 that after the passage of the 1866 Act, "a private party could acquire a right-of-way across Federal Land without any action by the government-- no application or filing with the government was necessary, and no government approval was required." In short, the regulation did not change the status of rights pre-existing FLPMA. It simply recited the history of the relationship of rights acquired pursuant to the 1866 Act and established prior to FLPMA. As such, it merely verifies that plaintiff's arguments throughout the past six years that no permission was required for plaintiff to maintain and construct a water diversion structure on federal land was required.

The third question raised by this Court was whether or not the decision of the Interior Board of Land Appeals is binding on this Court in deciding issues in the within case. The plaintiff respectfully submits that the answer is that the IBLA decision is **not** binding on this Court for the simply reason that the decision was based on the mistaken fact that there was no right-of-way that accompanied the water right. But sincethe clearly established law holds that only the State Engineer may forfeit a water right and the attendant right-of-way and thus, the

decision is in error. And, it is respectfully submitted, an erroneous decision should not be binding on this Court.

Interestingly, at page 97 of the decision of the IBLA, the Board states, "Further, that right-of-way has been held to include as well dams, reservoirs, pipes, and other structures incident to their usage. (cases cited). Moreover, one who had appropriated water under State law could (up until October 21, 1976) acquire such right-of-way pursuant to the 1866 Act merely by constructing such improvements, no application to the Federal Government being necessary." And, prefacing these two statements the Board correctly opined that, "Accordingly, by its own terms, until its amendment in 1976, the 1866 Act afforded those holding vested water rights recognized under State law a separate and independent right-of-way for the construction of ditches and canals." (supra at p..96) These are absolutely correct statements of the law as proven by the 2005 Regulation already cited. It is hard to understand how the board could have reached the conclusion it did in light of the Board's clearly correct recitation of the law and which recitation clearly supports the plaintiff's position in this case.

## CONCLUSION

Because there is clear and convincing evidence that there was in fact a very real and secured property interest by Underwood Livestock, Inc. in the property taken at the time of the alleged taking, and because it is now abundantly clear that the Department of the Interior has verified the position taken for years and years by the plaintiff with regard to the scope of rights acquired under the 1866 Act and which rights did not require approval from the BLM for maintaining and constructing a water diversion structure since said rights pre-exisited the passage of FLPMA, and because it is the clearly established law that only the State Engineer (and not the

IBLA) can create and cause forfeiture of a right-of-way for a duly acquired water right, it is respectfully submitted that the defendant's Motion for Summary Judgment should fail and that the plaintiff should be entitled to proceed to prove the extent of his damage.

Dated: June 12, 2006.

Respectfully submitted,

MARTIN G. CROWLEY

**EXHIBIT A**

LEASE AGREEMENT WITH OPTION TO PURCHASE

THIS LEASE AGREEMENT is made and entered into this 20 day of May, 1994, by and between DON BOWMAN, a married man dealing in his sole and separate property, of Churchill County, Nevada, hereinafter referred to as "LESSOR", and DALTON WILSON, an unmarried man, of Lander and Eureka Counties, Nevada, hereinafter referred to as "LESSEE".

R E C I T A L S:

1. LESSOR is fee title owner of a certain real property with water rights located in Lander and Eureka Counties, State of Nevada.

2. LESSOR desires to enter into a Lease with Option to Purchase with LESSEE.

3. LESSEE desires to enter into a Lease with Option to Purchase with LESSOR.

NOW, THEREFORE, the parties in consideration of the mutual terms and conditions hereinafter set forth, agree as follows:

1. LEASE AND DESCRIPTION OF PROPERTY:

LESSOR leases to LESSEE and LESSEE leases from LESSOR that certain real property and water rights located in Lander and Eureka Counties, State of Nevada, more particularly described as follows:

> All that certain real property situate in the Counties of Eureka and Lander, State of Nevada, described as follows:
>
> Parcel No. 1: Township 22 North, Range 48 East, M.D.B.&M., (Eureka County), Section 21: Northwest Quarter of the Southwest Quarter.



EXHIBIT 2

<u>Parcel No. 2:</u> Township 22 North, Range 47 East, M.D.B.&M., (Lander County), Section 12: South half of the Northwest Quarter.

<u>Parcel No. 3:</u> Township 22 North, Range 48 East, M.D.B.&M., (Lander County), Section 17: Northwest Quarter of the Southeast Quarter.

EXCEPTING FROM the above parcel an undivided one half interest in and to all petroleum, oil, natural gas or other hydro-carbon substances, and any and all other mineral, minerals, or mineral rights, in, upon, or under said lands owned or possessed by First Party, together with the right to enter on said land to prospect for, recover and remove the same, as reserved in the Deed from PETE ETCHEVERRY, a widower, to FILBERT ETCHEVERRY and MICHEL ETCHEVERRY, a Co-Partnership doing business under the firm name and style of EUREKA LIVESTOCK COMPANY, recorded April 30,1965, in Book 7 of Official Records, at Page 260, Lander County Records.

