AMERICAN LEGAL SERVICES
Martin G. Crowley, Esq.
Nevada State Bar No. 3049
85 South LaVerne Street
Fallon, Nevada 89406
775-423-7088
Attorney for Plaintiff
email: AmericanLegal@gmail.com

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNDERWOOD LIVESTOCK, INC., a Nevada corporation, Plaintiff, vs. THE UNITED STATES, Defendant. | No. 05 - 162L<br>Judge Mary Ellen Coster Williams |

**PLAINTIFF'S SUPPLEMENTAL PLEADINGS FOLLOWING TELEPHONIC ORAL ARGUMENT ON AUGUST 29, 2006**

**ARGUMENT AND AUTHORITIES**

One of the principal arguments advanced by the defendant, in their effort to secure a dismissal, is that a lessee of real property does not enjoy the same rights as a property owner as far as a claim for taking is concerned. The government asserts Underwood Livestock, Inc., because it was a mere lessee at the time of the willful destruction of the water structure, does not have standing to sue in this Honorable Court of Federal Claims.

Contrary to their position, however, it has long been held in both state and federal courts that a lessee for years under a lease agreement is considered an owner of property in the constitutional sense and is entitled to compensation when all or a part of the leased property is taken during the period of the lease. In *Alamo Land & Cattle Co. v. State of Arizona*, 424 U.S. 295 (1976) the United States Supreme Court upheld a United States District Court ruling that

when the government took land that the State of Arizona was leasing from the government, the State was entitled to reasonable compensation from the federal government.

An excellent and comprehensive summary of a lessee's standing in cases in which the government has taken land can be found at 56 AMJUR POF 3d 419. Citing a number of cases AMJUR points out that, "It is a long-established rule that the holder of an unexpired leasehold interest in land is entitled to compensation for the value of that interest when taken by the government..." As far as the State of Nevada is concerned, AMJUR points out that lessees of condemned land were entitled to compensation for destruction of their business... and that lessees had operated a franchised gasoline station with convenience store on the land, and they were unable to relocate their business because oil companies were not extending new leases for gas station franchises in the Las Vegas area..." See Nevada Revised Statutes Annotated Section 37.115 and *State Department of Transportation v. Cowan*, 103 P.3d. 1 (Nev.2004).

A second major contention of the defendant in this matter is that the plaintiff should be estopped from maintaining this action because there was an opinion issued by the Interior Board of Land Appeals to the effect that there were not any1866 Act rights held by Dalton Wilson and Don Bowman at the time of the destruction of the water diversion structure.

As pointed out in the oral argument on August 29, 2006, the 2005 regulation adopted by the Department of the Interior and found in the Federal Register/Vol. 70, No. 77, page 20979, set forth the entire history of the 1886 Act and, delineated with extreme clarity, the limits placed upon the federal government once it was established that a person held a valid 1866 Act right.

The Register states, in part, as follows: In the 1866 Act, Congress granted Federal protection for vested state law-based water rights and rights-of-way for ditches, canals, and other structures necessary for the use of water. Under the Act, a private party could acquire a right-of-way across Federal Lands without any action by the government - no application or filing with the government was necessary, and no governmental approval was required. Once the right-of-way was created, it existed in perpetuity and included the right to operate and maintain the ditch, canal, or conduit within the right-of-way.

Thus, the Bureau of Land Management had no lawful jurisdiction to decide that the water

diversion structure was violative of any federal regulation or that the water diversion structure required some type of permit since Dalton Wilson and Don Bowman clearly established that the right to the use of the water was established in 1917 well before the passage of either the 1934 Taylor Grazing Act or FLPMA in 1976. While the Battle Mountain BLM personnel staunchly maintained that FLPMA completely overruled the 1866 Act, the Federal Register cited above states:

> Instead, FLPMA expressly preserved and protected such pre-existing private rights-of-way. Section 701(a) of FLPMA provides that FLPMA does not terminate any valid lease, permit, patent, right-of-way, or other land use right or authorization existing at the time of FLPMA's enactment. In addition, section 701(h) of FLPMA provides that all actions taken by the Secretary in the exercise of her authority under FLPMA are subject to valid existing rights.

