RECEIVED
U.S. ATTORNEY'S
JAN 21 1 35 PM '03
LAS VEGAS NV

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

FILED
03 JAN 17 PM 3:16
LANCE S. WILSON
CLERK
BY ______ DEPUTY

| | | |
|---|---|---|
| DON BOWMAN and DALTON WILSON,<br>Plaintiff(s),<br>vs.<br>BRUCE BABBITT, in his official capacity as the Secretary of the Interior; *et al.*,<br>Defendant(s). | ) | CV-N-00-0506-HDM(RAM)<br><br>MINUTES OF THE COURT<br><br>January 15, 2003 |

PRESENT: HONORABLE HOWARD D. McKIBBEN, U. S. DISTRICT JUDGE

Deputy Clerk: Bette Stewart Reporter/Recorder: Kathryn M. French

Counsel for Plaintiff(s): Michael F. Mackedon

Counsel for Defendant(s): Blaine T. Welsh

ENTERED & SERVED
JAN 17 2003
CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY ______ DEPUTY

PROCEEDINGS: Telephonic Hearing on United States' Motion for Summary Judgment (#21)

2:00 p.m. Court convenes.

Arguments are presented.

The court sets forth on the record the findings of fact and conclusions of law.

IT IS ORDERED that the United States' Motion for Summary Judgment (#21) is granted in part and denied in part. Summary judgment is granted in favor of the United States and against the plaintiffs on the claims for relief under the Federal Tort Claims Act, the Administrative Procedures Act, Declaratory Judgment Act, 28 U.S.C. § 1331 and the United States Constitution. The motion for summary judgment is denied as to plaintiffs' claim for relief under the Quiet Title Act and the United States' counterclaim for trespass. Don Bowman is dismissed with prejudice as a plaintiff in this action.

IT IS ORDERED that this case is scheduled for court trial on the two-week stacked calendar commencing Monday, May 12, 2003 at 8:30 a.m. Proposed findings of fact and conclusions of law shall be filed no later than Wednesday, May 7, 2003. The proposed joint pretrial order (LR 16-4) shall be filed no later than March 3, 2003.

2:35 p.m. Court adjourns.

THEREAFTER, IT IS ORDERED that this case is referred to the Honorable Robert A. McQuaid, Jr., U. S. Magistrate Judge, to conduct a settlement conference at the convenience of the court and all parties.

LANCE S. WILSON, CLERK

By: [signature]
Deputy Clerk

Reno, Nevada, Wednesday, January 15, 2003, 2:00 p.m.

---oOo---

THE CLERK: This is case number CV-N-00-506-HDM(RAM), Don Bowman and Dalton Wilson versus Bruce Babbit, in his official capacity as Secretary of the Interior, et al.

Michael Mackedon, you're present on behalf of plaintiffs?

MR. MACKEDON: Yes.

THE CLERK: And Blaine Welsh, you're present on behalf of defendants?

MR. WELSH: Yes. This is Blaine Welsh.

THE COURT: All right. Thank you, Miss Clerk.

This is the time set for the hearing on the defendant's motion for summary judgment. I've reviewed the pleadings and I'll hear brief argument on this.

Mr. Welsh, you may go ahead.

MR. WELSH: Thank you, Your Honor. I'll try not to repeat the arguments I've made, in view of the Court's statement.

I would simply like to just summarize that, as it now stands, the only claim that this court has jurisdiction to consider is the Quiet Title Act claim on behalf of Mr. Wilson. Mr. Bowman has, according to his declaration, transferred

his interest in the property to Mr. Wilson; therefore, he's not a proper party on a Quiet Title Act claim. And while the Court may have jurisdiction to consider a takings claim, to the extent the plaintiffs have not -- or do not have damages in excess of $10,000, plaintiffs have not so limited their claims, and I would submit that the Court has no jurisdiction to consider that claim.

The plaintiffs, in their responsive brief to the United States' motion for summary judgment, have conceded that there is no jurisdiction over the FTCA, ATA or DJA claims that they cited in their complaint.

So, turning to the Quiet Title Act claim, the question that the United States just raised by motion of affirmative judgment, is whether that right-of-way that appears to have existed when Mr. Bragney (phonetic) placed a pipe or ditches on the ground in Underwood Canyon, continues to exist, or continue to exist as of 1976 when the Federal Land Policy and Management Act was passed, that repealed the statute under which that right-of-way was, could have been recognized.

