# In the United States Court of Federal Claims

**No. 05-0162L**
**(Filed: November 29, 2007)**

| | |
|---|---|
| **UNDERWOOD LIVESTOCK, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **Fifth Amendment Taking; Property Interest; Federal Land Policy and Management Act, 43 U.S.C. § 1761; 43 C.F.R. § 2801.3; Right-of-Way on Public Lands; Jurisdiction to Review Interior Board of Land Appeals Decision; Stay.** |

Martin G. Crowley, American Legal Services, 85 South LaVerne Street, Fallon, NV, for Plaintiff.

Kathleen L. Doster, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Defendant.; James Karkut, United States Department of the Interior, 125 South State Street, Salt Lake City, Utah, Of Counsel.

## OPINION

**WILLIAMS**, Judge

This Fifth Amendment taking case comes before the Court on the parties' motions for summary judgment. The alleged taking involves a water diversion structure consisting of an earthen dam, reinforced with 19 stacked heavy equipment rubber tires, some 69 feet in length, impounding water in the creek flowing down Underwood Canyon in Nevada. Plaintiff Underwood Livestock, Inc. ("Underwood") alleges that the Bureau of Land Management ("BLM") obstructed its use of its water rights by removing its water diversion structure and fencing and barricading the surrounding area. Plaintiff contends that by these actions, BLM prevented it from accessing its water rights, thereby unlawfully taking its real and personal property. Plaintiff alleges that this taking prevented it from raising feed for livestock, resulting in lost earnings of at least $300,000.

In order to prevail in this taking case, Plaintiff must establish that it had a cognizable property interest. The Interior Board of Land Appeals ("IBLA") adjudicated the property ownership issue at the heart of this case, concluding that there was no right-of-way which authorized construction or maintenance of the tire dam on federal land and finding that the builders of the dam -- Underwood's predecessors in interest -- had trespassed. In light of this IBLA decision, which is binding unless overturned by a court of competent jurisdiction, Plaintiff cannot establish it had a cognizable property interest in the right-of-way. Because this Court lacks jurisdiction to review decisions of the IBLA, Plaintiff is precluded from challenging the IBLA's determination of this property ownership issue in this forum. Rather, under the Administrative Procedure Act ("APA"), the exclusive forum for such review is the district court. As such, following the Federal Circuit's decision in Aulston v. United States, 823 F.2d 510 (Fed. Cir. 1987), this Court stays this action, so that Plaintiff or its owner may pursue such a challenge in district court.[1]

## **Background**[2]

Plaintiff is a Nevada Corporation formed on December 29, 1989. Pl.'s Mot. Ex. A. Dalton Wilson is Underwood's owner, President, sole shareholder, and sole employee. Amend. Compl. ¶¶ 1,7; Pl.'s Mot. Ex. A (Aff. of Dalton Wilson, Mar. 26, 2006 ¶ 1); Def.'s Mot. Ex. A, (Wilson Dep. at 13-14, Feb. 28, 2002). Wilson is not a party to this litigation in his personal capacity.

### **Nevada's 1917 Grant of a Water Permit 4613 and a Certificate of Appropriation of Water for the "Brackney Water Diversion Structure"**

In 1917, Thomas Brackney filed an application with the Nevada State Engineer, Division of Water Resources, for a permit to appropriate water from Underwood Canyon for irrigation and domestic purposes, stating that the appropriated water would be used for "irrigation, stock, and domestic purposes" and that the water would "be diverted by means of small earth and rock dam, and conveyed to the land by means of ditches, and laterals."[3] Def.'s Mot. Ex. G at 2, 3. The application indicated that water would be diverted at a point described as "Underwood Canyon S.W. 1/4 of N.E. 1/4 of Sec. 12, T. 22 N., R 47 E., M.D.B. & M." Id. at 2. The Nevada State Engineer approved the application on February 25, 1919, and granted Brackney a permit to appropriate water,

---

[1] On November 14, 2007, this Court held a status conference with the parties and Plaintiff's counsel indicated that he would file an action in the District Court of Nevada challenging the IBLA decision under the Administrative Procedure Act.

[2] This background is derived from Plaintiff's Amended Complaint as well as attachments to the parties' motions for summary judgment, including the IBLA decision, Dalton Wilson, Don Bowman, 156 IBLA 89 (2001), and excerpts from the record and discovery in a district court action, Don Bowman and Dalton Wilson v. Babbitt, No. CV-N-00-0506-HDM (D. Nev. dismissed Aug. 29, 2003).

[3] Brackney filed the original application for a permit to appropriate water on October 1, 1917, and an amended application on December 5, 1917.

known as "Permit 4613." Id. at 3.

Pursuant to Nevada law, on or about April 16, 1919, Brackney filed an Affidavit of Labor and Improvements for Permit 4613 with the State Engineer to perfect his water right. This Affidavit described the water diversion structure that he had created under Permit 4613 as follows:

> at least Three Hunderd dollars ($300) has been expended in work or improvements performed or made under the conditions provided in Permit No. 4613, and at the expense of the applicant. Said improvements consisted of Earth dam constructed at about NE corner Section 6, T, 22 N., R. 48 E, and ditch constructed through said section approximately to SE ½ of NW 1/4 Section 12, T. 22 N., 4R, 47.E.

Def.'s Mot. Ex. H. Subsequently, in or about the 1920s, a pipeline of uncertain origin was installed in part of the ditch. Def.'s Mot. Ex. I (Declaration of Gail Givens) ("Givens Decl.") at ¶¶ 3-4.[4] In addition, it appears that a spring box was also erected in connection with this improvement. 156 IBLA at 97, n.11.

Several years later, on June 17, 1930, the State Engineer issued a Certificate of Appropriation of Water (Certificate 1656) to Brackney, which indicated the appropriation of water related to Permit 4613 was a vested water right. Specifically, the Certificate afforded Brackney and his successors-in-interest the right to divert 0.323 cubic feet per second ("cfs") of surface waters of the Canyon during the period from April 1 to October 1 of each year from a point of diversion situated in NW 1/4 NE 1/4 sec. 7 T. 22 N., R. 48 E., Mount Diablo Meridian, Lander County, Nevada, and to use such waters for irrigation and domestic purposes on appurtenant lands described in the Certificate. Def.'s Mot. Ex. G at 1.