TOGETHER with all Trustor's right, title and interest in water rights in the Counties of Lander and Eureka, State of Nevada, based upon the following:

Application No. 4613, Certificate Record No. 1656, Book 6, Page 1656, more specifically described as follows:

> NW 1/4 of NE 1/4, Section 7, T. 22 N; Range 48 E., M.D.B.&M. or at a point which bears S. 30° 30' E., 1300 feet distant from N 1/2 Corner Section 7, same township and range.

AND

Application No. 4758, Certificate Record No. 1657, Book 6, Page 1657, more specifically described as follows:

> SW 1/4 of NE 1/4, Section 23, T. 22 N; Range 47 E., M.D.B.&M. or a point which bears S. 59° 20'-W., 8510 feet from E 1/4 Corner Section 13, same township and range.

2. TERM PAYMENTS:

This Lease shall be a term of two (2) years, commencing on the 20th day of May, 1994, and ending at 12:00 midnight on the 20th day of May, 1996.

3. LEASE AGREEMENTS:

LESSEE shall pay to LESSOR the sum of TWENTY-EIGHT THOUSAND, EIGHT HUNDRED DOLLARS ($28,800.00) for the total Lease term. Said amount shall be payable in monthly installments of ONE THOUSAND, TWO HUNDRED DOLLARS ($1,200.00) per month with the first monthly installment becoming due on the 20th day of June, 1994, and each monthly installment thereafter becoming due on the 20th day of each month.

LESSEE shall pay a Late Penalty of ONE HUNDRED, TWENTY DOLLARS ($120.00) to LESSOR for any monthly installment which is received by LESSOR more than five (5) days after the due date.

4. OPTION TO PURCHASE:

LESSEE shall have the option to purchase the property leased herein and herein described. Said Option to Purchase shall be exercised by LESSEE notifying LESSOR of his intent to purchase in writing before the end of the term of this Lease.

LESSOR and LESSEE agree that the total purchase price shall be TWENTY-FIVE THOUSAND DOLLARS ($25,000.00).

LESSOR and LESSEE agree that ONE THOUSAND, FORTY-ONE AND 67/100th DOLLARS ($1,041.67) of each monthly rental installment paid by LESSEE to LESSOR may be applied towards the purchase price.

LESSEE shall have the option to pay LESSOR the sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) prior to the end of the term of this Lease providing LESSOR shall receive interest on said TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) at the rate of TWELVE PER CENT (12%) per annum from the commencement of this Lease until the time of payoff together with an additional fee of FIVE HUNDRED DOLLARS ($500.00). The sum of ONE THOUSAND, FORTY-ONE DOLLARS and 67/100ths ($1,041.67) of each monthly rental payment shall be credited toward a principal reduction of the purchase price of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) until time of early exercise of Option to Purchase.

Said Option to Purchase shall only be exercised by LESSEE if LESSEE is not in Default of the terms of this Lease.

5. SECURITY FOR PERFORMANCE OF LEASE:

LESSEE shall assign by Quit Claim Deed or other transfer to LESSOR, all his right, title and interest in the following described water rights and grazing preferences as additional security for performance of this Lease:

> All of Grantor's right, title and interest in and to grazing privileges totalling 1462 AUM's being the allotment identified on the records of the Bureau of Land Management as the "Underwood Unit", situate in the Counties of EUREKA and LANDER, State of Nevada, based on the following:

Water Base:

> Brackney Place, T.22N.,R.47E., Sec. 12: S1/2 of the NW 1/4
> Underwood Spring, T.22N., R.48E., Sec. 17: NW1/4 of the SE 1/4
> Underwood Canyon, T.22N., R.48E., Sec. 21: NW1/4 of the SW 1/4
> Wood Canyon Spring and Cottonwood Spring

ALSO TOGETHER WITH all of Grantor's right, title and interest in and to all water, water rights and other rights or privileges used in conjunction with the above-described fee land and the land affected by the above-referenced grazing privileges, including, but not limited to water rights evidenced by the following described Certificates of Appropriation of Water:

Certificate No. 2049, Application No. 9058, Book 7, Page 2049, pertaining to waters appurtenant to and/or works of diversion in the East.

Certificate No. 1299, Application No. 7424, Book 5, Page 1299, described as: N.77° 10'E. 3913.6 ft. distant from 1/4 corner common to Sections 11 and 12, T. 21 N., R. 47E., or in SW1/4 of NE1/4, Sec. 12, T. 21 N., R. 47 E., M.D.B.&M, situate in the County of Lander, State of Nevada.