Contrary to the government's position that this case is barred by the IBLA decision, the federal regulation makes it clear that there no federal entity such as the Bureau of Land Management or the IBLA that can interfere with a valid pre-existing right.

The fact that the BLM had no authority to destroy the diversion structure or require a permit was underscored by the fact that the Department of the Interior Office of the Solicitor had issued its written opinion dated August 13, 1999 specifically stating, at page 1, that "until the successful prosecution of such an action, (-i.e., a challenge through a forfeiture proceeding which, by the way, was undertaken but denied) the BLM should consider the water right valid." This 1999 letter was included in Plaintiff's Motion for Summary Judgment as Exhibit K and is included in this Supplemental Brief as **Exhibit A**.

Further underscoring plaintiff's assertion that the Battle Mountain BLM employees knew they had no authority to destroy the diversion structure is the fact that the Nevada State Engineer, in Ruling #5030, dated May 31, 2001, which was 5 months before the diversion structure was destroyed and which found that the BLM had no valid reason to have the water right forfeited. That ruling is attached as **Exhibit B**. The ruling was never appealed by the BLM.

Interestingly, the ruling of the State Engineer was never even brought to the attention of the IBLA, presumably because the government did not want to give the IBLA the benefit of knowing all of the relevant facts in the case. And while the defendant argued at oral argument on August 29, 2006 that Underwood Livestock, Inc., even though it was not a named party in the IBLA case, was

still fully represented by Dalton Wilson. It is probably judicious to point out that Mr. Wilson could not represent Underwood Livestock, Inc. as was so clearly established by the government at the very beginning of this case when Mr..Wilson filed his initial complaint as president of Underwood Livestock, Inc., Mr. Wilson could not legally represent Underwood Livestock, Inc. The government's motion successfully challenging the initial complaint on that basis is part of the file in the within case.

Finally, it should be pointed out once again that in 1996 Dalton Wilson sent a Freedom of Information Request to the Department of the Interior seeking to determine what authority existed for the BLM to determine pre-existing rights. On November 22, 1996 a letter in response to that request was sent to Mr. Wilson which stated that there was "no such regulation, policy, guide directive or other document that authorized the Bureau or Department personnel to determine existence, status or use of pre-existing rights." These two letters are attached as **Exhibits C and D** respectively.

In sum, the record must be perfectly clear that, prior to the destruction of the diversion structure, the Battle Mountain BLM personnel knew that they had no authority to determine pre-existing rights as is evidenced by the 1996 FOIA and the response. They knew that the state engineer had issued a written ruling reestablishing the fact that Underwood Livestock, Inc. had a perfectly valid water right. They knew that the Office of the Solicitor in a letter sent to them specifically told them that unless a forfeiture prosecution was successful they should treat the water right as valid. And, finally, they knew, as the 2005 regulation clarified, that FLPMA protected, rather than destroyed, the pre-existing 1866 Act rights. They knew that Mr. Wilson had consistently claimed that he had a valid pre-existing right and that the Brakney ranch history dated back to 1917 and that the water had been put to a beneficial use. They knew that Dalton Wilson transferred all of the water rights to Underwood Livestock, Inc. in 1989. A copy of that deed is attached as **Exhibit E**[1]. Nevertheless, they continued to insist that the diversion structure required

[1] Filed contemporaneously herewith is the Declaration of Don Bowman, with attachments, that set forth additional documents relevant to understanding the operative facts.

a permit and then they tore down the structure and charged Mr. Wilson and Mr. Bowman over $27,000.00 for their destruction work.

Since it is now clear that a lessee of real property has standing as an owner to advance a takings claim and since it has been clearly established that there was not then, nor is there now, any authority for the federal government to interfere with the water right and the rights of way that accompany it, the government's Motion for Summary Judgment must fail and the Plaintiff's Motion for Summary Judgment should be granted.

DATED September 22, 2006.

/s/ Martin G. Crowley

MARTIN G. CROWLEY
Attorney for Plaintiff