When the pipeline and the uses to which it would have been put were simply totally neglected, as Mr. Dalton testified in his deposition, the pipe was, some portions of it were in place, but it was in a state of disrepair when he acquired the property.

THE COURT: What are the elements -- and I think it's proper to focus basically on the quiet title action, because it seems to me that and the trespass that's alleged in the counterclaim really is what this lawsuit is about -- what are the elements the Court would look to in deciding whether or not there is sufficient material facts relating to those elements that this case ought to go to trial?

What would the plaintiff have to show in order to quiet title to this right-of-way if it was, you know, being used prior to 1976?

MR. WELSH: The plaintiff would have to show that he had a water right pursuant to which he had authority to use water; that he had actually constructed a right-of-way over unreserved, unappropriated public lands. Those are the two primary elements according to the Supreme Court's interpretation in the Bear River case that is cited in our motion.

THE COURT: So the two things, if there are factual disputes, the only factual disputes that would be material are those that relate to, one, whether or not Wilson had a water right; and, two, whether or not he'd constructed, or predecessors in interest had constructed improvements over the public land, is that right?

MR. WELSH: That's what the plaintiff would have to

prove in order to establish a right-of-way, as I understand it, Your Honor.

THE COURT: All right.

MR. WELSH: But with respect to abandonment, Your Honor, I think that the United States' defense in this case is that even a right-of-way that had been established, could be lost through a prolonged period of non-use. And the Nevada Supreme Court has determined that non-use does constitute evidence of abandonment.

In this case, we have not only non-use, but we have a completely neglected system that was nonfunctional for approximately 40 to 45 years that --

THE COURT: When was the last time it was used, in any sense, as far as you can tell from the discovery?

MR. WELSH: From the discovery, the last time that Mr. Bowman claims it was used was in the 1940's, Your Honor.

THE COURT: All right. And what period of time is a "prolonged period of non-use"?

MR. WELSH: Well, Your Honor, the only -- I did not find a Nevada case on point. I did cite the Court to a case from California in which a pipeline that was abandoned and not serviceable for a period of 15 years was considered to be a sufficient time period of non-use and neglect to

constitute abandonment.

THE COURT: Usually, if you look at the statutes on questions involving abandonment or forfeiture, whatever, that, you know, a lot of these statutes talk in terms of anywhere between 5 and 15 years, don't they?

MR. WELSH: Your Honor, the State of Nevada had, with respect to water rights, had a provision that used to say that the non-use of a nonvested water right for a period of five years constituted a statutory abandonment of that water right. Those statutes have since been modified or amended, and I believe that the State of Nevada takes a different position with respect to water rights. But, there is, there is no -- this court doesn't have any jurisdiction in this case to consider whether or not he has a water right, and I don't think there's an issue as to whether he has a water right in this case. The only question is about the right-of-way. And I did not find a specific --

THE COURT: You say there's no issue about the water right; what do you mean by that?

MR. WELSH: I mean that the United States, that Mr. -- this court cannot adjudicate whether Mr. -- or quiet title to a water right on behalf of Mr. Wilson or Mr. Bowman in this case. Under the Quiet Title Act --

THE COURT: Assuming that's true, is the Court then

even to consider at all whether or not the plaintiff does or doesn't have a water right?

MR. WELSH: I believe that according to Interior Board of Land Appeals cases that I've seen in which the issue of a RS-2339 or a ditch of right-of-way wasn't contested, one of the necessary requirements is that the plaintiff have a water right that would allow him to use the right-of-way that he seeks or that he claims to own.

THE COURT: So does the Court in this case then decide whether or not, if there was such a water right, that water right has been lost? Do I go into that?

MR. WELSH: No. I don't believe so, Your Honor.

THE COURT: So, all that would have to be determined here is whether or not, at any point in time, Wilson or a predecessor in interest had a water right. And that's the end of that element, and then we just look to see whether there's been improvements constructed on public lands, and then whether or not there's been an abandonment with respect to those improvements, is that right, for a long period of non-use?

MR. WELSH: Well, except to one point. I would agree that the Court has to determine whether someone had a water right, but I also would have to agree that the person who is now asserting the right-of-way still has that water right.

THE COURT: Okay.

MR. WELSH: And it's unclear. I cannot tell from the records that I have seen from the State Engineer's Office, because of the transfers and because, I'm told, of the extreme backup in their office, exactly who owns the water right at this point in time. But, I don't -- I don't have any doubt that with time and with an affidavit from the State Engineer's Office, that Mr. Wilson or someone to whom the person, entity or person to whom Mr. Bowman transferred the land, might be able to obtain a water right. But I am not in a position at this point in time to either concede that he does not, but I don't think that that is an issue that needs to be decided on this summary judgment, at least it's the United States' defense. And, the plaintiffs have not asked for summary judgment on their favor with respect to the counterclaim.