**1924 Land Patent and Lease Agreement**

Meanwhile, on February 19, 1924, the United States issued a patent to Brackney under the Act of Congress of May 20, 1862, Ch. 75 § 1, 12 Stat. 392, a homestead act, for 80 acres of land described as the "south half of the northwest quarter of Section twelve in Township twenty-two north of Range forty-seven east of the Mount Diablo Meridian, Nevada, containing eighty acres...." Def.'s Mot. Ex. J. The patent provided in pertinent part:

> NOW KNOW YE, That there is, therefore, granted by the United States unto the said claimant the tract of Land, . . . with the appurtenances thereof, unto the said claimant and to the heirs and assigns of the said claimant forever; subject to any vested and accrued

---

[4] The Givens Declaration is undated and was originally included as an exhibit in the United States' motion for summary judgment, filed June 14, 2002, in the Nevada District Court litigation.

> water rights for mining, agricultural manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, and decisions of courts; <u>and there is reserved from the lands hereby granted a right-of-way thereon for ditches or canals constructed by the authority of the United States</u>.

156 IBLA at 95, Def.'s Mot. Ex. J, (emphasis added).

**<u>Wilson's Purchase of the Land in 1981</u>**

In 1980, Dalton Wilson purchased the same 80 acres of land, with an appurtenant Nevada water right, Certificate 1656. Pl.'s Mot. Ex. A, (Declaration of Dalton Wilson, Sept. 26, 2002 ("Wilson Decl.") at ¶¶ 2, 6).[5]

**<u>The 1989 Foreclosure By Western Farm Credit Bank</u>**

Wilson testified in a declaration that in 1981 he "allowed a friend named Gary Sprouse, doing business as S & H ranches, to use [Wilson's] land and appurtenant water rights appropriated under Certificate 1656 to secure an operating loan for [Sprouse's] benefit with the Federal Land Bank of Sacramento." Wilson Decl. ¶ 14. Subsequently, Sprouse defaulted on the loan, and the lender commenced foreclosure proceedings on Wilson's property. <u>Id.</u> ¶¶ 21-22. In September 1989, the Western Farm Credit Bank, successor to the Federal Land Bank of Sacramento, foreclosed upon and acquired the 80 acres of land and the vested water rights specified in Certificate 1656. <u>Id.</u> According to the Amended Complaint, "Western Farm Credit sold the property to Don Bowman in 1994, who leased it to Underwood Livestock the same year." Am. Compl. ¶ 7; <u>see</u> <u>also</u> Pl.'s Supp., Declaration of Don Bowman ("Bowman Decl.") ¶¶ 1-2, (Sept. 26, 2006) (stating that Bowman owned the real property, water rights and appurtenant easements and that he leased this property to Wilson).[6]

---

[5] The record contains a deed, dated July 9, 1981, under which Donald R. Smith and Wilma M. Smith, husband and wife, transferred to Dalton Wilson, "<u>TOWNSHIP 22 NORTH, RANGE 47 EAST, MDB&M</u>. Section 12: S1/2NW1/4 " . . . . TOGETHER with all water, water rights, . . . including all vested water rights and all applications to appropriate water, certificates of appropriation, other permits issued by the office of the State Engineer of the State of Nevada. Pl.'s Mot. Ex. C at 11.

[6] Plaintiff submitted for the record a notarized deed of transfer of water rights, including the Water Certificate 1656 water right, from Wilson as Grantor to Underwood Livestock, Inc. as Grantee, dated February 1, 1990. Pl.'s Sept. 23, 2006 Supp. Br. Ex. E. It is unclear on this record how Wilson had obtained the water rights to transfer to Underwood in 1990. According to Wilson's declaration and the Amended Complaint, Western Farm Credit, not Wilson, owned both the property and water rights between 1989 and 1994. Am. Compl. ¶ 7; Wilson Decl. ¶ 22-23. The Amended Complaint makes no mention of this 1990 transfer or deed.

**Western Farm Credit's Transfer of Land and Water Rights to Bowman**

Bowman acquired the 80 acres of land and Certificate 1656 from Western Farm Credit Bank in 1994 under a quitclaim deed dated May 23, 1994. Wilson Decl. ¶¶ 22-23; Def.'s Reply Ex. T (Bowman Decl. ¶ 1, Sept. 27, 2002); Pl.'s Mot. Ex. C at 9. Exhibit A to the May 23, 1994 quitclaim deed describes the property conveyed as follows:

> Lander County, Nevada
> TOWNSHIP 22 North, Range 47 East, MDB&M.
> Section 12: South half of the Northwest Quarter
> . . . .
>
> TOGETHER WITH all of Grantors' existing and future rights, however, evidenced, to the use of water for irrigating said lands and for domestic and stock watering uses, including ditches, laterals, conduits, and rights of way used to convey such water or to drain said land, all of which rights are hereby made appurtenant to said land. . . .

Mot. Summ. J. of United States Ex. P, Don Bowman and Dalton Wilson v. Babbitt, CV-N-00-0506-HDM (D. Nev. June 14, 2002).[7]

**Bowman's Lease of Water Rights to Wilson: May 1994**

On May 23, 1994, Bowman signed a two-year agreement, agreeing to lease these land and water rights to Wilson for $1,200 a month, giving Wilson an option to purchase the land and water rights. Def.'s Mot. Ex. K. The lease included the water rights pertaining to Permit No. 4613 and Water Certificate 1656. Id. at 2. Underwood was not mentioned in the lease.