Certificate No. 1655, Application No. 7893, Book 6, Page 1655, described as: NW1/4 of SE1/4, Sec. 12., T. 22 N., R. 47 E., M.D.B.&M, or at a point which bears S. 66° 10' W., 2460 feet from E 1/4 corner section 12, same township and range, situate in the County of Lander, State of Nevada.

Certificate No. 2057, Application No. 8892, Book 7, Page 2057, described as: NE1/4 of NE1/4, Sec. 21., T. 22 N., R. 48 E., M.D.B.&M, or at a point which bears S. 53° 30' W., 1234 feet from NE1/4 corner of said Section 21, situate in the County of Eureka, State of Nevada.

Certificate No. 2049, Application No. 9058, Book 7, Page 2049, described as: NE1/4 of NW1/4, Sec. 30., T. 22 N., R. 48 E., M.D.B.&M, or at a point which bears S. 73° 17' W., 3780 feet from NE corner of said Section 30, situate in the County of Lander, State of Nevada.

Said Assignment or Quit Claim Deed shall be held in escrow by JAMES F. SLOAN, ESQ., Attorney at Law, 977 West Williams Avenue, Fallon, Nevada 89406.

In event LESSEE shall default in the performance of the terms of this Lease as set forth in Paragraph 10 of this Lease

pertaining to Default, said Attorney shall be authorized to release said Assignment or Quit Claim Deed to LESSOR.

LESSOR shall execute a Quit Claim Deed to LESSEE for said property described in this Lease to be held in escrow by JAMES F. SLOAN, ESQ, Attorney at Law. Said Deed shall only be released to LESSEE upon written instructions of LESSOR that LESSEE has fully performed the terms of this Lease and Option.

6. TAXES:

LESSEE, in addition to the Lease payments herein, shall pay all real estate taxes and assessments. Said taxes and assessments shall be brought current within ten (10) days of execution of this Lease.

7. MAINTENANCE OF PROPERTY AND PRESERVATION OF ANY WATER RIGHTS OR GRAZING PREFERENCES:

LESSEE shall be responsible for maintenance and repair, at his own expense, of all corrals, barns, fences, watering facilities, drift fences and irrigation systems during the term of this Lease.

LESSEE shall pay all grazing fees for livestock which utilize BLM grazing preferences. LESSEE shall comply with BLM regulations and avoid any trespass violations which may jeopardize BLM grazing preferences.

LESSOR and LESSEE acknowledge that only the property described as an additional security in Paragraph No. 5 is base property for BLM grazing preference.

8. ASSIGNMENT AND SUBLEASE:

LESSEE shall not sublease or assign this Lease without written consent of LESSOR.

9. HOLD HARMLESS PROVISION:

LESSEE agrees to hold LESSOR harmless from any liability for any acts or conduct of the LESSEE and LESSEE'S agents, employees, business invitees and guests on said premises.

10. DEFAULT:

LESSEE and LESSOR shall have a period of thirty (30) days to cure any default by either party of the terms and conditions of this Lease Agreement. Said thirty (30) days period of time shall commence three (3) days after mailing of a written notice by non-defaulting party to defaulting party or on the day after personal delivery by either party of written notice of default.

In event either party shall not cure default within the thirty (30) days after commencement of the period to cure default, either party may terminate this Lease Agreement whereby it shall no longer have any force or effect.

11. WRITTEN NOTICE:

Written notice shall be delivered to the parties at the following addresses:

| LESSOR | LESSEE |
|---|---|
| DON BOWMAN<br>PO BOX 1024<br>Fallon, NV 89406 | DALTON WILSON<br>P. O. Box 165<br>Austin, NV 89310 |

12. BINDING EFFECT:

This Lease Agreement shall be binding upon the heirs,

executors, administrators, assigns and successors of the parties.

13. APPLICABLE LAW AND VENUE:

The law of the State of Nevada shall apply to this Lease Agreement and venue for any civil action shall be in Churchill County, Nevada.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

LESSOR: Don Bowman
DON BOWMAN

LESSEE: Dalton Wilson
DALTON WILSON

STATE OF NEVADA )
: SS.
County of Churchill )

On the 20th day of May, 1994, personally appeared before me, a Notary Public, DALTON WILSON, personally known (or proved) to me to be the person whose name is subscribed to the above instrument, who acknowledged that he executed the instrument.