THE COURT: All right. Thank you.

Mr. Mackedon.

MR. MACKEDON: Yes. Thank you, Your Honor. And I don't know whether -- whether your clerk told you, but I do have Don Wilson and Don Bowman here with me --

THE COURT: All right.

MR. MACKEDON: -- present.

I think I can limit my argument, given what the government has said here, and be fairly concise about it.

The issue of whether there is or is not a water right, I believe, has been settled and decided. And I think that that was done, as we've indicated in our briefs, and the record clearly shows, that was done by the Bureau of Land Management Office itself in Battle Mountain. Prior to -- before the commencement of any of this, the Battle Mountain office-- and, Blaine, correct me if I'm wrong here. It may have been the state office, but I think it's the Battle Mountain office -- made inquiry of the State Engineer to determine whether the water right that allegedly existed there, was still valid and still existed, and they were informed that it was. But, that was through correspondence.

After taking the action that the government did, and while this, I believe while this action was pending, that same office actually filed a petition with the State Engineer to determine whether or not the water right had been forfeited. There was a decision made by the State Engineer which was not appealed or challenged by the government, that a valid water right existed. So, I think that that is a known fact and is not in --

THE COURT: Who has the water right?

MR. MACKEDON: -- Dispute.

THE COURT: Who has the water right?

MR. MACKEDON: Of course we contend, and Dalton's

affidavit alleges, that he is the owner of the water right and it's appertinent to the ground that he owns and always has been.

THE COURT: Do you have any opposition to the Court granting the motion to dismiss Bowman?

MR. MACKEDON: I don't, Your Honor.

THE COURT: All right.

MR. MACKEDON: Because I think the argument made. I had to commence the case as I did, but I think at this point in time that he doesn't have the standing, at least for quiet title, because he doesn't claim ownership.

THE COURT: Right.

MR. MACKEDON: And then in terms of the Nevada law concerning abandonment and forfeiture, there's been a long debate, as the Court well knows, over the meaning of that particular statute, which is in NRS-533, over whether the five years of non-use was a forfeiture statute or an abandonment statute. And the Assembly, the State Legislature passed what we call AB-380, in which testimony was given at that time by the State Engineer as part of the record there, although not here, that it had been the longstanding practice of the State Engineer not to cause the forfeiture of surface rights through non-use. And that would be -- and that AB-380 in fact did not change the law, but clarified what in fact had been a longstanding practice.

In any event, this water right would not be subject to forfeiture through nonuse because no -- under that particular statute, in order for forfeiture to apply, even possibly apply in theory to a surface water right, an action would have to have been commenced to challenge the right, and none was done here, so this particular water right is protected by the benefits of the provisions of AB-380 that was incorporated in the statute. And I believe --

THE COURT: Well, the action on the quiet title really focuses on whether or not there's a right-of-way over public lands, isn't that right?

MR. MACKEDON: I agree, but the history of the case that BLM commenced, as I read the record, and as I read what was done, commenced with the notion that there wasn't a valid water right. And then it moved, and we're presently litigating, I guess, whether there was a right-of-way.

I believe that there is no factual dispute that the -- that there was in fact a right-of-way created by the installation of works of diversions, the development of springs and pipes.

THE COURT: Right. Well, let's assume that the Court finds, one, that at least at this stage, this case is not going to be dismissed because of the water right issue; and, two, that there is sufficient evidence, certainly, to

go forward at this point on whether or not there had been improvements over public land, and construction of those improvements over the public lands, at a point in time preceding the change in the Act which, therefore, under appropriate circumstances, might grant to the plaintiff, through predecessors in interest, a right-of-way over the public land.

It seems to me the real focus here, and the reason I called for the hearing, is what's in the evidence that shows the use of those facilities or improvements prior to 19 -- what is it, 1976? I've forgotten. I think it's 1976 -- going back from 1976, how far back do you have to go to show when there was some use or some improvement or some work on these improvements on the public lands?

MR. MACKEDON: Well, I'm assuming that from the way you phrase your question, that we're conceding, at least for the purposes of discussion at this moment, that the water right was perfected, and the only way it could be perfected was through the application by beneficial use to the land that Dalton owns. And the only way that that could be done was by works of diversion --

THE COURT: Uh-huh.

MR. MACKEDON: -- that serves the right.