Bowman asserts that in early 1995, he initiated foreclosure proceedings against Wilson for not keeping up with payments required under the lease agreement. Bowman Decl. ¶ 3, Sept. 20, 2006; Def.'s Mot. Ex. K (May 20, 1994 lease agreement) at 5-6. To avoid foreclosure, on April 3, 1995, Dalton Wilson in his capacity as President of Underwood executed a document which purports

---

[7] There is no reference in Exhibit A to the May 23, 1994 quitclaim deed submitted by Plaintiff with its motion for summary judgment to any water rights, including the water rights contained in Certificate 1656. See Pl.'s Mot. Ex. C at 10. However, a different Exhibit A to this same deed -- which does include appurtenant water rights -- was submitted as Exhibit P to the United States' Motion for Summary Judgment in Don Bowman and Dalton Wilson v. Babbitt, CV-N-00-0506-HDM (D. Nev. June 14, 2002). It appears that the Government's exhibit, not Underwood's, has the correct quitclaim deed because the deed and plat numbering is sequential in the Government's exhibit, while Underwood's exhibit appears to be taken from an April 4, 2002 deed transferring the property from Bowman to Underwood. Pl.'s Mot. Ex. C at 14-15.

to be an addendum to the lease agreement dated May 23, 1994, between Bowman and Wilson. This addendum stated, in relevant part, "THIS ADDENDUM to the lease agreement of May 20, 1994 between DON BOWMAN and DALTON WILSON declares that UNDERWOOD LIVESTOCK, a Nevada corporation, is hereby bound to the terms of said lease agreement." Def.'s Mot. Ex. K at 5-6; Pl.'s Opp'n Ex. A (punctuation altered).[8]

The lease was set to expire on May 20, 1996, but Wilson asserts that he and Bowman orally agreed to extend the lease agreement and that Underwood subsequently exercised the option to purchase the property on April 4, 2002.[9] Def.'s Mot. Ex. A (Wilson Dep. at 40-41, Feb. 27, 2002), Ex. D at 8, Ex. L (Bowman Dep. at 23-24, Feb. 26, 2002). On May 23, 1995, Bowman offered to renew the lease on the same terms and conditions as originally stated, provided that he was paid the sum of $4,218 as past due interest on June 1, 1995.[10] Bowman Decl. ¶ 5 & Ex. E, Sept. 20, 2006. According to Bowman, he was paid the full sum before June 1, 1995, and all subsequent payments under the lease agreement were made by Underwood. Id. ¶ 6.

The grant, bargain and sale deed governing Underwood's purchase of the property dated April 4, 2002, provided:

> Don Bowman . . . do(es) hereby GRANT, BARGAIN and SELL to Underwood Livestock, Inc., a Nevada Corporation, the real property situate in the county of LANDER, state of Nevada as follows . . .

---

[8] This addendum was filed in the instant action on June 15, 2006, with Plaintiff's opposition to Defendant's motion for summary judgment. Defendant states that Plaintiff never provided this document during discovery. The record does not indicate whether this addendum was submitted in any other proceeding, and the addendum is not notarized or authenticated.

[9] It is unclear from the record why Underwood rather than the named lessee, Dalton Wilson, exercised the option to purchase.

[10] This offer was contained in a note which stated:

> Dalton,
>
> If you will pay $4218.00 for interest and my out of pocket expenses by June 1, 1995, I will renew the lease on the same terms as before for a period of 1 year.
>
> Don Bowman

Bowman Decl. Ex. E, Sept. 26, 2006. Bowman asserts that he received $4,218 before June 1, 1995, that all payments under the terms and conditions of the agreement were made by Underwood Livestock. Id. at ¶ 6; Amend. Compl. ¶ 7. The record does not document whether Underwood Livestock or Wilson made the $4,128 payment.

Lander County, Nevada
TOWNSHIP 22 North, Range 48 East, MDB&M.
Section 12: South Half (S1/2) of the Northwest Quarter (NW1/4)

Pl.'s Mot. Ex. C at 14-15. There is no mention of any transfer of water rights in this deed.

Underwood Livestock subsequently lost the property by defaulting on its mortgage in June 2005. Def.'s Mot. Ex. M.

**The Wilson Water Diversion Structure**

By 1998, little remained of the original Brackney Water Diversion Structure, constructed in or about 1919 and supplemented in the 1920's with a pipeline. All that remained were "scraps of old wood, which might be remnants of the spring box" and a pipeline that appears to have "been abandoned for at least 10 years . . . [with] small aspen trees growing through the metal." 156 IBLA at 98 n.12 (2001) (internal quotations and citations omitted).

In approximately 1998, Wilson constructed a new water diversion structure in the vicinity of the Brackney water diversion structure which consisted of 19 heavy equipment tires. Wilson built this dam by taking "an old military four-by four" to haul three tires at a time and then "took a 933 [CAT] loader, crawler loader in there with a front-end bucket on it and back grippers on it . . . [and] installed the dam, just within 20 feet below the original [Brackney] structure . . . [downstream]." Def.'s Mot. Ex. A (Wilson Dep. at 80, Feb. 27, 2002).[11] The tire dam was approximately 69 feet in length and crossed the creek that flows down the Underwood Canyon, virtually impounding the water. The dam was located on public lands at NE 1/4 sec. 7, T. 22 N., R. 48 E., Mount Diablo Meridian, Lander County, Nevada with a total surface disturbance associated with the structure of about 0.13 acres. 156 IBLA at 90. Wilson decided to build a tire dam, rather than replicating the Brackney dam, because it would be less susceptible to washout from weather and floods. Def. Mot. Ex. A (Wilson Dep. at 91-92, Feb. 27, 2002). Wilson asserts that he did not seek or obtain authorization from the BLM to build the tire dam because "none was needed," because he had a pre-existing right-of-way under the 1866 Act. Id. at 95-96.

**BLM's Notice of Trespass**

BLM sent a letter to Wilson on August 26, 1998, informing him that it was investigating the construction of the tire dam as of August 6, 1998, after the Nevada Department of Wildlife had reported observing a bulldozer in the canyon. 156 IBLA at 90. On March 8, 2000, BLM issued a

[11] There is a dispute between the parties as to the distance of the Wilson tire dam from the original Brackney structure. While Wilson asserted that his tire dam was 20 feet away from the original Brackney structure, Defendant alleges that Wilson's tire dam was 46 feet away from the remains of the Brackney structure and 377 feet from the original point of diversion described in Permit 4613.