Connie Marie Sloan
NOTARY PUBLIC

CONNIE MARIE SLOAN
Notary Public - State of Nevada
Appointment Recorded in Churchill County
MY APPOINTMENT EXPIRES SEPT. 7, 1997

STATE OF NEVADA )
: SS.
County of Churchill )

On the 23 day of May, 1994, personally appeared before me, a Notary Public, DON BOWMAN, personally known (or proved) to me to be the person whose name is subscribed to the above instrument, who acknowledged that he executed the instrument.

Heather L. Stroup
NOTARY PUBLIC

HEATHER L. STROUP
Notary Public - State of Nevada
Appointment Recorded in Churchill County
MY APPOINTMENT EXPIRES SEPT. 7, 1997

**EXHIBIT B**

RECEIVED
MAIL ROOM
2000 MAR -6 PM 2:05
BUREAU OF LAND MANAGEMENT
BATTLE MOUNTAIN FIELD OFFICE

| | | | | |
|---|---|---|---|---|
| P&EC | | | | |
| SS | | | | |
| | | | | |
| RR | \ | | | |
| | | | 3-1-2000 | |
| NR | | | | |
| | | | | |
| FIRE | | | | |
| | | | | |
| TFS | | | | |
| FILE/ LIBRARY/TOSS (CIRCLE ONE) | | | | |

UNDERWOOD LIVESTOCK
Post Office Box 74
Austin, NV 89310

February 25, 2000

Gerald M. Smith
Field Manager
Bureau of Land Management
50 Bastian Road
Battle Mountain, NV 89820

Re: 2800, 4150, 8550 9230
(NV-060)
and
NV-060-428, 8550 (NV063.02)

Dear Mr. Smith:

This is in reply to your letter of October 5, 1998, regarding the dam constructed by this corporation in Underwood Canyon. Your letter appears to be a pure case of harassment.

1. You saw fit to send a copy of the letter to the Western Farm Credit Bank when in fact in the body of the letter you acknowledge the Western Farm Credit Bank has deeded the water rights to Don Bowman. As you well know, the Western Farm Credit Bank may be a potential lender to the corporation, and your notice to them of your bogus allegations could chill any opportunity to use the services of that bank.

2. You send a copy of the letter to the State of Nevada Division of Water Resources, and you threaten to initiate action to have the water right forfeited without providing any authority whatsoever for forfeiture of that water right. This has caused me considerable time and expense to clarify with the State Engineer, which I did not get resolved with the State Engineer until August 24, 1999.

3. Your letter requests clear documentation of the current water right holder. However, you acknowledged in the letter that the current water right holder is Don Bowman. This request is pure harassment.

4 You ask for evidence that the water right has been put to beneficial use in accordance with state law. However, you cite in your letter the Certificate of Appropriation issued on June 17, 1930, which is Certificate No. 1656 pursuant to Application No. 4613, a copy of which I have enclosed. I would

recommend you consult your attorney regarding this request so that you can be informed the State Engineer does not issue certificates of appropriation unless there has been satisfactory proof of beneficial use filed with the State Engineer. Here again this request by you is absolutely ludicrous and pure harassment.

5. You also sent a copy of that letter to the U.S. Army Corps of Engineers obviously in an attempt to motivate them to harass me based on the false statements set forth in the letter.

6. You allege the dam constructed pursuant to my water right is located in the Wilderness Study Area, yet I am sure you are well aware the dam is within the Cherry Stem Road indicated as an exception to the Wilderness Study Area. I am also sure you are well aware that pursuant to the recent decision of the United States Court of Federal Claims in Case No. 91-1470L filed November 5, 1998, wherein E. Wayne Hage was a plaintiff, and the United States was a defendant, provides that a ditch right of way includes the ground for 50 feet on either side of the ditch. Here again your assertion that the dam this company constructed was within the Wilderness Study Area was absolutely false, and you knew it to be false when you made the statement. You had in your possession the Wilderness Study Area map, and you had in your possession my Certificate of Appropriation No. 1656 with a priority date of October 1, 1917. If the dam and pipeline were in the WSA, the WSA was improperly identified.

7. You have issued an IMP Violation Discovery Notice dated October 30, 1998, with the clear intention of damaging my reputation and to cause me to be rejected by my peers in the community without any factual basis whatsoever. This is another example of your pure harassment of me.

I am sure you are aware your job description does not provide for you to make false and misleading statements concerning citizens of the United States, nor does it provide for you to harass citizens of the United States. Your act set forth in your October 5, 1998 letter, together with your request of February 18, 2000 for a meeting concerning that matter, are pure ultra vires acts and subject you to personal liability for the grief and harassment visited upon this corporation. Please furnish a copy of all documents you have in your possession that support the allegations of your letter of October 5, 1998, and the IMP Violation Discovery Notice dated October 30, 1998.

Please consider this letter a formal demand to immediately furnish me and this corporation an apology and to notify each and