THE COURT: Okay.

MR. MACKEDON: Now, the -- and there are maps,

and there is no dispute that there were actual works of diversion on the ground. In fact, their footprint is still present.

Prior to the commencement of this action, there's a couple of things: One, prior to the commencement of this action, Dalton Wilson, as you'll see in his declaration, rebuilt the diversion structure.

THE COURT: Yes. When did he do that?

MR. MACKEDON: In '98.

THE COURT: Yes. And that's, what, with a bunch of tires?

MR. MACKEDON: Well, yeah, it could be described that way, but it's actually a very serviceable diversion structure in the same footprint, and basically the same size, according to his declaration, as what was originally in place. And it's not a dam.

THE COURT: What was originally in place? You say the footprint --

MR. MACKEDON: Yes.

THE COURT: Was all of that removed?

MR. MACKEDON: No. It had degraded and eroded. This is an ephemeral stream that runs no water some years, and serious volumes of water the next. So, the diversion structure was replaced.

THE COURT: Well, let's assume there was a

right-of-way there at one time.

MR. MACKEDON: Yes.

THE COURT: Can that right-of-way, as far as you're concerned, legally be abandoned?

MR. MACKEDON: I think it cannot if the water right is not. But, even assuming --

THE COURT: What's your support for that?

MR. MACKEDON: Well, I was looking at -- this is a fairly complicated matter, but there's a case that I think I cite, and I know that the government cites, which is a Nevada case. I believe it's the Adams versus the United States.

That's cited in the briefs, isn't it, Blaine?

MR. WELSH: Yes. Adams versus the United States -- this is Mr. Welsh -- Adams versus the United States is cited, and I can give some details on that since I was one of the counsel working on that case subsequent to that decision.

THE COURT: All right. Well, go ahead at this point, Mr. Mackedon.

MR. MACKEDON: In that case, the court found that the Adamses here had a vested water right under Nevada law and, therefore, had an easement to transport water across the Forest Service land. Now, this is Forest Service land, not BLM. And that statement, I think, is consistent with the notion you have a valid water right, and although there are situations and occasions where the right-of-way and the

water right can be independent estates and can be severed, in this case that is not true; one is appertinent to the other. And if there's a valid water right, then there's an easement to service that right. Abandonment here -- so, in that sense, I think if the water right is valid, then, de jure, the easement has not been abandoned.

But when we talk about abandonment, the key element is always -- there's a presumption against it -- the key element will always be the intention of the parties. This property, which has been bought and sold a number of times, has been bought and sold with that water right, and at premium because of the value of the right to the property without which the deeded land where the beneficial use has been applied has no value, or minimal.

THE COURT: All right. Did you have anything else then?

MR. MACKEDON: May I have just a second, Your Honor?

THE COURT: Certainly.

MR. MACKEDON: No. I think that that's --

THE COURT: All right.

MR. MACKEDON: -- that's probably satisfactory, given the question the Court has asked.

THE COURT: All right. Just a brief response then, I guess, Mr. Welsh.

MR. WELSH: Thank you, Your Honor.

I think that there is no evidence in the file, no evidence on the record to show any use of this property or any upkeep of the pipeline from shortly after the property was, or the pipeline was constructed until, well, actually until the present day, but certainly no active efforts to do anything in terms of rebuilding or reconstituting this pipeline, even after Mr. Wilson obtained the property in 1981 when he -- which he promptly turned around and loaned or gave or transferred to some friends who lost the property. And, it wasn't until 1987 that an application was filed to construct a right-of-way over the public lands. So, I would suggest that for a period of somewhere between 40, and perhaps as many as 60 years, there wasn't really anything ongoing on this property, and the entire pipeline fell into an entire state of disrepair and couldn't have been used. Any right that you have, whether it is -- any property rights that you have can be lost through prolonged period of non-use. And, here, we didn't have just non-use. We had non-use and a structure, a facility that in order to be used, would require substantial reconstruction under a changed land management regime at this point in time. And I would suggest that there is ample evidence in the record to support the finding of an abandonment of that right-of-way.

I would also like to just comment briefly that while Mr. Mackedon may have some evidence that there -- that the

land was sold numerous times to premier value, I have not seen that in the record, nor am I aware of any evidence that would suggest that the value of the land was heightened because of a water right or otherwise, one way or the other.

Finally, with respect to the Adams case, Your Honor, the Adams case involved two adjoining pieces of -- or two non-adjoining pieces of property on the National Forest system on the west side of Mt. Charleston. The question in that case was primarily a fight over whether Mr. Adams could replace a v-shaped wooden flume system with underground pipes without checking with the Forest Service first.