Notice of Trespass/Notice to Cease and Desist to Wilson and Bowman advising them that trespass proceedings had been initiated against them due to the construction of the tire structure on public lands. Id. at 91.[12] Specifically, BLM stated that because neither Bowman nor Wilson had received authorization for the construction and maintenance of the new dam, both Wilson and Bowman were deemed to have violated the Federal Land Policy and Management Act, as amended, 43 U.S.C. §§ 1701-85 (1994) ("FLPMA") as implemented by 43 C.F.R. § 2801.3. Id. This regulation provided that:

> [a]ny use, occupancy, or development of the public lands that requires a right-of-way, temporary use permit, or other authorization pursuant to the regulations of that part and that has not been so authorized, or that is beyond the scope and specific limitations of such an authorization, or that causes unnecessary or undue degradation, is prohibited and shall constitute a trespass.

43 C.F.R. § 2801.3(a) (2000).

Wilson and Bowman responded to this notice in a March 27, 2000 letter, stating:

> [they] enjoyed a right to construct and maintain a water diversion structure on public lands, arguing that such construction/maintenance is permitted 'within existing rights-of-ways granted by state laws, local customs and by the original patent for the land signed by [the] President' granting Federal lands to Bowman's predecessor-in-interest.

156 IBLA at 92.

On April 10, 2000, BLM issued a decision finding that the construction of Wilson's tire dam constituted a trespass on public land, requiring Wilson and Bowman to pay trespass damages and to cease the trespass. 156 IBLA at 92. BLM directed either that Wilson and Bowman remove the structure and rehabilitate the site by May 10, 2000, or that BLM would perform the removal and rehabilitation at Wilson's and Bowman's expense. Id. BLM required Wilson and Bowman to pay trespass damages in the amount of $6,722.16 representing BLM's administrative costs. Id. at 92-93. Subsequently, BLM removed the dam and sent a letter to "Dalton Wilson, President, Underwood Livestock, Inc.," dated January 6, 2006, demanding payment in the amount of $20,349.82 for the removal and $828.66 for rehabilitation of the site. The total amount that BLM demanded, including all trespass damages, was $27,900.64. Def.'s Opp. Ex. S.[13]

---

[12] Both Wilson and Bowman were subject to the BLM action because Wilson constructed and maintained the dam on Bowman's behalf as the lessee pursuant to the lease dated May 20, 1994. 156 IBLA at 90.

[13] The BLM letter demanding payment was addressed to Dalton Wilson in his capacity as President of Underwood, but the bill summary and bill for collection attached to the letter states the

**Appeal to the Interior Board of Land Appeals**

Wilson and Bowman each separately appealed BLM's decision to the IBLA arguing that they were not required to obtain authorization from BLM to construct the tire dam since they owned private land, appurtenant water rights, and an easement or right-of-way arising under state law. 156 IBLA at 93. They argued that these property rights were acquired and perfected prior to the enactment of the FLPMA, and were protected by that statute, such that they were not required to obtain any authorization to erect the tire dam under that statute or its implementing regulations. Id.[14] Finally, they claimed that requiring such authorization constituted an ultra vires act on the part of BLM and/or a condemnation of their property rights without just compensation in violation of the Fifth Amendment. Id.

The IBLA consolidated their appeals and, in a decision dated December 14, 2001, rejected their arguments. First, the IBLA dispelled the notion that Bowman and Wilson had a right to use federal lands simply because they possessed an interest in a water right under Nevada law. The IBLA stated:

> Underlying appellants' appeals from BLM's April 2000 Trespass Decision is a fundamental misconception regarding the nature and extent of their water rights under State law, which concern only the proper use and dispensation of the water to which they are entitled. Such rights do not include any automatic right to use Federally-owned lands for the construction and maintenance of a structure, even where it is utilized in connection with those water rights.

Id. at 94 (citations omitted).

Next, the IBLA noted that "[a]lthough appellants refer to an existing 'easement' and 'right-of-way' that assertedly entitle[s] them to place the structure on public lands, they present no evidence on appeal of the existence of such an easement or right-of-way deriving either from State or Federal law." Id. at 95. The IBLA held that "any person [including Wilson and Bowman] who desires, on or after Oct. 21, 1976, to use, occupy, or develop the public lands for the purposes of impounding,

---

name "Dalton Wilson" in the "Customer" and "Payor" line, without any reference to Underwood.

[14] FLPMA authorizes the Secretary of the Interior to "grant, issue, or renew rights-of-way over, upon, under, or through . . . public lands" for, among other purposes, "reservoirs, canals, ditches, flumes, laterals, pipes, pipelines, tunnels, and other facilities and systems for the impoundment, storage, transportation, or distribution of water." 43 U.S.C. § 1761(a)(1). Effective October 21, 1976, no right-of-way could be granted, issued, or renewed except in accordance with the relevant provisions of FLPMA concerning rights-of-ways on public lands. 43 U.S.C. § 1770. However, FLPMA itself did not terminate pre-existing rights-of-way. 43 U.S.C. § 1769. FLPMA specified the general requirements for the issuance of rights-of-way on public lands. 43 U.S.C. § 1764.

storing, transporting, or distributing water [was] required to obtain a right-of-way or other authorization pursuant to Title V of FLPMA and its implementing regulations." Id. at 97 n.10 (citing 43 U.S.C. §§ 1761(a), 1770 (1994); 43 CFR § 2800.0-7; Wayne D. Klump, 130 IBLA 98, 101 (1994)). The IBLA expressly recognized that neither Wilson nor Bowman had proved the existence of a right-of-way, stating:

> At various times between October 5, 1998, and January 27, 2000, BLM discussed with Wilson and/or Bowman whether to grant a right-of-way pursuant to Title V of FLPMA, . . . that would authorize some manner of impoundment of the surface waters of the creek in Underwood Canyon and their conveyance to the appurtenant private lands owned by Bowman in the S ½ NW 1/4 sec. 12. Despite repeated written requests by BLM starting in August 1999, no right-of-way application was ever submitted by Wilson or Bowman.

Id. at 91 (footnote omitted).