In that case, the court held that the United States could regulate those rights-of-way, but that change in use, essentially, that the change in conveying the water was not significant to constitute a trespass. And on appeal, the Ninth Circuit Court of Appeals noted the district court's decision, but then also said RS-2339, or the ditch right-of-way is not as broad as the Adams think because it is subject to a Forest Service regulation. And that goes to the second part of our brief, Your Honor, but we haven't addressed that in our oral argument. I think it's well-stated in our briefs, and I don't think I need to make any argument on that point.

THE COURT: All right. Thank you.

I've carefully considered the pleadings on

file and the arguments today. I'll enter the following findings and conclusions, at least as far as I see them at this point.

The plaintiffs both appear to concede in their arguments and in their responses to the motion, that the Court does not have jurisdiction to hear claims under the FTCA under 28 USC Section 2675. The procedural requirements for such claims have not been met and, accordingly, summary judgment should be granted with respect to the plaintiff's claims under the FTCA.

Addressing the claims under the Declaratory Judgment Act and the Administrative Procedure Act, it appears to the Court that the parties basically have conceded, the plaintiff has basically conceded that summary judgment should be granted as to claims under the APA and the Declaratory Judgment Act by virtue of the pleadings here and, accordingly, summary judgment will be granted in favor of the defendant and against the plaintiff both claims.

With respect to the constitutional claims, the United States in its briefs and argument have asserted that federal agencies and their officers cannot be sued for Fourteenth Amendment violations. There's been no waiver of the government's sovereign immunity. The United States further contends that the takings clause of the Fifth Amendment, concurrent jurisdiction of federal courts, that

the Court does not have jurisdiction to hear matters where the amount in controversy is greater than $10,000, and that such matters are reserved for The Court of Claims.

Again, it does not appear that that's been addressed. There appears to have been a concession. And the Court believes that summary judgment should be granted in favor of the defendant and against the plaintiff on the Fifth and Fourteenth Amendment claims.

The basic claim in this case is one involving the quiet title action by the plaintiff, and the response by the defense's counterclaim on trespass.

As I've indicated, Wilson and Bowman both seek quiet title to a right-of-way over public lands. Obviously intertwined with that, is this issue of water rights. And with respect to the standing issue, the Court is satisfied that Bowman no longer has an interest in the property or any right-of-way at issue in this case. All ownership and control has been transferred at least, and no later than May of 2002, to Wilson.

Accordingly, the Court concludes that plaintiff Bowman does not have standing to assert a claim against the United States under the Quiet Title Act for the property at issue in this case. And, accordingly, summary judgment is granted as to all such claims in favor of the United States and against the plaintiff --

MR. MACKEDON: Bowman.

THE COURT: -- Bowman.

Now, in connection with the quiet title action, I think that that's a fairly close issue as to the remaining claim that Wilson has in this action. And, you know, I think that this case could be tried in a very short period of time, and I'm a little hesitant to grant summary judgment. Although it's, you know, as I say, it's a close issue.

Under Nevada law, abandonment and forfeiture are divined separately. As the parties are well aware, abandonment is a relinquishment of the right by the owner with the intention to forsake and desert it. Forfeiture is involuntary or forced loss of the right caused by the failure of the appropriator or owner to do or perform some act required by statute.

There is a dispute in this case between the parties as to whether the original water box was no longer in use after the 1940's. Wilson contends in a deposition that he remembers hearing that the water box was in use around 1940. The parties agree that the water box was in, certainly, a state of disrepair and deteriorating, was not functional, when Wilson purchased the property in 1980.

It appears that he lived on the property for almost 20 years before installing what purports to be a dam at the center of, or in connection -- in an area, allegedly,

where there was a footprint or an existing structure.

I am not totally persuaded at this time that the record is all that clear on exactly what has happened. It seems to me that prolonged period of non-use certainly would be a basis for abandonment of a right.

I'm a little intrigued by the argument that Mr. Mackedon has made with respect to the fact that if you have a valid and existing water right, that you never can abandon improvements that have been constructed for purposes of transportation of the water to the lands. I'm not sure that there's a great deal of authority for that proposition but, in any event, I'm disinclined at this stage to grant summary judgment on that claim, or to grant summary judgment -- and there hasn't been a summary judgment motion filed by the plaintiff -- on the trespass claim. I think those are at least viable claims for purposes of trying those before the Court.