The IBLA went on to address arguments made by Wilson and Bowman which Plaintiff is reiterating here. Specifically, the IBLA noted that Wilson had argued that the original 1924 land patent to Brackney had authorized the construction of the tire dam as part of a right-of-way for ditches or canals. Id. at 95. In response, the IBLA determined that the patent's reservation for ditches or canals did not authorize the tire dam. Id. at 95-96.

Further, the IBLA found that the only way in which such a right to construct the tire dam could have existed appurtenant to the 1924 Brackney patent would have been as a right-of-way under section 9 of the Act of July 26, 1866,14 Stat. 253, also known as a R.S. 2339 right-of-way.[15] Id. at 96. Section 9 of the 1866 Act provided that those who held vested water rights also held a separate and independent right-of-way for the construction of ditches and canals:

> [W]henever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right-of-way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed.

This right-of-way was interpreted to include dams, reservoirs, pipes, and other structures.

[15] The Act of July 26, 1866 is also known as the Mining Act of 1866, Ch. 262, § 9, 14 Stat. 253 codified at 43 U.S.C. § 661, repealed in part by the Federal Land Policy and Management Act, § 706(a), Pub. L. 94-579, 90 Stat. 2793 (1976). R.S. 2339 refers to the Revised Statute section in which this provision was once codified.

Dalton Wilson, Don Bowman, 156 IBLA 89 at 97 (2001) (citing Broder v. Water Company, 101 U.S. 274, 75 (1879); Utah Light & Traction Co. v. United States, 230 F. 343, 345-46 (8th Cir. 1915); Martin Hackworth, 141 IBLA 249, 251-52 (1997). Thus, holders of valid water rights under state law could obtain a 1866 Act right-of-way by constructing improvements on federal lands without obtaining any authorization or approval from the Federal Government. However, according to the IBLA there were two impediments to Dalton and Wilson attaining the right-of-way under this statute. First, this provision was repealed in 1976. After October 21, 1976, the effective date of FLPMA's repeal of the relevant portion of the 1866 Act, an owner of a valid water right could no longer obtain a right-of-way on federal lands simply by constructing improvements, including ditches, canals, and dams on federal lands. Instead, the water-right owner was required to apply to the BLM for a right-of-way or some other form of authorization for "reservoirs, canals, ditches, flumes, laterals, pipes, pipelines, tunnels, and other facilities and systems for the impoundment, storage, transportation, or distribution of water." 43 U.S.C. §§ 1761(a)(1), 1770(a). If the owner of a valid state water right built any such improvements without a right-of-way granted by, or authorization from, the BLM, the BLM had the authority to determine that a structure on public lands was being maintained in trespass. 43 C.F.R. § 2801.3(a) (2000).

Second, while an 1866 Act right-of-way for water impoundment structures, including dams, that pre-dated FLPMA could remain valid after October 21, 1976, so long as the pre-existing water impoundment structure remained in use, this circumstance did not occur here. The IBLA expressly held that the preexisting Brackney water impoundment structure did not remain in use and thus did not extend the validity of the pre-existing right of way. The IBLA stated:

> [Wilson and Bowman] have made no effort to show that they hold an R.S. 2339 right-of-way that supports the construction of the water impoundment here. Nor do we find evidence in the record so showing. It is clear from the record that the only structures that had ever been erected for use incident to exercise of appellants' successor-in-interest's water rights were a spring box and pipeline. Thus, it does not appear that appellants' predecessor-in-interest ever had an R.S. 2339 right-of-way that would have entitled them to maintain a water diversion/impoundment structure of the size or effectiveness at issue here.

156 IBLA at 97.

The IBLA further held that any pre-existing 1866 Act right-of-way was extinguished because "the right-of-way was co-extensive with the [Brackney] constructed structures." Id. at 98. The IBLA made this determination because "any structure that might have been erected in connection with an R.S. 2339 right-of-way prior to October 21, 1976, had seemingly fallen into such a state of disrepair that the right-of-way had ceased to exist." Id. The IBLA explained:

> Although a water right itself may be deemed to have persisted under State law despite the cessation of water use even for many years, we

> find no indication that Congress intended that an R.S. 2339 right-of-way similarly persists when it has ceased to be employed for any useful purpose. In any event, we do not think that such a right-of-way survived repeal by FLPMA of the originating statutory language, where there was no useful structure in existence on October 21, 1976, that might have served to support a valid existing right preserved by FLPMA.

Id.

In affirming the decision of the BLM, the IBLA held:

> We conclude that BLM properly determined in its April 2000 Trespass Decision under 43 CFR 2801.3, that the water diversion structure at issue here was constructed and is being maintained in trespass on the public lands, and that, consequently, Wilson, who had erected the structure, and Bowman, on whose behalf the structure was erected, are appropriately deemed to be jointly and severally liable for the trespass damages, in the amount of the administrative costs of investigating and terminating the trespass. Further, we find that BLM was entitled to require that arrangements be made for removal of the structure and rehabilitation of the affected lands.

Id. at 98-99 (internal citations omitted).

The IBLA decision was issued on December 14, 2001, and constitutes final agency action reviewable by a district court under the APA. Although Wilson and Bowman did not directly challenge this IBLA decision under the APA in district court, they did bring a Quiet Title Act suit and other statutory claims in District Court.

**Nevada District Court Litigation**

While the appeals at the IBLA were pending, but before a decision was rendered, Wilson and Bowman filed a lawsuit in the United States District Court for the District of Nevada on September 26, 2000, against the Secretary of the Interior and BLM, alleging, inter alia, causes of action under the 1866 Act, the FLPMA, the Quiet Title Act ("QTA"),[16] and the Fifth and Fourteenth Amendments of the Constitution. Complaint, Don Bowman and Dalton Wilson v. Babbitt, CV-N-00-0506-HDM (D. Nev. Sept. 26, 2000), Def.'s Mot. Ex. N. Wilson and Bowman were represented by counsel in the District Court action. Wilson and Bowman did not request vacatur or reversal of the IBLA

---

[16] Under the Quiet Title Act, the United States may be named as a party defendant in a civil action "to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 U.S.C. § 2409a(a).