There has been an argument raised as to overuse or misuse of any existing right. Again, I believe that that presents a factual issue to be tried by the Court.

The final argument that's been raised is whether or not the location of the Wilson dam is located in a newly formed wilderness study area. Congress, as I understand it, has directed the Secretary of the Interior to designate wildlife areas concerning certain characteristics as

wilderness study areas. And, that in managing the public lands, the Secretary shall, by regulation or otherwise, take action required to prevent unnecessary undue degradation of the lands and their resources, to afford environmental protection.

There's a dispute whether the location of Wilson's dam is located in the wilderness study area, whether the construction maintenance of the dam harmed the wilderness study area to constitute a trespass on government property. But, again, I think that that poses a material issues of fact that will have to be decided by the Court.

Based upon these findings and conclusions, the United States' motion for summary judgment is granted as to plaintiff's claims for relief under the Federal Tort Claims Act, Administrative Procedure Act, Declaratory Judgment Act 28 U.S.C. Section 1331, and with provisions that I've cited earlier, under the United States Constitution.

Motion for summary judgment is denied as to plaintiff Wilson's claim only as to the quiet title action, and the United States' counterclaim for trespass.

The plaintiff Bowman is dismissed as a party to this action with prejudice. It is so ordered.

I would think this matter could be tried very quickly in terms of the time involved. I may not be able to get it on calendar right away, but it shouldn't take very

long, I think, to hear it. Perhaps part of it could be even submitted on the basis of affidavits, or there probably would have to be some live testimony.

How long do you think the case should last in terms of a trial on this, Mr. Mackedon?

MR. MACKEDON: To the court, I would think two days.

THE COURT: Mr. Welsh, do you agree with that?

MR. WELSH: I think that's about right. It may take a little more than that, but I think it is a heavily document intensive case, and I think that many of those documents will be stipulated into evidence, and a large part of the case will be argument much like what the Court's heard today.

MR. MACKEDON: Two days would be a minimum. Three days would be probably right.

THE COURT: What do we have?

THE CLERK: February 24th?

THE COURT: I'm talking several months from now. I can't do it in February.

THE CLERK: Certainly. May 12th?

THE COURT: May 12th.

THE CLERK: It's a stack. It's a two-week stack.

THE COURT: I don't know if you have your calendars or not. Do you have time May 12th?

MR. MACKEDON: And that's a stack?

THE COURT: Right.

MR. MACKEDON: I think I'm fine then. I'm going to get my calendar up here.

MR. MACKEDON: I don't see anything on my calendar for May 12th or May 13th, Your Honor.

THE COURT: All right. We'll set it on the stack calendar for May 12th at 8:30. I would ask that you prepare by, say, the Wednesday preceding that date, proposed findings and conclusions and submit those to us. I'd like to have them on file by then.

All right. I think that's all I have. I don't need a trial statement.

MR. WELSH: Your Honor, do you need -- do you not need a pretrial statement, is that what you said?

THE COURT: Well, I don't need trial memorandum. That's what I'm talking about. I would like to have a pretrial order prepared. I would ask that that be -- discovery is closed in this case, so I would think -- how long do you need to prepare that, another month or so, or a month-and-a-half?

MR. WELSH: Yes, Your Honor. I believe a month-and-a-half would work.

THE COURT: All right. We'll say that should be submitted to the Court 45 days from today's date.

MR. MACKEDON: Pretrial statement?

MR. WELSH: A pretrial order.

THE COURT: Yes, a pretrial order. I don't really need statements. I do want fairly comprehensive findings of fact and conclusions of law with citations to the law.

MR. MACKEDON: Okay.

THE COURT: All right. I think that's about all we need.

MR. WELSH: Your Honor, I do have one question, one point of clarification.

THE COURT: Yes.

MR. WELSH: Mr. Bowman was a defendant or a counter-defendant to the United States' counterclaim. Was your order meant to take him out of the United States' trespass counterclaim as well, or only as to the Quiet Title Act claim?

THE COURT: Only as to the Quiet Title Act claim.

MR. WELSH: Thank you, Your Honor.

THE COURT: He remains as a potential -- well, he remains as a defendant in the trespass action --

MR. WELSH: Thank you.

THE COURT: -- because that encompasses an area or a time when he did have the property.

All right. Thank you very much.

MR. WELSH: Thank you, Your Honor.

MR. MACKEDON: Thank you, judge.

(Court Adjourned.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Kathryn French (signature) 2-21-03

KATHRYN M. FRENCH, RPR, CCR DATE