decision -- which was not issued until later during the District Court litigation -- on December 14, 2001. Id.[17] Instead, they purported to challenge the BLM's trespass decision -- the decision which was then on appeal to the IBLA. Wilson and Bowman's District Court complaint stated in relevant part:

> On April 10, 2000 GERALD M. SMITH, Field Manager of the BLM Battle Mountain Field Office issued a trespass decision in which it is alleged FLPMA applies to plaintiffs ['] rights and infers that plaintiffs' rights to divert water may be denied because the water right in question may have been forfeited through non-use. All matters relative to plaintiffs ['] certificated water rights are governed by Nevada water law and any determinations which would find Certificate 1656 to be forfeited would be based on either a ruling by the Nevada State Engineer or a Nevada District Court pursuant to the provisions of NRS Chapter 533. This decision does not acknowledge plaintiffs['] property easement, and purports to impose penalties, terms, and conditions on the property rights belonging to plaintiffs not authorized by law and as such clouds plaintiffs' title to the easement and deeded land to which Certificate 1656's water rights are appurtenant.

Id. ¶ 14.

In the District Court action, Wilson and Bowman sought to quiet title to their "easement on public lands sufficient to serve the water rights set forth in Certificate 1656 in favor of [Wilson and Bowman] pursuant to the Quiet Title Act, [the 1866 Act] and the savings clause in FLPMA." Id. ¶ 17. They also sought to enjoin the defendants from enforcing BLM's trespass decision and from imposing any conditions on their rights to access their easement or interfering with their use of their diversion dam. Id. ¶ 18. The Government counterclaimed against Bowman and Wilson for trespass, and filed a motion for summary judgment arguing that the District Court lacked jurisdiction to hear any claim other than the Quiet Title Act claim. The Government argued that the APA does not confer authority to grant relief if there is "other adequate remedy in a court," citing the Quiet Title Act as such remedy. Id. at 16.

The District Court found that the plaintiffs conceded that the District Court lacked jurisdiction over the APA claims. Tr. at 3, 18, Jan. 15, 2003, Def.'s Status Report, May 17, 2007.[18]

---

[17] In their District Court complaint Wilson and Bowman cited the APA as grounds for the District Court's jurisdiction apparently because they challenged the BLM decision.

[18] The District Court dismissed Bowman's QTA claim without prejudice, reasoning that Bowman had transferred all ownership and control of the real property at issue, no later than May 2002, to Dalton Wilson, thereby depriving Bowman of standing to assert any claim under the QTA. Id. at 19.

The District Court granted summary judgment in the Government's favor on all claims except Wilson's QTA claim and the United States' counterclaim for trespass and scheduled the matter for trial. Id. at 20-25.

However, the Government subsequently discovered that, in fact, Bowman did not transfer the real property at issue to Dalton Wilson, but instead had transferred his interest to Underwood -- which was not a party in the District Court proceeding -- prompting the Government to file a motion to dismiss Wilson's QTA claim. On August 28, 2003, the District Court dismissed Wilson's Quiet Title Act claim. The Court also dismissed Defendant's trespass counterclaims without prejudice. Pl.'s Resp. June 19, 2007.

The IBLA decision was not cited as a basis for any of the District Court's rulings.

**Petition for Forfeiture Before the Nevada State Engineer**

Prior to the resolution of either Wilson and Bowman's District Court action or their IBLA appeal, on January 18, 2001, BLM filed a petition with the Nevada State Engineer seeking a declaration of forfeiture in accordance with Nev. Rev. Stat. § 533.060. See Pl.'s Sept. 22, 2006 Br. Ex. B. BLM asked that Permit No. 4613, Certificate 1656, with a priority date of Oct. 1, 1917, "now owned by Mr. Don Bowman" be declared forfeited on the ground that the water right had been abandoned under Nevada law due to a five-year period of nonuse. Id. at 6.

In a ruling dated May 31, 2001, the Nevada State Engineer denied BLM's petition "on grounds that the forfeiture of a water right permit that appropriates water from a surface source is exempt from forfeiture in accordance with NRS § 533.060." Id. at 5.

**Current Litigation**

On January 21, 2005, Plaintiff filed its complaint in this Court pro se. After obtaining counsel, Plaintiff filed an amended complaint on October 7, 2005. Plaintiff alleges that the actions of the BLM in dismantling the water diversion structure and creating a barricade preventing Plaintiff's access to the site constitute a taking of real and personal property without just compensation in violation of the Fifth Amendment.[19] Each party seeks summary judgment.

**Discussion**

**Summary Judgment Standard**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal

---

[19] The amended complaint did not reference the IBLA decision or purport to seek review of that decision.

Claims 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A fact is material if it may affect the outcome of the suit. Anderson, 477 U.S. at 248. The moving party bears the initial burden of proof and may discharge its burden by demonstrating an absence of evidence to support the opposing party's case. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562-63 (Fed. Cir. 1987); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).

When considering cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the moving party. Mingus, 812 F.2d at 1391. Denial of both motions is warranted if genuine disputes exist over material facts. Id. at 1391 ("The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts."). Cross-motions for summary judgment are not an admission that no material facts remain at issue. See Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citations omitted). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." Id.

**Property Interest in the Right-of-Way**

The Takings Clause of the Fifth Amendment to the United States Constitution provides that private property shall not " be taken for public use without just compensation." U.S. Const. amend. V. A "taking" of private property can be accomplished by either physical invasion or regulation. Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001). The Federal Circuit has articulated a two-part test for determining whether a party is entitled to compensation under the Takings Clause. "First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." Am. Pelagic Fishing Co. v United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005). "Second, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." Id. However, this step is only reached if the first step is satisfied. If the claimant does not have cognizable property interest at the time of the taking, then the Court need not consider the second step. Id.

With respect to the first step, "[i]t is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." Wyatt, 271 F.3d at 1096. Thus, a party with a taking claim "can prevail only if the 'taking' occurred while he was the owner. . . . [since] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment.'" United States v. Dow, 357 U.S. 17, 20-21 (1958) (quoting Danforth v. United States, 308 U.S. 271, 284 (1939)); Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1215 (Fed. Cir. 2005) (claimant "must, at a minimum assert that *its* property interest was

actually taken. . . .") (italics in original).[20]

**The IBLA Determined the Issue of Ownership of the Right-of-Way**

Plaintiff alleges that the BLM effected an unlawful taking of its water rights, and wrongfully destroyed its diversion structure. However, under the IBLA decision, Plaintiff cannot establish it had a cognizable property interest in the right-of-way which entitled it or its alleged predecessors-in-interest to erect and maintain the dam on public lands. Rather, the IBLA expressly ruled that no such right-of-way existed and that Plaintiff's president and sole shareholder was liable in trespass for erecting and maintaining the tire dam on federal land. In an effort to bypass that decision without directly appealing it, Plaintiff asserts a Fifth Amendment taking claim here. Such a tack cannot succeed.

Although Plaintiff has not expressly asked this Court to review the IBLA decision, it has asked the Court to reach a conclusion in direct conflict with the IBLA's holding that no right-of-way permitted construction of the tire dam on federal land. However, in adjudicating a taking claim, this Court does not have either the jurisdiction to review, or the authority to disregard, IBLA decisions that adjudicate property rights. Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1366 (Fed. Cir. 1998). Rather, it is well established in the Federal Circuit that:

> when an agency determines that a private party is not the owner of property that is claimed to have been taken, the private party must challenge that determination in district court under the APA and may not do so through a Tucker Act takings action in the Court of Federal Claims.

Id. at 1365 (citing Aulston v. United States, 823 F.2d 510 (Fed. Cir. 1987); Freese v. United States, 221 Ct. Cl. 963 (1979); Patterson v. United States, 115 Ct. Cl. 348 (1950); Dawson v. United States, 113 Ct. Cl. 82 (1949)). As the Court stated in Ware v. United States, 57 Fed. Cl. 782, 785 (2003), "[Tucker Act] jurisdiction is not a license to review the determination by the IBLA. Rather, in this

---

[20] Defendant argues that Underwood lacks standing because at the time of the taking Plaintiff did not have a property interest in the water rights, the appurtenant land, and the right-of-way on which the dam was built because Wilson in his personal capacity, not Underwood, leased the subject property and water rights from Bowman. Def.'s Mot. at 13. Plaintiff disagrees, claiming that it possessed a leasehold interest in both the real property and the water rights and the accompanying right-of-way. It is impossible on this record to determine ownership of the real property or leasehold and appurtenant water rights. The record is riddled with inconsistencies regarding the chain of title to the property and its appurtenant water rights. In any event, the IBLA determined that even though Wilson and/or Bowman owned or leased the property and appurtenant water rights, there was no right-of-way authorizing them to construct the tire dam on federal land, and they were trespassers. 150 IBLA at 90. As such, BLM was fully authorized to dismantle the tire dam and assess trespass damages. If this IBLA determination is upheld by the District Court, there can be no taking here.

Court, as a general proposition, [plaintiff] must accept the result of the adjudicative process provided by the Department of Interior."

Here, there is no question that the IBLA adjudicated the existence vel non of Wilson and Bowman's property interest which is coextensive with Underwood's claimed property interest in the tire dam and right-of-way. As such, this Court is not free to reexamine that issue. As the Federal Circuit stated in Aulston,

> We agree with Judge Wiese that in order to press their taking claim before the Claims Court appellants must first obtain a proper reversal of the adverse IBLA ruling. As noted earlier. . . that IBLA decision marked the exhaustion of appellants' administrative remedies and constituted final agency action. Although judicial review of the IBLA determination is not precluded, Congress has vested review in the district courts, not in the Claims Court.

823 F.2d at 513; see also Freese, 221 Ct. Cl. at 964-65 (declining to overturn the Interior Department's conclusion regarding the ownership of mining lode claims.

In Aulston, the Government granted homestead patents to the plaintiffs but reserved the rights to "oil and gas" in the patented land. After carbon dioxide was discovered on the property, the Aulston plaintiffs claimed that the carbon dioxide was not within the definition of "oil and gas" and sought a determination from the Department of the Interior to that effect. The Department ruled that the United States owned the carbon dioxide. Rather than pursue an APA review of the IBLA decision in district court, the Aulston plaintiffs brought a takings suit before the Court of Federal Claims, seeking "money damages (exceeding $10,000) for a Government taking." Aulston, 11 Cl. Ct. 58, 60 (1986). Judge Wiese held that the Aulston plaintiffs' taking case could not be heard:

> The question now faced by this court is whether, in its present procedural posture, the plaintiffs' taking case can be heard here in light of the IBLA's prior adjudication of their ownership rights. The answer is "no."
>
> From the beginning, the complicating factor in this case has been plaintiffs' effort to obtain both specific and monetary relief in a single judicial forum. That complication affects them still. For even as the district court was without authority to entertain plaintiff's taking claims so, in turn, are we without authority to entertain what, in effect, amounts to an action to set aside the decision of the IBLA. And without such authority, the plaintiffs' claims cannot proceed here.
>
> To explain: In order to sustain their claims to a taking of their property, plaintiffs must demonstrate a right of ownership in that property. This they cannot do given the final agency decision (the decision of the

> IBLA) holding that the Government and not plaintiffs, is owner of the carbon dioxide.
>
> To overcome this threshold obstacle to the assertion of their claims, plaintiffs argue that this court is free to look behind the IBLA's decision, that is, to reexamine that decision or else simply to ignore it. We may not do either.

Id. (emphasis added). In affirming this ruling, the Federal Circuit quoted the Aulston Court: "As Judge Wiese noted, 'the Claims Court does not acquire authority to review an agency action otherwise reviewable only in district court merely because plaintiff's effort to obtain review is couched in terms of a taking claim.'" Aulston, 823 F.2d at 514 (quoting Aulston, 11 Cl. Ct. at 61); see also Del Rio, 146 F.3d at 1366 (reaffirming and quoting Aulston).

The instant case is strikingly similar to Aulston. Here as in Aulston, the parties claimed conflicting property interests. In both cases, the IBLA, whose rulings constitute final agency action for the Department of the Interior, adjudicated the property interests in favor of the Government, but the plaintiffs failed to challenge the IBLA decision in district court, instead pursuing a taking action in this forum. Here, as in Aulston, Plaintiff's taking action cannot be maintained unless and until the District court overturns the IBLA decision.

Unlike the plaintiffs in Aulston, Underwood itself was not a party in the IBLA proceeding, although its president and sole owner Dalton Wilson was. However, the fact that Wilson, not Underwood appealed the BLM decision to the IBLA, does not alter the finality of the adjudication of the property right -- which is akin to an in rem disposition, holding that no such property right to construct or maintain the tire dam existed because there was no right-of-way. The IBLA found that the alleged 1866 Act right-of-way permitting construction and maintenance of the tire dam did not exist because Certificate 1656 water rights only encompassed a spring box and a pipeline and did not entitle the owner to maintain a diversion structure in the size or location of the tire dam that Wilson erected and Underwood claims to own. 156 IBLA at 97.[21] This finding that there was no such right-of-way is conclusive, no matter who was the successor-in-interest to the Certificate 1656 water right.[22] The IBLA also determined that, even if the right-of-way had previously existed, it had

---

[21] The IBLA noted also that Wilson once owned a 30-year right-of-way which authorized construction, operation, and maintenance of a "surface water pipeline" and an access road. That right-of-way was issued by BLM, effective March 29, 1989, pursuant to Title V of FLPMA. However, that right-of-way was cancelled by BLM on February 15, 1996, due to nonpayment of rental fees and, in any event, according to the IBLA, did not authorize construction of the tire dam at issue here. 156 IBLA at 90, n.2. The disputed tire dam itself was not constructed until some time in 1998.

[22] Moreover, the IBLA decision did mention Underwood as a possible lessee. Specifically, the IBLA stated that the land granted under the 1924 patent was leased by Bowman to "Wilson and/or Underwood Livestock, Inc (ULI),"and that "Bowman applied to the State on January 17, 1995

long since been extinguished by the time of the erection of the tire dam.

**The Court Stays This Action Pending A Challenge to the IBLA Decision in District Court**

Although this Court does not have jurisdiction to review the IBLA's ownership determination, dismissal of the present action is not appropriate at this time because neither Dalton Wilson, the President and sole owner and employee of Underwood, nor Don Bowman has yet sought APA review of the IBLA determination upholding the BLM's Trespass Decision. At a status conference on November 14, 2007, counsel for Underwood represented that he intends to file suit in district court challenging the IBLA determination. If the Court were to dismiss the present case now and the IBLA ownership determination were to be overturned, Plaintiff would likely be unable to pursue its takings claim here because the statute of limitations would have run. Under the Tucker Act, Plaintiff has six years to file its taking claim once the claim accrues. 28 U.S.C. § 2501. Plaintiff appears to allege in its amended complaint that the taking took place more than six years ago -- on May 10, 2000, the date on which the BLM instructed Wilson and Bowman to remove the tire dam.

Aulston teaches that staying this action pending district court review of the IBLA decision is appropriate. The plaintiffs in Aulston, who similarly were precluded from challenging the adverse IBLA ownership determination in this forum, faced the prospect of having their taking claim extinguished by the statute of limitations, even if they prevailed in an APA challenge to the IBLA determination. To avoid the operation of the statute of limitations, the Federal Circuit vacated the dismissal of the Aulston plaintiffs' action and directed the Claims Court "to hold appellants' taking claim on its docket in suspension for such time as is reasonably necessary for appellants to challenge the IBLA decision in a district court and, if successful there, to return promptly to the Claims Court." Aulston, 823 F.3d at 514. The Aulston Court further noted that "the Court of Claims regularly suspended its proceedings to allow a party to proceed with other litigation deemed preliminary to a Court of Claims' determination." Id. at 514 n.8 (citing Engels v. United States, 230 Ct.Cl. 465, 678 F.2d 173, 174-75 (1982); Change-All Souls Housing Corp. v. United States, 229 Ct.Cl. 380, 671 F.2d 463, 466 (1982); Honeywell Inc. v. United States, 228 Ct.Cl. 591, 661 F.2d 182, 186 (1981)).

This Court will follow the procedure dictated by Aulston to protect Underwood's rights in the event that the IBLA's ownership determination is overturned.[23] "Plaintiffs. . . have a right to

---

to transfer these water rights [including Certificate 1656] to Wilson and/or ULI, but, at all relevant times herein, the transfer had not yet been approved." 156 IBLA at 90-91.

[23] Even if Plaintiff is ultimately able to maintain a taking action, it is not entitled to the measure of damages that it seeks -- $300,000 in lost earnings. Claims for lost profits incidental to a taking are nonrecoverable consequential damages. See United States v. General Motors Corp., 323 U.S. 373, 380 (1945) ("[i]t has generally been held that that which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage.);"

have [adverse agency action] reviewed, without having to give up a substantial legal right protected by the Takings Clause of the Constitution." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1555 (Fed. Cir. 1994) (citing Aulston, 823 F.3d at 514); cf. Pa. R.R. Co. v. United States, 363 U.S. 202, 205-06, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960).

**Conclusion**

1. Plaintiff's Motion for Summary Judgment is **DENIED**; Defendant's Motion for Summary Judgment is **DENIED**.

2. The Court **STAYS** proceedings in this action pending the District Court's resolution of a challenge under the Administrative Procedure Act to the IBLA decision in Dalton Wilson, Don Bowman, 156 IBLA 89 (2001).

3. Plaintiff is directed to file, no later than **December 31, 2007**, a status report informing the Court as to whether a complaint has been filed in Federal district court challenging the IBLA's determination, including a copy of the docket sheet if a complaint has been filed.

4. Should Plaintiff or its owner fail to "employ all deliberate speed in seeking district court review" of the IBLA decision, this case is subject to dismissal. Aulston, 823 F.2d at 514-15.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990) ("It is a well settled principle of Fifth Amendment taking law ... that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking."); Georgia-Pacific Corp. v. United States, 226 Ct Cl. 95, 146-47 (1980) ("The Government must pay only for what it takes, not for opportunities which the owner may have lost").